UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X
P.K. and P.K., on behalf of P.K,

          Plaintiffs,


    -against-


BEDFORD CENTRAL SCHOOL DISTRICT,
          Defendant
----------------------------------------------------------X

Leah L. Murphy (LLM/8934)
KUNTZ, SPAGNUOLO &
MURPHY P.C.
Attorneys for Plaintiffs
444 Old Post Road
Bedford Village, NY 10506
(914) 234-6363

**COMPLAINT**

Index No.:

Plaintiffs, P.K. and P.K., on behalf of P.K., by their attorneys, Kuntz, Spagnuolo &

Murphy, P.C., as and for their Complaint, allege and state as follows:

**PRELIMINARY STATEMENT**

1. P.K. ("P.K."), born July 12, 1989, is a troubled young man. In the three years after he

was first classified with an emotional disturbance by the Bedford Central School District

("District"), he had six psychiatric hospitalizations, one arrest, two residential school placements,

two wilderness programs, one therapeutic day treatment program and countless bouts with the

demons of his condition – anxiety, depression, mood instability and substance abuse. The

decision of the State Review Office upholding the appropriateness of the District's placement for

P.K. is fatally flawed. The District could produce no records from the 2004/05 school year upon

which the 2005/06 and 2006/07 programs at issue were based. The SRO failed to address the

fundamental principal that decisions over a student's program must have a factual basis. His

decision is erroneous as a matter of law.

2. Plaintiffs P.K. and P.K. ("Parents"), on behalf of P.K., bring this action pursuant to

Section 1415(i)(2) of the Individuals with Disabilities Education Improvement Act, as amended

(the "IDEIA"), for an Order, annulling and vacating the decision of the State Review Officer of

the State Education Department (the "SRO") in Appeal No. 07-039, dated May 30, 2007 and

received by Parents on June 4, 2007. (Attached hereto as Exhibit "A"), denying their claim for tuition reimbursement for a private unilateral placement of P.K. at the Wisdom Ranch School, in Arco, Idaho (including the SUWS therapeutic component), transportation costs and for reimbursement for a psychological evaluation. The SRO wrongfully denied the Parents claims and dismissed their challenge of the appropriateness of the District's recommendation placing their severely disabled son in the failed Keys to Emotional Awareness ("KEA") program at Fox Lane High School for the 2005/06, Summer 2006 and 2006/07 school years.

3. This action is brought pursuant to the provisions of the IDEIA, and in particular, 20 U.S.C. § 1415(i)(2)(A), in order to seek (1) a de novo review and reversal of the above referenced SRO decision and the decision of the Impartial Hearing Officer, Mary Noe, ("IHO") dated March 9, 2007 (Attached hereto as Exhibit "B"), (2) a determination that the Parents met the applicable standards for reimbursement and compensatory relief, (3) an order directing defendant to reimburse plaintiffs as requested, and (4) an order granting plaintiffs leave to file a fee application pursuant to the fee shifting provision of the IDEIA.

## JURISDICTION AND VENUE

4. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, 1343(a)(4) and 20 U.S.C. § 1415(i)(2), the pertinent implementing regulations promulgated under the Code of Federal Regulations, N.Y. Education Law § 4400 et seq., and 8 N.Y.C.R.R. § 200.

5. This Court has pendent jurisdiction to adjudicate any state claims which arise out of the same facts as the federal claims asserted herein.

6. Venue is properly laid in the United States District Court for the Southern District of New York, as authorized by 28 U.S.C. § 1391, as the district wherein the parties reside.

## PARTIES

7. Plaintiff P.K. is a male student who was classified by the District with an emotional disability making him eligible for special education services. P.K.'s classification and eligibility are not in dispute.

8. P.K. was at all relevant times a disabled student residing within the Bedford Central School District and as such entitled to all rights, entitlements, and procedural safeguards mandated by applicable law and statutes including, but not limited to, the Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1400 et. seq., the pertinent implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the New York State Education Law ("Article 89") and Part 200 of the Regulations of the Commissioner of the New York State Education Department ("Commissioner's Regulations").

9. Plaintiffs P.K. and P.K. are P.K.'s parents and are residents of the State of New York, residing at all relevant times at 11 Delano Lane, Bedford, New York 10506, within the Bedford Central School District.

10. Plaintiffs are not expressly named herein by their given names because of the privacy guarantees provided in the IDEA statute, as well as the in the Family Educational Rights and Privacy Act, 20 U.S. 1232(g), and 34 C.F.R. 99.

11. Upon information and belief, Defendant Bedford Central School District ("District"), is a duly constituted school district organized under the laws of the State of New York.

## BACKGROUND FACTS

12. P.K. was first classified with an emotional disturbance by the District's CSE on March 26, 2003, when he was an eighth grade student at the Fox Lane Middle School. (P-16)1 P.K. had been exhibiting great difficulty socially, behaviorally, emotionally and academically

---

1 References to Parents Exhibits will be "P-__;" reference to District Exhibits will be "D-__" and reference to the transcription record of this impartial hearing will be "T-__."

3

and in spite of various interventions continued to flounder. (T-116, T-117; P-21, P-22, P-23, P-20, P-19). He evidenced limited academic productivity and was suspended from school for behavioral incidents on several occasions including having created a list of "people to kill." (P-21, P-22; P-107, P-109, P-110, P-111, P-113, P-114, P-115; T-122 -123) Concerned about P.K.'s behavior and academic performance, P.K.'s parents had him evaluated privately by Dr. Laurence Baker (P-19) and then at Four Winds Hospital (a hospital solely for the treatment of emotional and psychiatric disorders) where P.K. had been admitted into the Partial Hospitalization Program in December 2002 (P-120).

13.  Diagnosed with depression and oppositional defiant disorder, P.K. had become afflicted with the same mental illness which had wreaked havoc upon his family.  (P-20, P-22) P.K.'s paternal grandmother was bipolar and had spent most of her life in and out of psychiatric institutions. (T-120). His father had been diagnosed with depression. (T-120). P.K.'s uncle was on disability leave from employment due to his anxiety and depression and (T-120) depression claimed the life of P.K.'s paternal aunt, who put a gun in her mouth and killed herself when she was just 23 years old. (T-120)

14.  After his first hospitalization, P.K.'s parents referred him to the CSE for an evaluation on January 9, 2003. (P-41) In an eerie foreshadowing of things to come,  Mrs. K. testified that she referred P.K. to the CSE because he was "totally non-functioning.  He would show up in the classroom and zip his ski jacket up over his head and lay his head on the table and that would be his day." (T-134) P.K. also began to "self-medicate" with drugs at this time. (T-134)

15.  After this first hospitalization, P.K. began treatment with Suzanne Hanna who he continued to see regularly.  (T-141, T-159, T-378-79; P-120).

16.  Dr. Baker's evaluation indicated depression and suggested a non-verbal learning

disability. (P-19)  The District's evaluation indicated overall cognitive functioning within the high average range, elements of depression and anxiety and attentional difficulties. (P-21; P-22) The CSE classified P.K. with an emotional disturbance and recommended a resource room program five hours a week with individual counseling once a week. (T-142, P-16)

17.  Unfortunately, P.K.'s behavioral and emotional difficulties continued to escalate and in May 2003 he was admitted into Four Winds Hospital as an inpatient due to suicidal ideation and mood instability. (T-147; P-120)  P.K. had written the word "pain" on his arm and his parents had to call the police to take him to the hospital because he was so out of control. (T-147)

18.  After a two and one-half week hospital stay P.K. was referred to the Four Winds Partial Hospital Program and then the Intensive Day Treatment program ("IDT").

19.  During periods when P.K. returned to the middle school setting it was observed that he had a decreased ability to monitor his own behaviors, particularly in an unstructured setting. (T-157)  A number of incidents resulted in more disciplinary actions where P.K. was confrontational and combative with other students. (T-157)  The school psychologist reported that P.K.'s anxiety had increased. (P-15)

20.  At the K.'s request an emergency CSE meeting was convened on May 8, 2003. (P-15; P-48)  At that meeting, it was decided that the CSE would begin the process of looking at residential programs. (T-158; P-15)  Mrs. K. testified about the recommendations made by P.K.'s treating therapist, Suzanne Hanna at the CSE meeting as follows:

> It was discussed that P.K. thrived in a structured environment, that "part of what P.K. does is that he feels so out of control, that he actually ups the anti so other people will put him back in control. He would keep escalating it so that someone can control him. A structured environment, P.K. feels safe and he knows its' predictable. That was the consensus and still is today. (T-165)

21. *After* the CSE recommended that residential placements be explored, the K.s were

5

asked by Laurie Bauer to arrange for and provide the District with a psychiatric evaluation of P.K. and provide a Four Winds Discharge Summary since both documents would have to be sent with the referral packets to the residential schools. (T-166-68; P-58, P-67; T-1722) The K.s complied. (T-166; P-24; P-67)

22. *After* the CSE recommended a residential placement for P.K. in 2003, Laurie Bauer also signed and sent a "statement of assurance" to the State Education Department. The document, certifies that the CSE had included the appropriate county or State agents of community support services ("Network Services") in participating in making the recommendations for residential school. (T-1727; P-131) Despite her assurance to the contrary, Ms. Bauer "did not explore network" and admitted that the statement of assurance was inaccurate. (T-1732)

23. After P.K. was discharged from the inpatient hospital at Four Winds on May 21, 2003, he attended the partial hospitalization program there. (P-120) P.K. continued to exhibit significant emotional issues with an increase in his level of anxiety, depression and agitation. (P-120) In mid-June 2003, P.K. was admitted as an in-patient, once again, to Four Winds Hospital for five days due to significant depression. From there, P.K. was placed by his parents at the Summit Achievement Program, a six week intensive wilderness program in Maine. (T-171) When P.K. returned from Maine he entered a weekly therapy program at Four Winds Hospital called "Seeds for Change" run by his therapist, Suzanne Hanna and Dr. Christine Nichols. Dr. Nichols, a psychologist, later became the school psychologist in the District's Keys to Emotional Awareness ("KEA") program for the 2004/05 school year. (T-172) The KEA program is at the heart of this dispute and the subject of the K.s challenge.

24. The CSE reconvened on July 21, 2003 for P.K.'s annual review. (T- 176; P-13) At the meeting the psychiatric evaluation and the Four Winds discharge summary were added to the

6

District's evaluations for review. (T-179; P-13; P-24) The CSE reviewed the psychiatric evaluation conducted by Dr. Gil Lichtshein which indicated a working diagnosis of mood disorder with a rule out of bipolar disorder. (P-24; P-13) Dr. Lichtshein wrote "I do believe that there is a significant mood disorder and although there have not been any clear cut manic episodes, his mood instability, rages and overall lability along with some disruptive behaviors, may be suggestive of a possible bipolar diathesis." (P-24) Dr. Lichtshein recommended placement in a residential treatment facility for the following reasons:

> Patrick has clearly demonstrated highly unstable behavior over the past seven months that has necessitated two inpatient psychiatric hospitalizations, two partial hospital program admissions and an intensive day treatment program placement. He clearly requires a more structured and therapeutic setting that can ensure his safety and stability and that can provide an environment in which he can grow and demonstrate more appropriate behaviors. (P-24)

25. At its July 21, 2003 CSE meeting, the CSE recommended that P.K. attend the Devereux Glenholme School, a state approved residential therapeutic setting located in Connecticut, for the 2003/04 school year. (T-176; P-13; P-74) Even though P.K. had not actually been accepted (P.K. wasn't accepted into Devereux until August (P-74)), the CSE put Devereux Glenholme on his IEP. (P-13)

26. P.K. made a good adjustment to the residential treatment program provided at Devereux/Glenholme. (T-180) Overall he made many gains on the goals and objectives he had been working on in therapy and had decreased challenging authority, reduced task avoidant behavior and improved his social skills. (P-80) The staff working directly with P.K. reported in a counseling summary dated June 2, 2004 that *"P.K. continues to appear to be reliant upon Glenholme's setting that provides predictability and structure. P.K. continues to make progress here, and will benefit from continued time in the program to build on this success, internalize the gains he has made, and further develop his coping skills and anxiety management skills."* (P-80)

27. At P.K.'s annual review for the 2004/05 school year, held on June 3, 2004, the professionals working directly with P.K. recommended continued time in the program. (T-186; P-7) P.K.'s program social worker, Melissa Countryman, reported to the CSE that P.K.'s odds of decompensating were *extremely high*. (T-187) The Devereux Staff encouraged the CSE to maintain the current placement because "their best educated experience has taught them that it wouldn't be successful if we took·him out." (T-187)

28. Despite that recommendation, the CSE decided to return P.K. to an in district program known as "Special Class KEA" for the 2004/05 school year. (P-7) Anxious to have their son return home and cognizant that the psychologist of the KEA program was Dr. Christine Nichols (she worked with P.K. along with his therapist, Suzanne Hanna), the K.s agreed to the change. (T-183; P-7) Dr. Nichols had worked with P.K. in the "Seeds for Change" teen group with his therapist Suzanne Hanna the prior summer. (T-184)

29. The K.s felt hopeful that Dr. Nichols could support P.K. in this less restrictive placement. (T-184) The K.s were also concerned about the anxiety level P.K. exhibited with the "token economy" methods employed at Devereux Glenholme. The token economy fed into P.K.'s fear that if he didn't do everything right he would be punished. (T-182; T-191)

30. The CSE recommended that P.K. be given extended school year services and remain in Glenholme for the Summer of 2004. (P-7)

31. Not surprisingly, and as predicted by the Devereux staff, P.K.'s reentry to the District program was unsuccessful. (T-205) Initially, P.K. was a "model student" in the KEA program. (T-201, T-397) P.K. resumed his therapy with Suzanne Hanna twice a week (T-204, T-395) and she and the KEA psychologist, Dr. Christine Nichols, spoke on a regular basis. (T-205, T-396)

32. In November 2004, P.K. started to act out again. (T-205) The K.s were called regarding an incident where P.K. threw a plant at an aide. Ms. K. met with the KEA staff who

8

discussed that P.K. was starting to exhibit old behaviors again. He was agitated and acting out. (T-205) P.K. returned to treatment with a psychiatrist, Dr. Lerman, and was placed on medication once again. (T-206)

33. The K.s shared all this information with the KEA team who agreed with the K.s interventions. (T-206) Despite P.K.'s deterioration, the District has no record of any of the KEA teams meetings, reports or P.K.'s progress notes from any KEA staff for the entire 2004/05 school year. All records were either discarded or lost (T-1699) and the entire KEA team from the 2004/05 school year was discharged at the end of the school year. (T-217-18)

34. In his decision, the SRO relied heavily on the assumption that P.K. had been "successful academically and behaviorally during the . . . 2004/05 school year." (SRO Decision p. 13, citing to IEPs dated March 2005) In fact, is it undisputed that P.K. began to decompensate significantly during the spring of 2005. The District has conveniently "lost" all records of P.K.'s progress for the 2004/05 school year.

35. It is undisputed that by March 2005, P.K. was once again exhibiting his physically aggressive behavior against his peers (T-207; P-85) and he began using mood altering substances again in late spring, April. (T-227) P.K. was suspended when he threatened another student. (T-207)

36. The K.s were called to meet with the KEA program psychologist, Dr. Nichols, who told them that she was concerned because she was seeing P.K. repeat old behaviors. (T-207) After another suspension in May 2005, the K.s met with Dr. Nichols who stated that both she and P.K.'s therapist, Suzanne Hanna, were "both concerned that maybe KEA – that this program as it was, was not working for P.K. anymore." (T-210)

37. Suzanne Hanna testified that she had many conversations with KEA psychologist, Dr. Nichols about P.K.'s emotional deterioration. (T-399) Ms. Hanna noticed that P.K. was

9

increasingly anxious, and that his depression and anxiety manifested itself in P.K.'s becoming "very fidgety." (T-400)

38. During the latter part of the 2004/05 school year, P.K. was easily distracted, tearful, having difficulty sleeping and began to lose a significant amount of weight. (T-400) Ms. Hanna shared all this information with Dr. Nichols. (T-400) According to Ms. Hanna, "things got really bad the last marking period of the year." (T-401) Ms. Hanna suspected that P.K. began self-medicating in the early Spring or Winter of that school year. (T-402)

39. According to Ms. Hanna, Dr. Nichols "definitely agreed that P.K. was struggling" in the KEA program. (T-403) Towards the end of the school year, Ms. Hanna testified that both she and Dr. Nichols agreed that P.K. would need a very structured and strong intervention over the summer (T-403) and that they would speak in the beginning of the school year about a change in placement. (T-407).

40. Ms. K. had conversations with both Ms. Hanna and Dr. Nichols in May 2005 that KEA might not be working for P.K. anymore. (T-210; T-224) According to Ms. K., P.K. was totally non-functioning. "He would come home from school and lay in bed, and he would not move. He was extremely depressed. . . . He [was] very agitated, very on edge. And he starts to up the anti again where he becomes very difficult to control." (T-225)

41. It was agreed that P.K. would be closely monitored over the summer to determine what, if any, changes would be made to his program in the fall. (T-210) It was anticipated that all parties would reconvene in the fall to see what, if any, steps should be taken.

42. The entire KEA staff didn't return in the fall, the entire team was summarily fired without any explanation in May 2005. (T-218) The SRO failed to consider the consequences of the KEA staff dismissal and the District's inability to produce *any* records from the 2004/05 school year concerning P.K.'s functioning in the KEA program.

10

43. Meanwhile, the CSE had already recommended (and the K.s had agreed) to a continuation of the Special Class KEA program for the 2005/06 school year. P.K.'s annual review was held on March 22, 2005 several weeks before P.K.'s emotional decline. (P-5)

44. The new KEA staff, Denise Taylor (school psychologist), Kieran O'Gorman (special education teacher) and Tony Monchinsky (special education teacher) each testified that at the start of the 2005/06 school year, other than P.K.'s IEP they had no information about P.K.'s current functioning because there were *no* documents maintained by the District from the KEA program from the 2004/05 school year. (T-1971; T-1699)

45. None of the new KEA team spoke to any of the prior KEA staff and the only information relied upon by the new KEA team was P.K. IEP. (T-1975; T-2135; T-2245; P-5; P-32) None of the new KEA staff, including Ms. Taylor, spoke to either Dr. Nichols or Suzanne Hanna prior to the beginning of the school year, (T-1977) so none of them knew that P.K.'s emotional state was in steady decline at the latter part of the 2004/05 school year.

46. The SRO relied heavily upon the notion that the District's staff making decisions about P.K.'s needs were familiar with P.K.'s functioning during the 2004/05 school year. (SRO Decision p. 14) In fact, none of the District staff from the KEA program made any effort to learn about P.K.'s decline, even after they were told by P.K.'s mother. The District had no records to support P.K.'s supposed behavioral success during that school year.

47. Even the Director of the KEA program, Laurie Bauer, admitted that she was not familiar with P.K.'s functioning during the 2004/05 school year. Ms. Bauer was also not told of the many incidents of concern during the 2005/06 school year exhibited by P.K.'s teachers who were "turning a blind eye."

48. P.K.'s devastating history of anxiety, aggressive behavior, hospitalizations and substance abuse began to repeat immediately into the 2005/06 school year. (T-806; T-1980) Ms.

K. testified that she had spoken to both Denise Taylor and Tony Monchinsky about P.K.'s history and difficulty over the last school year and summer. (T-231, 232; T-1983; T-2213)

49. Both Mrs. K. and Suzanne Hanna testified that during this period P.K. was struggling both in and out of school. (T- 232; T-806) P.K. was cutting classes and being oppositional to staff. (T-232)

50. Suzanne Hanna testified that she received a call from Denise Taylor within the first four to six weeks of school. (T-808) Ms. Hanna testified that she explained to Ms. Taylor that P.K. had a difficult summer and explained some of his symptoms of anxiety, depression, and impulse control. (T-808) Ms. Hanna testified that she explained to Ms. Taylor that P.K. had been in trouble the previous school year and invited Ms. Taylor to call her at any time. (T-808)

51. The only subsequent call from Ms. Taylor to Suzanne Hanna for the *entire 2005/06 school year* was the one reflected in Ms. Taylor's notes in December 2005. (T-812; T-1988-1989; D-F) Ms. Hanna testified that during that brief conversation she had shared with Ms. Taylor her concerns about P.K., "that [she – Ms. Hanna] was very concerned that P.K. was reporting to me that he wasn't doing any work in classes. That he was sitting playing cards. That he basically felt it was a hopeless case. That he felt he was too far behind in his academics to catch up." (T-814)

52. Ms. Hanna testified that she didn't believe Ms. Taylor knew P.K.'s history and she explained the difficulties P.K. had had over the spring and summer. (T-809) There was no recommendation for Network Services at that time. (T-810)

53. With regard to Network Services, Ms. Hanna testified that the family had available resources to access all the services "Network" could provide, privately. The K.s were in family therapy, P.K. was in individual therapy, AA, working with a substance abuse counselor (who was a community resource, not employed by the school) and was participating in a teen group

12

with Mr. Scott Gillette.  (T-812)

54.  On September 27, 2005, P.K. was admitted to the Silver Hill Hospital for substance

abuse.  (T-232)  He was thereafter discharged on October 4, 2005 and referred to Four Winds

psychiatric hospital to address his emotional disability.  (T-233)  The staff from Silver Hill

hospital informed P.K.'s parents that a substance abuse rehabilitation program would not address

P.K.'s psychiatric needs.  (T-235; P-120)

55.  After P.K. was discharged from Four Winds, it was decided that he would be placed

on a "shortened day" in the KEA program.  (T-237-38; T-1910; P-3).

56.  The K.'s sent KEA psychologist a copy of P.K.'s discharge summary from his

hospitalization.  Ms. Taylor admitted that she never shared the summary with any other member

of the CSE.  The SRO erred in finding that the K.'s failed to provide the District with pertinent

information.  (SRO Decision p. 15)  The District staff either failed to share the information (Ms.

Taylor didn't share the discharge summaries), lost the information (no records from the

devastating 2004/05 school year was maintained) or simply did not bother to obtain the

information (no one from the District requested psychiatric evaluations, discharge summaries,

hospital records, or contacted any of P.K.'s treating physicians, or conducted any evaluations

themselves).

57.  The KEA psychologist, Denise Taylor, testified that one of the purposes for the

shortened day was to place P.K. in "protective custody."  (T-1910)  She testified as follows:

> . . . That we would keep P.K. in a sheltered and in as tight a place as we could to try to
> support everything that the parents were trying to help P.K. do at home so that we would
> – during that time period, as I recall, the phrase that was used was that P.K. would be
> either at home or at school.  Those were the only places that he was allowed to be.  That
> we would make the school environment as safe for him as we could to support everything
> that he was trying to do with AA and trying to keep himself clean and working in a better
> direction.
> We designed the plan of the shortened day with a lot of time in our classroom.  Coming
> in a little later in the morning to avoid all the buses.  Leaving earlier in the afternoon,
> eliminating some of the classes and keeping him in our protective custody.  If he had to

go somewhere in the building, whether it was to meet Melanie Ryan [the substance abuse counselor] or the guidance counselor, one of us would always be with him. (T-1910-11)

58. Mr. O'Gorman, P.K.'s KEA teacher testified that after his hospitalization, P.K. "was either in the KEA room or the KEA classes or with protected custody." (T-2098) Mr. O'Gorman testified that the purpose of the "protective custody" was to help P.K. "isolate himself from forces that would lead him back to substance abuse." (T-2099)

59. The SRO erred in finding that the shortened day after P.K. was released from the hospital was for the purpose of attending AA meetings. The staff clearly wanted to provide P.K. with more structure and seclusion from the general education population.

60. In a candid acknowledgement of the need for a closely supervised setting, when Ms. Taylor was asked what the KEA staff was attempting to "protect" P.K. from she testified "Outside influences, from other students in the building." (T-2007). That "protective custody" – similar to what could be offered in a residential school -- was not sufficient to meet P.K.'s needs while in the mainstream population of KEA.

61. Mr. O'Gorman, referring to the "protective custody," testified that "it was not very successful. I know that he had found friends that were influencing him to not – he did not seem to be sticking with where he was supposed to go." (T-2103)

62. Mr. O'Gorman stated that P.K. was "not being able to access school the way he had in the past. That it was difficult to stay away from the people he had been with when he was having trouble before." (T-2152) That was because the KEA staff, was inviting a student who "might be dealing" (T-2223) into the KEA room.

63. Tony Monchinsky, P.K.'s other KEA teacher testified that P.K. began to "hang out" with a student who went to Fox Lane High School who District staff suspected might be "drug involved" or "might be dealing" drugs. (T-2223)

64. Mr. Monchinsky testified that this other student, who was not a member of KEA,

14

might be "wandering the halls. To try to keep *him* out of trouble, we would get him to where he belonged, call security or as a last resort, tell him come in and sit and talk to Ms. Taylor." (T-2254)

65. Given the failure of the "protective custody," even with the altered schedule P.K.'s ability to access his education was severely limited. (T-239) He no longer attended any mainstream classes. (T-238) P.K. did no work. He was sleeping. (T-239) He had difficulty doing actual writing tasks. (T-2090; T-2111) KEA teacher, Kieran O'Gorman testified that he spoke to the K.s about how "P.K. seemed to be having more agitation and we were concerned about how the protected custody was working." (T-2099)

66. Mr. O'Gorman testified that P.K. was "extremely tired and constantly sleeping or putting his head down. . . .He was not alert and much of his day was spent really just not engaging in school." (T-2101-02) Mr. O'Gorman stated that academically, "he was not producing. . . . The behavior, what I observed, was not going where he had to go all the time. Not being in the classroom when he needed to be in the classrooms. I believe there were some times he was outdoors where he should not have been outdoors." (T-2103)

67. Mr. O'Gorman testified that P.K. was fidgety and having difficulty keeping his head up. (T-2123; T-2143) During November and December 2005, P.K. would be sleeping in the KEA room. Mr. O'Gorman testified that "sometimes he'd go into the office and sleep. It was difficult to arouse him. It was often difficult to arouse him." (T-2144) Mr. O'Goerman also testified that P.K. was oppositional. (T-2145).

68. Mr. Monchinsky testified that by mid-November P.K. sat in class with his head down. (T-2205) "He seemed out of it. He wasn't paying attention." (D-N; T-2205) P.K. became antagonistic with students and staff. (D-N; T-2207; T-2208)

69. On several occasions P.K. provoked Mr. Monchinsky; (T-2210; T-2212) cut classes

(T-2213); and left the building to smoke cigarettes; (P-117; D-N; T-2213) On another occasion,

P.K. drew a machine gun in his notebook with the word "kill" next to it. (D-N; T-2211). P.K.

also "cursed out" Mr. Monchinsky on several occasions (T-2233).

70. While CSE chairperson, Laurie Bauer attempted to compare the CSE action in 2003

(when residential placement was recommended) to 2006 by pointing to P.K.'s sparse disciplinary

record, she failed to acknowledge that P.K.'s own teachers "turned a blind eye" to disciplinary

infractions which might raise red flags. (T-2197-98)

71. There is little disciplinary record attributable to P.K. for the 2005/06 school year

because he was not routinely referred for disciplinary action. KEA teacher, Mr. Monchinsky,

admitted that he often would "let stuff slide" even though some people might think that is

"turning a blind eye." (T-2197-98)  All these behaviors "send up red flags" and Mr.

Monchinsky shared them with the K.s but he didn't always "write up" P.K. (T-2262)

72. The K.s shared with the KEA staff the anguish they were experiencing at home with

P.K. In particular, the fact that P.K. had been arrested for assault with a knife. (T-2267) Mr.

Monchinsky testified that P.K.'s interaction with his peers demonstrated that his "perspective

was off." (T-2270)    Academically, P.K. was failing (P-32).

73. Throughout the 2005/06 school year, no one from the District made any attempt to

determine how to address P.K.'s needs and deteriorating performance. (T-248) There was no

functional behavior assessment and the only behavior intervention was never implemented

specifically for P.K. (T-249)

74. The SRO erred in relying heavily upon the notion that the District KEA staff for the

2005/06 school year "remained convinced that based upon the student's performance in KEA

during the 2004/05 school year, that if substance abuse issues were dealt with he would be

successful in KEA." (SRO Decision p. 15)  The SRO's assumption is flawed since the KEA

16

staff for the 2005/06 school year had no accurate information about P.K.'s functioning from the 2004/05 school year. In fact, P.K. was floundering in the KEA program and had not been successful in the less restrictive environment of the public school program.

75. The KEA staff was given information about P.K.'s functioning from both his parents, the therapist working with P.K. and their own observations about P.K. during the 2005/06 school year. He was failing each and every class; engaging in aggressive and oppositional behavior both in and out of school; hospitalized on multiple occasions; and arrested. The KEA staff for the 2005/06 school year ignored all that information and instead based their report and decisions upon the false belief that P.K. was successful during the 2004/05 school year -- he was not.

76. The CSE discounted any information which didn't match the myopic view of District staff concerning P.K.'s needs, in particular, that P.K.'s functioning was solely related to substance abuse. The District staff either ignored the wealth of information which pointed to a serious psychiatric disorder or made not attempt to discover what P.K.'s needs were.

77. During the 2005/06 school year, P.K.'s needs clearly were not and could not be addressed in the therapeutic public school day treatment program known as KEA.

78. On November 17, 2005 (P-4) the CSE convened. Mrs. K. testified that they were discussing the fact that P.K. was shut down and it was obvious to everyone that it just wasn't working. (T-249)  Without a clear understanding of P.K.'s actual functioning, the inadequate program modifications, placement and schedule changes were simply insufficient to address P.K.'s intense needs.

79. On January 9, 2006, Mr. Monchinsky had to call P.K.'s parents to come pick him up from school after he witnessed P.K. becoming out of control and had to be wrestled into a classroom after attacking another student. (P-N)  That same day, P.K. was hospitalized for the third time that year, at Four Winds on January 9, 2006. (P-120; D-B).

17

80. By letter dated January 12, 2006, the K.s requested another CSE meeting. The CSE was informed that P.K. was hospitalized, in "crisis" and they knew he could not safely return to the KEA program. (P-95; T-253) No one from the District requested any information from the K.s concerning P.K.'s condition. Nor did anyone from the District request hospital records, discharge summaries or psychiatric evaluations. No one from the District made any effort to assess P.K.'s needs at that time.

81. Instead, the CSE attempted to delay assistance to P.K. Rather than schedule a CSE meeting, Laurie Bauer convinced the K.s to meet with the KEA team. The K.s, always cooperative, agreed and a meeting with the KEA team was held on January 17, 2006. (T-255)

82. At the KEA meeting, no one from the meeting requested any information from the K.'s concerning P.K.'s condition. They knew he was "in crisis" and the K.s were seeking a more supportive and structured placement for P.K. The K.s requested a therapeutic residential treatment program. P.K. was going to be placed in an intense therapeutic intervention, the Ascent Wilderness program on a temporary basis where P.K. could be comprehensively evaluated. (T-262)

83. The K.s requested exploration of residential programs. Ms. Bauer did not ask the K.s for more information. She didn't ask if there were any current psychiatric evaluations or hospital records to assist the District in assessing P.K.'s needs. Ms. Bauer did not say, we need updated information so that we can make a reasonable determination about P.K.'s needs.

84. In response, Ms. Bauer simply told the K.s that no search for an appropriate program could be conducted because there were "new" regulations from the New York State Education Department.

85. Ms. Bauer informed the K.s that it was *now* required by the State Education Department regulations that before *any* recommendations are made for a therapeutic residential

18

treatment program, the K.s would have to meet with the local "Mental Health Association." (T-267)

86. In fact, the regulations Ms. Bauer referred to were not new. Those same regulations were in place when the District's CSE had recommended P.K. go to a residential school back in 2003. (Chapter 600 of the Education Laws of 1994)

87. The "regulations" were in place when Ms. Bauer signed a statement of assurance that she had requested (when in reality she had not) the participation of "community support services" in the decision making process in 2003. (P-131)

88. There had been no change in the law. In fact, the directives from the State Education Department specifically caution against delay or denial of appropriate educational services while community resources are explored.

89. Upon information and belief, Ms. Bauer was referring to recent guidance memos or letters sent to New York State school administrators from the State Education Department ("SED") concerning placements of New York disabled students in out of state residential programs.

90. Upon information and belief, during the 2005/06 school year, the SED commenced a campaign to bring disabled students from out of state placements back into New York State schools. To accomplish this, the SED denied several schools status of being on the "approved" school list; and initiated stricter oversight of compliance with Chapter 600 of the Education Law requiring exploration of community services for students who are at risk of being placed in a residential school.

91. The New York State Education Department during the 2005/06 school year commenced a concerted effort to reduce the amount of out of state residential placements and upon information and belief, in or about December 2005, issued guidance letters to local

19

educational agencies ("LEA"), including defendant, that strongly directed the LEA's to

discourage out of state placements in residential programs, thereby violating rights secured by

disabled students and their parents for a free appropriate public education, under federal laws.

92.  Upon information and belief, the SRO's analysis of this case is similarly biased and

heavily influenced by the same directives from the SED to thwart out of state placements in

residential schools so as to support the SED efforts discouraging such placements by LEAs.

93.  The District's overzealous and misguided compliance with SED requirements

resulted in a denial of a free appropriate public education being made available for P.K..

94.  The District illegally justified its denial and delay of appropriate educational services

for P.K. by hiding behind the bogus and supposedly required referral of P.K. to "network

services" before undertaking any effort to assess P.K.'s needs and develop a program for him

which would lead to educational benefits.

95.  Given Ms. Bauer's erroneous pronouncement, the K.'s reasonably believed they

were required to meet with a social services agency *before* a CSE meeting could be scheduled.

(T-266)  When the K.s left the January meeting, P.K.'s special education teacher, Tony

Monchinsky, turned to them and said "get a lawyer, . . . they'll listen to you more seriously once

you do that."  (T-267; T-2344))

96.  P.K.'s parents should not be forced to secure the services of a lawyer to be heard

when planning for the educational needs of their son.

97.  The K.s complied with Ms. Bauer's directive to meet with community mental health

representatives and thereafter requested, for the third time that year, a CSE meeting.  (T-273)

The meeting was scheduled for March 9, 2006.  In the meantime, the K.s provided the District

with notice of their intention to unilaterally place P.K. in a residential school (Wisdom Ranch

School) and arranged for a private educational evaluation in the absence of the District's

20

compliance with its obligation to reevaluate P.K. (P-101; T-289)

**IEP'S FOR 2005/06, SUMMER 2006 AND 2006/07 SCHOOL YEARS INAPPROPRIATE**

98. The District had failed P.K.. The District's failure to properly assess P.K.'s

individual needs became evident in the KEA program where P.K. failed to progress in any

demonstrable way. In fact, he got worse. P.K. was failing his classes while in KEA. (P-32)

99. No effort was made to properly assess P.K.'s needs. (T-292) No functional behavior

assessments were conducted, (T-292) he was deemed by the school psychologist to be too

restless and fidgety to conduct his mandated reevaluation assessment (T-1610); no updated

medical information was gathered – the only medical in his file was from November 2002 – even

though Laurie Bauer opined that his substance abuse was a "medical issue." (T-1470, T-1687)

100. The CSE had no functional behavior assessment to review concerning P.K.'s

functioning. Ms. Bauer had testified that a FBA is conducted "if there are any behaviors that are

interfering with a student's progress, that the school should be collecting data and developing a

behavioral plan." (T- 1483)

101. The District made no effort to update the obsolete information used to initially

classify P.K. in March 2003 (and used to send P.K. to a residential placement for the 2003/04

school year and then used to remove P.K. from the same residential placement and back into the

district program for the 2004/05 school year). The same evaluative information was used to

deny the K.s request for a residential therapeutic placement for the latter part of the 2005/06

school year. (T-292)

102. There is no evidence that the school's psychiatrist had any involvement with P.K.

(T-2353) The only document listed on the IEP as having been reviewed by the CSE at the March

9th meeting was P.K.'s report card. P.K.'s report card shows he was failing. (P-1; P-32) Ms. K.

testified about P.K.'s academics: "He's not doing anything in school. He got F's from the first

quarter on. He's doing nothing in school. He's sleeping. He's keeping his head on the desk. I don't know. They play cards. They do whatever they want to." (T-247)

103. At the March 9, 2006 (P-1) CSE meeting, Mrs. K. shared with the committee her sincere belief that P.K. would need a residential therapeutic school to address his severe emotional disability. (P-1; P-105)

104. To support her position Mrs. K. shared with the CSE the recommendations of P.K.'s treating psychiatrist, (P-37) his therapist of several years, (P-34) a psychologist who had recently evaluated P.K. (P-36) and a social worker who had been working with P.K. for educational planning. (P-35) Each one suggested that due to P.K.'s poor judgment, inability to control his impulses and severe mental illness he would need a structured therapeutic setting.

105. In a surprising revelation of her lack of impartiality, IHO Noe, the hearing officer misquotes the IEP's description of these letters adding the gratuitous word "only" to a statement in the IEP. At page 24 of the decision, Ms. Noe writes: "The IEP dated March 9, 2006 stated the following: "'Comments' – Parents presented the CSE with _only_ four letters during the meeting. (P-Exh. 1)" The actual quote from the IEP does not include the word "only." Ms. Noe was attempting to demonstrate that the parents had not provided the District with sufficient information to render a decision about P.K.'s needs.

106. The District is legally responsible for assessing a students needs. There is no evidence that the K.'s intentionally concealed information from the CSE. She was never asked for discharge summaries and the discharge summary Ms. K. provided to the KEA staff was not shared with the CSE (P-130).

107. The SRO erred in finding that the K.'s had failed to provide the CSE with pertinent information concerning P.K.'s being the "victim" of abuse by his older brother. (SRO Decision p. 15) In fact, that information was known to the District in March 2003 where it appears in the

22

psychological evaluation of P.K. (P-22)  No District staff followed up with a referral to the

Child Protective Services or felt it necessary to conduct a further investigation at that time.

108. At the March 2006 CSE meeting, when Ms. K. provided the CSE with the letters

from those professionals working with P.K. she felt she was not being heard.  She stated:

"Truthful, they just weren't – I felt that at that meeting, that I wasn't going to be heard no matter

what I said.  I got that very very quickly."

109. P.K.'s regular education math teacher, Mr. Bill Tozzo, testified that he was aware

that P.K. was using drugs because the "KEA aide" had told him.  (T-1412)

110. Mr. Tozzo testified that there was discussion at the meetings about P.K.'s

aggressive behaviors.  (T-1421).  Mr. Tozzo also knew about the criminal proceedings.  (T-1422)

Mr. Tozzo testified that the K.'s were not asked for more information at the meetings.  (T-1423)

111. Mr. Tozzo testified that the CSE discussed that the changes previously made to the

KEA program were not successful for P.K.  (T-1425)  When asked whether he believed P.K. was

functioning in school for the 2005/06 school year, Mr. Tozzo answered that P.K. was not

functioning in school for the whole year.  (T-1426).

112. Mr. Tozzo testified that Mrs. K. was crying and upset at the meeting and had told

the CSE that P.K. was "in crisis."  (T-1426)

113. When Mr. Tozzo was asked whether he thought P.K. should stay in a residential

program Mr. Tozzo testified that his recommendation was to leave him where he was.  (T-1435)

Mr. Tozzo stated "KEA was not working."  (T-1435).

114. Neither Ms. K. nor Mr. K., were heard by IHO Noe.  In her decision, not once does

Ms. Noe mention or cite to a single word of the K.s' testimony.

115. No one from the District, at any time during this period, asked for any information

from the family about P.K., including the January hospital discharge summaries.  (T-294)  No

23

one from the District made any effort to contact any of the people who were working with P.K.
to determine his needs.

116. The District ignored the information which was provided by P.K.'s parents. Instead
the minutes reflect that "CSE members agreed that student should continue in the KEA Program
as a program that could meet his needs in the least restrictive environment." (P-1) To support
that inadequate and clearly inappropriate recommendation, the CSE relied upon only one
document: the report card (P-1; P-32) which showed he was failing or receiving incompletes in
every single class in which he was enrolled.

117. Even had the CSE bothered to look into P.K.'s CSE file (and there is no credible
evidence that any member actually did) the most current information in the student's file to
support the District's inappropriate determinations was over -- or dangerously close to being
over -- three years old.

118. The SRO analysis that the District's CSE had sufficient support to recommend the
failed KEA program for the 2005/06 school year, Summer 2006 and 2006/07 school years is
flawed. The SRO agreed that the CSE fairly concluded that a residential placement was "beyond
what P.K. needed." (SRO Decision p. 14) To support his analysis, the SRO points to P.K.'s
report card (which shows he was failing); the oral report of the KEA staff (which didn't include
a report to the CSE of events that the KEA staff knew, such as the felony charge where P.K. was
arrested for injuring a peer with a knife, the aggressive and oppositional behavior, the sleeping in
class; the hospitalizations; the notes in P.K.'s notebook stating "kill" with a picture of a machine
gun next to it; the behavior which should of warranted disciplinary action but KEA staff turned
a "blind eye" to; and P.K.'s fidgety and nervous behavior.

119. The SRO relied heavily on the mistaken assumption that the KEA staff was fairly
relying upon P.K.'s supposed success in the KEA program during the 2004/05 school year.

24

(SRO Decision p. 15)  The evidence does not support that P.K. was successful during the latter part of the 2004/05 school year.  P.K.'s emotional condition deteriorated.

120.  Despite the student's severe emotional state, only one social emotional goal was recommended on the IEP generated from the March 9th meeting.

121.  The K.'s rejected the CSE's recommendations and placed P.K. in the Wisdom Ranch School. They requested a hearing by letter dated May 11, 2006.  (Attached hereto as Exhibit "C").   Hearing officer Mary Noe was appointed two weeks later on May 25, 2006.

122.  The K.s requested extended school year services for P.K. for the Summer 2006 and provided notice to the District that they would seek reimbursement for tuition for the Summer. (P-132)

123.  When the K.s returned to the CSE on June 19, 2006 for P.K.'s annual review for the Summer and 2006/07 school year, despite production of a complete and thorough evaluation recommending residential school in a therapeutic setting, (P-123C) and a request for residential placement for both summer and the 2006/07 school year, once again the CSE denied the K.'s request.

124.  P.K.'s management needs, and clear evidence of regression over the summer of 2005, demonstrate his clear need for a summer program.  P.K. demonstrated that without the structure of a summer program he severely regressed in the Summer 2005 and he qualified for extended school year services.

125.  Despite the fact that the CSE had before it the full psycho-educational evaluation by Dr. Jeff Schroeder (P-123C) and another submission by P.K.'s psychiatrist, Dr. George Uy, (P-38) for the 2006/07 school year, the CSE once again ignored the parents concerns and recommended the failing KEA program.  (P-126)

126.  The Parents provided notice to the District that they were rejecting the

25

recommendations of the CSE and of their intention to seek reimbursement for the 2006/07 school year tuition at Wisdom Ranch School. (P-133) Thereafter, the Parents challenge to the District's recommendations for the 2006/07 school year was consolidated with the initial impartial hearing request. (P-127).

## WISDOM RANCH SCHOOL IS APPROPRIATE

127. The Wisdom Ranch school provided the appropriate environment to allow P.K. to make progress. There's no token economy. There's no level system. It gives the students opportunities to be able to be as normal as possible, where they have the opportunity to be in a safe environment to make their own choices and decisions and to learn from experience. (T-287)

128. P.K. needed a more closely supervised and structured day program. He needed residential placement. (T-288; P-34; P-35; P-36) "In order for P.K. to feel safe, he needed the predictability and the structure that comes with residential. And the reason that Wisdom Ranch was such a great place for P.K. is because when his emotional needs are being addressed, he starts to excel academically. He can learn again. His grades are back up. He's reading. He's doing very well academically." (T-289)

129. At Wisdom Ranch School, P.K.'s special education needs were supplied by a certified special education teacher. All the requirements on his IEP were being met - he can retake tests; takes breaks if he needs them and he was in a very small class environment where he gets a lot of one-on-one instruction. (T-300)

130. P.K. graduated with his high school diploma from Wisdom Ranch School in March 2007.

## IHO DECISION

131. Hearings were held before Impartial Hearing Officer, Mary Noe on July 11, 2006, July 12, 2006, July 28, 2006, September 12, 2006, September 14, 2006, September 26, 2006,

November 9, 2006, November 14, 2006, December 8, 2006 and December 11, 2006. By decision mailed on March 9, 2007, Ms. Noe denied the Kellys' petition for tuition reimbursement. ("IHO Decision") She failed to rule on the Kellys' request for reimbursement for the psycho-educational evaluation conducted independently.

132. No weight should be given to the IHO decision. The IHO was biased against the parents, ignored their witnesses, and wrongly ruled against admission of evidence the parents sought to include in the hearing.

133. The decision was not based upon the evidence presented. The hearing officer ignored the numerous procedural abuses by the District including the failure to properly assess P.K.'s needs. The hearing officer arbitrarily ignored the testimony of all of the Parents' witnesses. The hearing officer erred in questioning the "predominant disability" of P.K. as "drug abuse" where P.K.'s disability was not in issue, it had long been determined that P.K. was emotionally disturbed and his classification was not in dispute.

134. The IHO Decision should be annulled. The hearing officer focused exclusively upon the view that the K.s were not entitled to tuition reimbursement because in her view they did not share "critical information available from the institutions P.K. entered." (IHO Decision p. 34.)

135. Without any fair review of the District's recommendation, the IHO found that the failed KEA program was appropriate based upon the information available to the CSE when the decision was made. (IHO Decision p. 31)

136. The IHO made no critical analysis of the actual information the CSE (and the members of the District staff who composed the CSE) did have and the failure of the CSE to take any steps toward assessing P.K.'s needs. In total disregard of the credible evidence presented at the hearing, the IHO wrongly determined that the District had no knowledge of P.K.'s aggressive

27

behavior.

137. The IHO erred in finding that the District could focus exclusively on P.K.'s drug addiction and deny him an appropriate education.

138. At page 32 of the IHO Decision, Ms. Noe states "Drug abuse is not a classification under IDEA. Based on the information the district had at the time of the CSE review, the district's recommendation was appropriate." However, the District, not the parents, erroneously viewed P.K.'s drug addiction as separate from his disability and therefore not necessary for them to assess its impact on his education.

139. It was uncontested that P.K. was emotionally disturbed and was entitled to a free appropriate public education. The evidence supported a program such as Wisdom Ranch School (and SUWS) to address his needs.

140. P.K.'s therapist, Suzanne Hannah testified that P.K. was aggressive because of his anxiety. (T-385) and that P.K. resisted taking medication because he viewed it as a sign of weakness. (T-386) Ms. Hannah testified that P.K.'s needs resulted in her recommendation for more support because he needed more structure and his behaviors were "too high risk." (T-387)

141. Ms. Hannah testified that she did not believe P.K. needed "traditional talk therapy" to progress. (T-864) "I don't think that traditional talk therapy was the only way to go with P.K., because he hasn't always been responsive to it in the past." (T-864) Ms. Hannah agreed that Wisdom Ranch was appropriate for P.K. because it provided P.K. with a highly structured schedule, certain expectations that they have to live by and a nurturing environment. (T-869)

142. Ms. Hannah explained that a "therapeutic" setting is "a setting where people are where they're in a nurturing environment. Where they can process emotions, feeling. Where they have mentors and staff members who they can go to that they can talk to. Where they have certain responsitiblities. Certain restrictions." (T-873)

143. P.K.'s treating psychiatrist, Dr. Uy, testified that the P.K. exhibited "mood lability" meaning that "there could be periods when he could be reasonable, calm, collected and then there would be a rapid change in mood to becoming depressed, irritable, angry." (T-493) Dr. Uy testified about the inter-relationship between the depression and substance abuse as follows:

> . . . with individuals who are depressed or who may have mood difficulties, the substance abuse comes in to play usually because that individual is trying to self-medicate themselves in terms of depression. Sometimes because of their psychiatric illness, they're at a higher risk in terms of getting high risk behavior.

(T-494) Dr. Uy testified that P.K. needed a more structured program where he could be more closely supervised. (T-501)

144. Dr. Uy opined that P.K. would need a residential facility where his emotional and academic needs could be addressed. (T-502) How P.K.'s individual emotional needs could be appropriately addressed was ignored by the IHO. She found that Wisdom Ranch School was inappropriate only because it didn't offer what is considered a traditional "therapeutic" program. However, the mantel of the Individuals with Disabilities Education Act is individualizing the instruction to meet the unique needs of the student.

145. P.K.'s particular make-up made a traditional "therapeutic" setting one which could not offer him educational benefit.

146. The IHO ignored the overwhelming testimony of those persons who had made it their business to understand P.K.'s needs. John Schrom, the Ascent program director for P.K. testified that P.K. was "very untrusting." (T-630). P.K.'s level of distrust led him to view the world as an unsafe place. (T-634) In adopting that schewed world view, P.K. became very aggressive as a means to protect himself. (T-635)

147. To deal with the emotional pain he experienced, P.K. would self-medicate with alcohol and drugs. (T-634) Mr. Schrom testified that a therapeutic environment is one where P.K. "could continue to develop his self-esteem, self-confidence, have experiences that would

provide success for him." (T-903)

148. Mr. Schrom opined that the Wisdom Ranch School was an environment which could address his needs. He stated: "A therapeutic environment is one that provides students with an opportunity to look at themselves, be challenged, physically, mentally, emotionally. Provide ongoing feedback to them. Let them find success on many levels." (T-903)

149. Wisdom Ranch School provided the experiential therapeutic education in an environment that provides students with the ability to gain responsibility through choice making, decision making and guidance from the trained adults. (T-904)

150. Dr. Jeff Schroeder conducted a comprehensive evaluation of P.K. and testified about his assessment of P.K.'s needs (P-123C) and how they could be addressed. Dr. Schroeder explained that a "therapeutic program" means "something that is designed to initiate and support positive emotional changes in anyone." (T-964)

151. Dr. Schroeder testified that there are many ways to "do therapy." In P.K.'s case, it was clear that he needed a more experiential learning paradigm. The "do to get" philosophy. (T-965) Dr. Schroeder explained the "do to get" philosophy as follows: "you act and that's the way you get what you want rather than just talking about things. So the various kind of experiential learning, hands on learning, whether we're talking about classroom learning or more emotional attitude kind of learning. The experiential approach is going to work better than talk therapy. . . .He was going to need to have success experiences." (T-966)

152. Dr. Schroeder testified that P.K.'s needs would be met with a program that "has a primarily experiential component rather than just kind of sitting in an office and doing talk therapy. . . Something that was based on group interaction, because P.K. would accept that kind of confrontation better, at least from peers, than he would from anyone in a position of authority." (T-967) Dr. Schroeder agreed with the Parents' educational consultant, Mr. Rob

30

Spears that P.K. needed a "hands-on experiential approach more than he needs a psychiatric or kind of just psychotherapy approach." (T-968)

153. Dr. Schroeder also opined that a standard public school class environment would not lead to progress for P.K. because "his emotional problems would keep him from being – from learning. From being available to the class. He would return to substance abuse. He would return to the various kinds of behavioral problems that he had. He wouldn't be in class. If he was there, he wouldn't really be present." (T-971) Dr. Schroeder made the assessment which was lacking in the District's review of P.K. They didn't look beyond the drug problem to the emotional disability he was exhibiting.

154. Mr. Rob Spear testified that P.K. would need "an environment that was going to be structured. An environment that was going to hold him accountable. An environment that he could not manipulate. And an environment were he, P.K. would feel safe enough in himself so that he could continue to make adjustments to his behavior." (T-1173) Mr. Spear also was clear that the traditional standard therapy situation was not going to be his recommendation. (T-1173)

155. At Wisdom Ranch School, P.K. would have access to psychological services and Alcoholics Anonymous meetings but the "therapy" would not be "forced down his throat." (T-1223, 1227)

156. Wisdom Ranch School Director, Mr. Monte MacConnel, testified about the program. Mr. MacConnell described Wisdom Ranch School as an "experiential alternative school in a ranch setting." Physical activities are used to not only educate the students "but give them life experiences by which they can gain a greater sense of independence and personal success." (T-730) He described the school, that it consisted of twenty boys all of whom have had difficulty in the traditional school environment. (T-731)

157. Mr. MacConnell testified that the school is accredited by the State of Idaho and

31

2005.

163. The District failed to properly assess P.K.'s needs and the result was a complete denial of a free appropriate public education during the relevant time period. The K.'s can not be held responsible for the District's failure to properly assess P.K.'s needs.

164. The SRO's analysis does not consider the facts as presented at the hearing and is replete with factual errors concerning the information known by District personnel.

165. The evidence adduced at the hearing strongly supports a finding that the District failed to recommend an appropriate program for P.K. for the 2005/06, Summer 2006 and 2006/07 school years.

166. The evidence adduced at the hearing strongly supports a finding that the K.s unilateral placement of P.K. at the Wisdom Ranch School (and SUWS Program) was appropriate to address P.K.'s educational, social/emotional, physical and management needs for the 2005/06, Summer 2006 and 2006/07 school years.

167. The evidence adduced at the hearing strongly supports a finding that the equities in this case balance in favor of an award of tuition reimbursement for the costs of educating P.K. for the 2005/06, Summer 2006 and 2006/07 school years and for reimbursement for the costs of a psychological evaluation in the face of the Districts failures. The K.s were cooperative, un-obstructive and they acted reasonably at all times. They provided notice of all their claims and any information which was requested was immediately shared. There was no evidence that the K.'s were uncooperative.

WHEREFORE, it is respectfully requested that this Court:

(a) reverse the May 30, 2007 decision of the SRO and the March 9, 2007 Decision of the IHO;

(b) declare that Defendant failed to offer P.K. a free appropriate public education for the

33

Northwest Association of Accredited Schools and that students who graduate receive a high school diploma from the State of Idaho. (T-732) All the teachers are certified teachers and the Director of the educational program, Mr. Hal Jardine, has a specialty in special education. (T-733)

158. Mr. MacConnell described the experiential learning environment at Wisdom Ranch School and detailed the structured learning environment where academics are interspersed with ranch work, vocational skills, work training and work experience. (T-735) Mr. MacConnell also testified that one-on-one assistance is available to students. (T-735)

159. Mr. MacConnell testified that psychological services are available to students at Wisdom Ranch. Arrangements are made for students with local providers of the services. (T-738, 755) P.K. sees a psychiatrist to oversee his medication management. (T-757) Mr. MacConnell also explained the relationship the school has with a local "therapeutic wilderness program" where a student can meet with someone with a clinical background. (T-738)

160. Mr. MacConnell testified that P.K. was doing well at Wisdom Ranch School. He attended his classes and was doing well with the academic work. (T-743) P.K.'s report cards reflect his successful academic work. (P-123B, P-135).

### SRO DECISION

161. Material violations of the substantive and procedural protections provided parents by IDEA and state law amount to a denial of a free appropriate public education. The SRO Decision is factually and legally flawed and should be annulled.

162. School personnel had clear knowledge concerning the many behavioral and emotional problems P.K. was experiencing during the latter part of the 2004/05 school year and the 2005/06 school year. The K.'s and P.K.'s therapist Suzanne Hanna told the KEA psychologist about the difficulties P.K. was having during the 2004/05 school year and summer

32

2005/06, Summer 2006 and 2006/07 school years.

(c) declare that P.K.'s privately secured placement for a portion of the 2005/06, Summer 2006 and 2006/07 school years was appropriate and that the associated tuition (and costs of the SUWS program) and transportation costs are reimbursable under applicable legal standards and that the equities balance in favor of an award of tuition reimbursement;

(d) Order that the Defendant reimburse the K.s for the actual costs of P.K.'s private placement;

(e) Declare the K.s as the substantially prevailing parties;

(f) Grant leave to plaintiffs counsel to submit a fee application for purposes of statutory attorneys fees and other recoverable costs at the administrative level, the SRO level and in this action, pursuant to the express fee-shifting provisions of the federal IDEIA statute; and

(g) Grant plaintiffs such other, further and different relief as may be just under the circumstances.

Dated: Bedford Village, New York
       October 1, 2007

_Leah L. Murphy_ (LLM/8934)
KUNTZ, SPAGNUOLO & MURPHY, P.C.
Attorneys for Plaintiffs
444 Old Post Road
Bedford Village, New York  10506
(914) 234-6363

34