

# The University of the State of New York

## The State Education Department
### State Review Officer

No. 07-039

**Application of a CHILD WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Bedford Central School District**

Appearances:

Kuntz, Spagnuolo & Murphy, PC, attorney for petitioners, Leah L. Murphy, Esq., of counsel

Ingerman Smith, LLP, attorney for respondent, Ralph C. DeMarco, Esq., of counsel

## DECISION

Petitioners appeal from the decision of an impartial hearing officer which denied their request to be reimbursed for their son's tuition costs at the Wisdom Ranch School (Wisdom Ranch) for part of the 2005-06 school year, summer 2006 and 2006-07 school year, in addition to costs associated with transportation and escort services and the cost of an independent psychological evaluation. The appeal must be dismissed.

At the time of the commencement of the impartial hearing, in July 2006, the student had just turned 17 years old and was attending Wisdom Ranch, a residential, experiential school in a ranch setting located in southeastern Idaho (Tr. pp. 18, 725, 730). The Commissioner of Education has not approved Wisdom Ranch as a school with which school districts may contract to instruct students with disabilities (8 NYCRR 200.1[d], 200.7). The student's classification as a student with an emotional disturbance (ED) and eligibility for special education services are not in dispute in this appeal (8 NYCRR 200.1[zz][4]; Tr. p. 78).

The record includes historical information regarding the student, including documentation of multiple hospitalizations due to a history of a "very unstable mood, depression, suicidal ideation and oppositional behavior in school and in his parents' home" (Tr. p. 120). The student also has a history of substance abuse (Parent Ex. 13 at pp. 3-4). Evaluations from 2002 and 2003 reflected a history of difficulties with his focus and attention, impulsivity, and further

revealed the presence of a non-verbal learning disability (Parent Exs. 21 at p. 6; 22 at p. 1). At the time of the June 19, 2006 Committee on Special Education (CSE) meeting, the student's cognitive ability was noted to be within the high average range with verbal abilities in the superior range and visual-perceptual abilities in the average range (Parent Ex. 126 at p. 3).

The student attended respondent's schools between kindergarten and eighth grade (Parent Ex. 22 at p. 1). In December 2002, when the student was in eighth grade, he was admitted to the partial hospitalization program (PHP) at Four Winds Hospital (Four Winds) due to increased depressive symptoms, academic decline, increased irritability, decreased concentration, appetite loss and sleep difficulties (Parent Ex. 120 at p. 26). A family history of mood disorders was noted, as was the student's occasional use of marijuana (id.). Following the hospitalization, petitioners referred the student to the CSE (Parent Ex. 41) and on March 26, 2003, he was found eligible for special education as a student with an ED (Parent Ex. 16 at p. 1). The possibility of a non-verbal learning disability was noted (id. at p. 3). The student was recommended for resource room services and individual counseling (id. at p. 1).

Following his initial classification the student's behavioral and emotional difficulties continued to escalate and in May 2003, he was admitted to Four Winds as an inpatient (Tr. p. 147; Parent Ex. 120 at pp. 21-22). The student was subsequently referred to the Four Winds PHP program (Parent Ex. 120 at p. 19). The student acknowledged having an active drug problem (id. at p. 22). In July 2003, the CSE recommended the student for a residential placement (Parent Exs. 13 at p. 1; 74). For the 2003-04 school year, when the student was in ninth grade, he attended Devereux-Glenholme (Glenholme), a New York State approved residential facility located in Connecticut (Parent Ex. 80).

Following a successful year at Glenholme, the CSE recommended that the student return to respondent's school from residential placement (Parent Ex. 7 at pp. 4-5). At the student's June 3, 2004 annual review, the CSE recommended that for tenth grade the student be placed in respondent's "Keys to Emotional Awareness" (KEA) program, an in-district therapeutic support program located in respondent's high school (id. at pp. 1, 4-5). Petitioners agreed with the CSE's recommendations (id. at p. 5).

In September 2004, the student began attending respondent's KEA program (Tr. p. 2002). On March 22, 2005, the CSE subcommittee reconvened for the student's annual review (Parent Ex. 5). The student's special education teacher reported that he had made a positive transition to the high school setting, was doing well academically and was keeping up with his work (id. at pp. 4-5). Petitioners reported that they were pleased with their son's performance and they thanked the committee for its support in helping the student return to his home school setting (id.). The March 2005 CSE subcommittee recommended that the student remain in respondent's KEA program for the 2005-06 school year (eleventh grade) (id. at p. 1). Specifically, the CSE subcommittee recommended that the student attend the 10:1+2 special class KEA for three periods daily for 40 minutes, with one individual counseling session per week for 30 minutes, and one 30-minute counseling session in an integrated setting (id.). The CSE subcommittee determined that the student was not eligible for extended year services (ESY) services (id.). Program modifications, accommodations, supplementary aids and services were comprised of refocusing and redirection, as well as a positive reinforcement plan (id.). Testing

accommodations included flexible scheduling where the student could have a five minute break for every 30 minutes of testing, a flexible setting, directions explained, use of a word processor for extended writing tasks, use of a spell check device, and use of a grammar check device (id. at p. 2). The student would not participate in the general education program for social studies and English, but would take part in the general education physical education program (id. at p. 1). The March 2005 individualized education program (IEP) indicated that all CSE members, including petitioners, agreed with the CSE's recommendations (Parent Ex. 5 at p. 5).

The student's mother and private counselor indicated that in April 2005, the student started using alcohol and illegal substances (Tr. pp. 227, 850-51). In April or May 2005, the student received a one-day out-of-school suspension for threatening and antagonizing another student to fight (Tr. p. 208; Parent Ex. 86). Petitioners reported that they were concerned about the student's behavior, as were the KEA psychologist and the student's private counselor (Tr. pp. 207, 209-10, 225, 852-53). Academically, the student achieved the following grades for the 2004-05 school year: English 9a (B+), English 9b (B+), global 1-a (A-), global 1-b (A-), living environment a (B-), living environment b (B-), math 2a (C), math 2b (C), physical education (B), Spanish a (B), and Spanish b (B-) (Parent Ex. 123B at p. 2).

According to the student's private counselor, the student had a "difficult" summer 2005 (Tr. p. 808). She stated that the student's drug abuse escalated and his behavior became very erratic (Tr. p. 853). The student's mother reported that the student's depression and mood instability increased during the summer (Tr. p. 227). She acknowledged that the student was using illegal substances (id.).

In an August 9, 2005 letter from respondent's CSE, petitioners were informed of an upcoming three-year reevaluation of the student during the 2005-06 school year (Parent Ex. 91 at p. 1). The student's father signed the consent for the reevaluation on August 10, 2005, which was stamped "received August 15, 2005" (Parent Ex. 92).

The student returned to respondent's KEA program in September 2005 (see Tr. p. 1530). By the third week of September, he was "slipping" in school and his class schedule was reduced, permitting the student to come to school later than the original start time and leave earlier than the normal dismissal time, in order for him to continue to attend Alcoholics Anonymous (AA) meetings in the afternoon (Tr. pp. 1535, 1848, 2094-95, 2139-40). As the month progressed, he demonstrated difficulty concentrating and remaining focused at school (Tr. pp. 1531, 1849). The student spoke with the KEA psychologist about abusing substances (Tr. p. 1849). According to petitioners, at home, the student was agitated, explosive, combative and unpredictable (Tr. pp. 536-40, 882). In late September 2005, the student was admitted to Silver Hill Hospital (Silver Hill) in Connecticut (Tr. pp. 233, 1851-52, 1888; Dist. Ex. M). Petitioners indicated that Silver Hill had a "drug program" and that they wanted to address their son's substance abuse problem so that they could get him back on psychiatric medication to address his emotional disability (Tr. pp. 233, 535-36). Upon discharge from Silver Hill on October 4, 2005, the student was placed on medication and referred to the PHP at Four Winds for step-down care[1] (Tr. pp. 881-82, 884-85; Dist. Exs. B at p. 50; M). Toward the end of September 2005, the KEA psychologist

---

[1] The record does not furnish a definition for "step-down care."

provided petitioners with contact information for a substance abuse counselor who worked at the high school (Tr. p. 1852; Dist. Ex. F at p. 1).

On October 7, 2005, the student was admitted to the Four Winds PHP for depression, anger management and substance abuse problems (Dist. Ex. B at p. 50). The evaluating psychiatrist offered diagnoses of a mood disorder not otherwise specified (NOS) and polysubstance abuse (id.). The student's program at Four Winds included individual, group, and family therapy, as well as medication management (Parent Ex. 130 at p. 2). According to progress notes, the primary focus of the student's program was on family dynamics and maintaining sobriety (Tr. p. 1644; Dist. Ex. B at pp. 54-64). On October 21, 2005, the student was discharged from Four Winds (Dist. Ex. B at p. 65). The discharge plan included a recommendation that he continue working with his private therapist and attend AA meetings (id. at p. 67). It also recommended that the student follow up with a psychiatrist for medication management (id. at p. 68). In late October 2005, respondent learned that the student had been discharged from Four Winds, but was not attending school (Tr. pp. 1531-32, 1707). Respondent contacted petitioners to schedule a team meeting for the purpose of returning the student to school (Tr. pp. 1532-33, 1856).

On November 1, 2005, petitioners met with the KEA staff to discuss transitioning the student back to school (Tr. pp. 1533, 2022). Together they developed a plan that included shortening the student's school day and providing him with additional adult support and monitoring, as well as special transportation to accommodate his abbreviated schedule (Tr. pp. 238-39, 1533-36, 1538-39, 1860, 1910-11). In addition, a plan was developed to help him improve his missed academic work (Tr. pp. 1535-36, 1538). During this time, the student attended group counseling outside of school and AA meetings in the evening (Tr. pp. 542-43). On November 17, 2005, respondent's CSE met and formalized the plan recommended by the KEA staff and petitioners (Tr. pp. 1541-47; Parent Ex. 3 at p. 5). The resultant IEP was amended to reflect the student's shortened school day and the fact that the student would be making up math assignments during the resource room period (Tr. pp. 1542-43; Parent Ex. 3 at p. 1). A study skills goal was dropped from the student's IEP and a decision-making objective was added (Tr. p. 1543; compare Parent Ex. 5 at pp. 6-7, with Parent Ex. 3 at pp. 6-7). Mastery levels on the student's original social-emotional objectives were revised downward from 90% to 80% (Tr. p. 1543; compare Parent Ex. 5 at pp. 6-7, with Parent Ex. 3 at pp. 6-7).

The student's school performance in November and December 2005 was inconsistent (Tr. pp. 1760-61, 1863-64). When the student initially returned to school on November 3, 2005, he had changed his style of dress and maintained a very serious and directed focus to continue with AA and maintain his sobriety (Tr. pp. 1864-65, 1888, 1925, 2099, 2204, 2221-22). The student was awake and alert during school (Tr. pp. 2219, 2205-06). He avoided peers with whom he had previously associated (see Tr. p. 2099) and accepted the increased monitoring by KEA staff (Tr. pp. 2221-22). The student's teachers reported that he actively participated in classroom discussions, but did not complete written assignments (see Tr. pp. 2101, 2103). The student received first quarter grades of "Incomplete" for English and physical education, an "F" for global studies and a number grade of 50 for math (Tr. p. 2107-08; Parent Ex. 32). The student's progress toward his IEP goals was not significant enough to note (Tr. p. 2134; Parent Ex. 33). As the month progressed, the student began having a difficult time managing his withdrawal

4

symptoms and nicotine and substance cravings (Tr. pp. 1539, 1864, 1906-08, 2123-24, 2144). He was restless and fidgety (Tr. pp. 1539, 2123, 2142-43). On some days he appeared lethargic, would put his head on his desk or sleep at school (Tr. pp. 1539, 1864, 2101, 2143-44 2205-06, 2152). At home, the student was verbally and physically aggressive and did not comply with established curfews (Tr. pp. 816, 856). He returned to his former style of dressing (Tr. p. 2100). On November 28, 2005, the student received a disciplinary referral for smoking and refusing to return to class (Parent Ex. 117). In late November 2005, respondent's psychologist began testing the student's intelligence (Tr. p. 1894; Dist. Ex. F at p. 2). The student was not able to remain focused during some of the testing session and testing was not completed (Tr. pp. 2027-28).

In December 2005, the student's school performance continued to deteriorate (Tr. pp. 887, 1870, 1989; Dist. Ex. F at p. 2). He grew frustrated by his lack of freedom in the school environment (Tr. p. 2222). Staff supervision of the student was reduced to allow him to transition to math and through the halls on his own (Tr. p. 2103). He was not attending class when required (id.). The student became antagonistic and agitated (Tr. pp. 2206-09). In early January 2006, he relapsed into drug abuse (Parent Ex. 126 at p. 5). Around this same time, the student was involved in a knife fight with another student off school grounds, which later resulted in felony charges (Tr. pp. 252, 551-53).

On January 9, 2006, the student became extremely agitated at school (Tr. pp. 1873-74, 1898-1900). The student's father was called and subsequently came to pick him up (Tr. pp. 250-51, 1756, 1874, 1900). The student attempted to jump out of his father's car, and at home threatened to harm himself (Tr. pp. 251-52; Dist. Ex. B at p. 2). That evening, he was admitted to Four Winds where he was assessed by a Four Winds psychiatrist (Parent Ex. 122). The psychiatrist diagnosed a "mood disorder NOS, cannabis and alcohol abuse, and r/o substance induced mood disorder" (Dist. Ex. B at p. 4). He noted that it was questionable whether the student had been compliant with his medication regimen (id. at p. 2). The psychiatrist recommended that the student be admitted to the hospital's inpatient program to assess his safety (id. at p. 5). He also noted that the student would benefit from a 28-day substance abuse program following his hospitalization and that a trial of mood stabilization medication should be considered (id.).

By letter dated January 12, 2006, petitioners requested a CSE meeting as soon as possible, citing "crisis circumstances" (Tr. p. 253; Parent Ex. 95). In their letter, they stated that it had become apparent that the KEA program no longer met the student's educational needs (Parent Ex. 95). Upon the request of the CSE Chairperson, petitioners agreed to meet with the KEA team prior to a CSE meeting (Tr. p. 255; Parent Ex. 101 at p. 1). Sometime during the period of January 9, 2006 and January 17, 2006, petitioners hired an educational consultant to assist them in locating a temporary placement for their son while they continued to work with the CSE to determine how to deal with their son's emotional needs (Tr. p. 261). The consultant recommended that the student attend a wilderness program, specifically the Ascent Wilderness Program (Ascent) in Idaho because it offered a "base camp" model (Tr. pp. 262, 1161-62).

The student remained at Four Winds until January 18, 2006 (id. at p. 46). During his stay, he was verbally and physically aggressive toward others (Tr. pp. 1288-90; Dist. Ex. B at pp. 7-34). On January 16, 2006, he was placed in seclusion for threatening to attack peers (Dist. Ex.

B at p. 29). The following day, the student was transferred to a different unit in Four Winds after forming a group of peers to gang up against new patients (id. at p. 33).

On January 17, 2006, petitioners met with the KEA team (Tr. pp. 255, 1585; Dist. Ex. G at p. 3; Parent Ex. 126 at p. 5). At that time, they did not inform team members that the student had threatened to harm himself (Tr. pp. 1919-21, 1877, 2125) or that he had been verbally and physically aggressive toward others at Four Winds (Tr. pp. 1630-31, 1901, 1919-21, 2124-25). Petitioners informed the team that the student would be enrolled in Ascent the following day (Tr. pp. 263-64, 1585). They asked the team to consider a residential placement for the student; however, petitioners were either asked or told that they had to consider network/community services first (Tr. pp. 266-67, 270-71, 1587; Parent Exs. 101 at p. 1-2; 103). KEA team members suggested that the student should return to the KEA program (Tr. p. 265).

On January 18, 2006, the student was transported by a private escort service to Ascent (Parent Ex. 125 at p. 5). A bio/psychosocial assessment was conducted on the day of admission (Parent Ex. 121B). The evaluating clinician offered the following initial diagnostic impressions: polysubstance dependence disorder, conduct disorder adolescent-onset type, physical abuse of a child - victim and dysthymic disorder (id. at p. 8). The results of a psychological evaluation conducted by the program psychologist in February 2006 indicated that the student was of above average to superior intelligence and performing at or slightly above his age and grade level in academic content areas (Parent Ex. 123C at pp. 6-8). The psychologist noted a gap between the student's IQ and academic performance and suggested that it might be indicative of a learning disability, but might also be indicative of the cognitive and motivational impediments of severe substance abuse (id. at p. 8). He further noted that testing indicated the possibility of an attention deficit hyperactivity disorder (ADHD) - primarily inattentive type (id. at pp. 7-9). According to the psychologist, the student was experiencing a high degree of distress and was impulsive, manipulative and did not accept common social norms (id. at p. 9). The psychologist indicated that the student projected an extreme version of a "tough guy" image that hid a deep fear of his own weaknesses, instability and dependence (id.). The student completed inventories that revealed numerous indicators for severe substance abuse, illegal activities and possible violence (id. at pp. 7-9). The psychologist noted that the student possessed several strengths including his high intelligence, easy social manner and desire to succeed (id. at p. 9). He reported that the student worked effectively in a group culture at Ascent (id.). The Ascent psychologist opined that the student would require a structured residential treatment program in order to consolidate and continue the gains he made at Ascent (id.). He indicated that the student's educational needs could be addressed in a classroom setting within a residential program and that the student could benefit from an enriched or advanced curriculum (id.). According to the evaluator, experiential learning paradigms, structured behavioral contingencies and well-monitored pro-social relationship opportunities would be more effective treatment strategies for the student rather than traditional "talk" psychotherapy (id.).

On February 15, 2006, petitioners attended a KEA parent meeting outlining community mental health services (Tr. pp. 271-72; Parent Exs. 97; 101 at p. 2). Following the February 2006 meeting, the student's father spoke to the presenter who reportedly indicated that the agency did not have sufficient services to support the student (Tr. p. 274). Subsequently, the student's mother talked to a representative from the Mental Health Association (MHA) of

6

Westchester and concluded that MHA's services were not a viable option for her son at that point (Tr. pp. 274-75; Parent Ex. 101 at p. 2).

By letter dated February 16, 2006, petitioners requested a CSE meeting as soon as possible (Parent Ex. 97). The student received the following second quarter grades: an F in math, and "Incomplete" for global 2 KEA, physical education, and English 2 KEA (Tr. pp. 2248-49; Parent Ex. 32). IEP progress notes indicated that the student was making some progress in his ability to utilize effective coping strategies when faced with conflict situations and some progress in his ability to seek out appropriate people and ask for help when under stress (Parent Ex. 33 at pp. 1-2).

In a February 23, 2006 letter to the superintendent, petitioners indicated that effective March 13, 2006 they would be placing their son at Wisdom Ranch in Arco, Idaho (Tr. p. 281; Parent Ex. 101). Petitioners further indicated that they would be seeking reimbursement for the financial cost of the student's placement (Parent Ex. 101 at p. 3).

On March 1, 2006, the student was discharged from Ascent and transported by his parents to Wisdom Ranch (Parent Ex. 121D at pp. 1-2). Ascent discharge papers, completed by the student's therapist, indicated that he had found great success during treatment and that he had developed the ability to talk about his feelings, make relationships with staff and peers and control his anger (id. at p. 2). Final DSM-IV diagnosis included polysubstance dependence disorder, conduct disorder adolescent - onset type, physical abuse of child - victim and dysthymic disorder (id. at p. 3). The student's treating therapist recommended a structured placement to appropriately identify and address ongoing personal and family issues; individual therapy to assist the student in managing his anger and anxiety, and to establish his identity; group therapy as needed to assist in developing appropriate age-related relationships; family therapy; and cognitive behavioral therapy to challenge the student's negative thought process and integrate positive new beliefs (id.).

On March 9, 2006, the CSE met, at petitioners' request, for a program review (Parent Ex. 1). Petitioners requested a residential placement for their son and provided letters from professionals who had worked with the student in support of their request (Tr. p. 290; Parent Exs. 1 at pp. 5-6; 34; 35; 36; 37). The March 2006 CSE reviewed the student's history as it related to the 2005-06 school year in addition to the letters submitted by petitioners (Parent Ex. 1 at p. 5). The CSE discussed program options for the student (id. at p. 6). The CSE also discussed the lack of consistent support provided to the student relative to his substance abuse (Tr. pp. 698, 1608-09; Parent Ex. 1 at p. 6) and petitioners' reactionary placement of the student when a crisis situation arose (Tr. pp. 1133-35). Petitioners confirmed that they had not explored the possibility of an intensive drug treatment program with follow-up treatment and wrap around services (Parent Ex. 1 at p. 6). A representative from the Mental Health Association attended the meeting and provided petitioners with information regarding community supports and case management (Tr. pp. 294-95, 1600-01; Parent Ex. 1 at p. 5). Services were discussed but petitioners had previously concluded that network services would not meet the student's needs (Tr. pp. 2323-24). Petitioners did not inform the March 2006 CSE of the student's threats of self-harm or that the student was the victim of physical abuse (Tr. pp. 717, 1137, 1139, 1932-33). Respondent's CSE members concluded that some of the professionals who had drafted the letters

7

in support of petitioners' request for a residential placement had limited knowledge of the student (Tr. pp. 1603-09) or respondent's KEA program (Tr. pp. 1931-32). Respondent's staff indicated that petitioners' letters were not consistent with their own observations of the student and that he did not require a residential placement (Tr. pp. 2119-20). Given the student's performance in the KEA program during the 2004-05 school year, respondent's staff concluded that the if the student's substance abuse issues were managed, he could be successful in the KEA program (Tr. pp. 720-21, 1132, 1609, 1930, 2114) with additional community supports (Tr. pp. 721, 1133-34). The March 2006 CSE, with the exception of the petitioners, recommended that the student remain in respondent's KEA program for the duration of the 2005-06 school year (Parent Ex. 1 at pp. 1, 6). Petitioners disagreed with the March 2006 CSE's determination citing their son's need for a residential placement (id. at p. 6). CSE meeting minutes also indicated that a reevaluation of the student had not been completed due to his inaccessibility (id.).

In a letter dated April 5, 2006, petitioners expressed their concern over the accuracy of the March 9, 2006 CSE meeting minutes (Parent Ex. 105). Among other things, petitioners stated that respondent's misguided focus on the student's substance abuse and not his true disability of an emotional disability led the March 2006 CSE to make inappropriate educational recommendations (id. at p. 1). Further, petitioners asserted that the minutes did not reflect their repeated request to address the student's emotional disability instead of the symptoms of his drug addiction (id. at p. 3).

By due process complaint notice dated May 11, 2006, petitioners requested an impartial hearing seeking tuition reimbursement for part of the 2005-06 school year (Resp't Mem. of Law at p. 7).[2]

In a June 16, 2006 letter to the superintendent, petitioners indicated their intent to continue the student's placement at Wisdom Ranch for summer 2006 (Parent Ex. 132).

On June 19, 2006, respondent's CSE reconvened for the student's reevaluation/annual review (Parent Ex. 126). The June 2006 CSE reviewed the private psychological evaluation from Ascent and determined that the results of cognitive assessments were consistent with results previously obtained in 2003 (id. at p. 6). Meeting minutes noted that the student was unavailable for district reevaluation and that petitioners had no plan to have the student return home in the near future (id.). The CSE contacted the student's psychiatrist via telephone to discuss recommendations outlined by him in a June 15, 2006 letter to the CSE (Parent Exs. 38; 126 at p. 6). The psychiatrist reported that the student remained in a fragile state (Parent Ex. 126 at p. 6). He further reported that the student had recently stopped taking his medication, which resulted in a decompensation of the student's behavioral stability (Parent Exs. 38; 126 at p. 6). The psychiatrist convinced the student to resume his medication (id.). The psychiatrist also acknowledged the student's substance abuse problem and indicated that without the substances he was better able to diagnose some of the student's emotional factors and get a clearer picture of his depression (Parent Ex. 126 at p. 6). The CSE discussed several options for the student including exploring additional day treatment programs or remaining at KEA (id.). Respondent's

---

[2] I note that petitioners' due process complaint notice is not included as part of the impartial hearing record. During the course of the impartial hearing, the parties agreed to amend petitioners' due process complaint notice to include tuition reimbursement claims for the 2006-07 school year (Tr. p. 1340; Parent Ex. 127)

staff again opined that the student could be successful in the KEA program if he did not have the substance abuse problem (id.). However, petitioners and the student's psychiatrist disagreed with this assessment (id.). Although petitioners requested ESY services, the June 2006 CSE did not recommend them (id.). Petitioners did not agree with the CSE's recommendation (id.). The CSE Chairperson provided petitioners with a consent form to explore additional day treatment programs (id.). Although petitioners' attorney advised the CSE that petitioners would take it under advisement (id.), petitioners did not provide respondent with consent to explore other day treatment programs because the student's mother indicated that she had already done so in 2003 prior to her son's placement in Glenholme (Tr. pp. 2374-75).

The June 2006 CSE recommended that for the 2006-07 school year the student return to respondent's KEA special class where he would receive individual counseling one time per week and group counseling one time per week (Parent Ex. 126 at p. 1). For his core academic classes, the student would attend general education classes with the support of a special education teacher or aide from the KEA program (id.). In addition, the student would attend KEA 10:1+2 special class resource room periods twice daily for 40 minutes (id.). The student's IEP indicated that he would have counseling available to him on an as needed basis (id.). Program modifications, accommodations and supplementary aides and services included preferential seating, and copy of scaffolded class notes (id. at pp. 1-2). The student's IEP included a recommendation for a functional behavioral assessment (FBA) (id. at pp. 2, 6). The June 2006 IEP also afforded the student numerous testing accommodations (id. at p. 2). IEP goals and objectives targeted study skills, writing, and social-emotional-behavioral needs (id. at pp. 9-10).

The student returned home from Wisdom Ranch in June 2006 for a home visit (Tr. pp. 505-06). Petitioners reported that the student struggled and "couldn't maintain it" (id.). The student's private counselor reported that the student used drugs and went out with peers with whom he was not permitted to associate (Tr. pp. 868-69).

An impartial hearing commenced on July 11, 2006 and after ten days of testimony concluded on December 11, 2006.

A July 17, 2006 report from Wisdom Ranch indicated that the student's academic grades were pending (Parent Ex. 123B). The student's teachers reported that he participated in class, was very attentive to details and was making connections to literature (id. at pp. 2-3). In mid July 2006, the student was asked to leave Wisdom Ranch for smoking cigarettes on campus and instigating conflict between dorms (Tr. pp. 744-45, 767-68; Dist. Ex. L at p. 12). He was placed at SUWS in Shoshone, Idaho in order to help him take responsibility for his actions and create a plan to do things differently upon his return to Wisdom Ranch (Dist. Ex. L at p. 12). A service plan, which included an initial diagnostic impression of oppositional defiance disorder, was developed (id. at p. 7). Among other things, the student's treatment goals related to identifying his maladaptive control patterns and managing his feeling and behavior, and gaining an awareness of his family system (id. at pp. 8-11). The student's discharge summary indicated that he was essentially isolated for the duration of his stay at SUWS in order to provide him with the opportunity to reflect upon his choices and gain a deeper awareness of how his negative choices influenced his current situation (id. at p. 12). SUWS staff reported that the student made positive strides toward taking responsibility for his actions and past behaviors, as well as solid steps

9

toward developing a more positive self concept, openness and honesty in communication, and healthier coping skills (id. at p. 13). They recommended the student be provided an academic setting with access to experiential learning; a small positive peer culture; a clear system of boundaries, consequences and follow-through; individual therapy focused on emotional recognition and growth, honesty, working through anger and substance use, enhancing coping skills, accepting personal responsibility, and working through continued struggles with his parents; family therapy, with a focus on open and honest communication, supporting the emotional growth work and active listening; and group counseling focusing on substance rehabilitation and relapse prevention (id.). Respondent indicated that it had not received notice of the student's placement at SUWS (Tr. pp. 1658-59).

The student returned to Wisdom Ranch after spending 14 days at SUWS (Tr. p. 743). In an August 16, 2006 letter to the superintendent, petitioners indicated their intent to keep their son at Wisdom Ranch for the 2006-07 school year and to seek tuition reimbursement (Parent Ex. 133). Petitioners asserted that at Wisdom Ranch, their son demonstrated the ability to make meaningful educational progress (id.). They argued that respondent's recommendations were inappropriate as demonstrated by the student's utter lack of meaningful progress that he demonstrated while in attendance in the KEA program (id.).

By decision dated March 9, 2007, the impartial hearing officer concluded that the programs recommended in the March 2006 and June 2006 IEPs were appropriate; however, she did not offer a basis for her findings (IHO Decision at p. 32). She went on to find that Ascent and Wisdom Ranch were not tailored to meet the student's special education needs and consequently denied petitioners' request for tuition reimbursement (id. at pp. 30, 32).[3] With respect to Wisdom Ranch, the impartial hearing officer concluded that it was not appropriate because the school did not provide the student with a therapeutic environment (id. at p. 33). Finally, she determined that equitable considerations weighed against petitioners, inasmuch that they failed to provide respondent with ten days notice as required by the Individuals with Disabilities Education Act (IDEA) before unilaterally placing the student at Ascent (id. at p. 30).[4] The impartial hearing officer further concluded that petitioners failed to provide respondent with critical information from the institutions where the student was placed during the 2005-06 school year, thereby denying respondent the ability to properly assess the nature of his disability (id. at p. 34).

This appeal ensued. On appeal, petitioners contend that the March 2006 IEP and the June 2006 IEP were procedurally and substantively inadequate, thereby denying the student a free, appropriate public education (FAPE). On a procedural level, petitioners argue that the programs recommended in both IEPs were predetermined, thereby denying them of meaningful parental

---

[3] Inasmuch as neither party appeals the impartial hearing officer's finding with respect to the appropriateness of Ascent, that part of the decision is final and binding (34 C.F.R. § 300.514[a]; 8 NYCRR 200.5[j][5][v]; see Application of a Child Suspected of Having a Disability, Appeal No. 05-128).

[4] Inasmuch as neither party appeals the impartial hearing officer's finding with respect to petitioners' failure to comply with the ten-day notice requirement as set forth in the IDEA, that part of the decision is final and binding (34 C.F.R. § 300.514[a]; 8 NYCRR 200.5[j][5][v]; see Application of a Child Suspected of Having a Disability, Appeal No. 05-128).

participation as required by the IDEA. Specifically, petitioners assert that respondent failed to properly evaluate their son, because respondent failed to base its recommendation on updated evaluations or develop an FBA. Lastly, petitioners maintain that the March 2006 and June 2006 IEPs were not reasonably calculated to meet their son's special education needs because respondent's CSEs failed to consider a residential placement when developing a program for him. Respondent submitted an answer with affirmative defenses, and requests that the impartial hearing officer's decision be upheld in its entirety.

The central purpose of the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; see Schaffer v. Weast, 126 S. Ct. 528, 531 [2005]; Bd. of Educ. v. Rowley, 458 U.S. 176, 179-81, 200-01 [1982]; Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. 2006]). A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a written IEP (20 U.S.C. § 1401[9][D]; 34 C.F.R. § 300.17[d];[5] see 20 U.S.C. § 1414[d]; 34 C.F.R. § 300.320).[6]

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the child, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 C.F.R. § 300.513[a][2]; Matrejek v. Brewster Cent. Sch. Dist., 2007 WL 210093, at *2 [S.D.N.Y. Jan. 9, 2007]).

The IDEA directs that, in general, an impartial hearing officer's decision must be made on substantive grounds based on a determination of whether the child received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized

---

[5] The Code of Federal Regulations (34 C.F.R. Parts 300 and 301) has been amended to implement changes made to the IDEA, as amended by the Individuals with Disabilities Education Improvement Act of 2004. The amended regulations became effective October 13, 2006. While some of the relevant events in the instant case took place prior to the effective date of the 2006 amendments, none of the new provisions contained in the amended regulations are applicable to the issues raised in this appeal. For convenience, citations in this decision refer to the regulations as amended because the regulations have been reorganized and renumbered.

[6] The term "free appropriate public education" means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
(20 U.S.C. § 1401[9]).

instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see Perricelli, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192).

An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).

The IDEA directs that, in general, a decision by an impartial hearing officer shall be made on substantive grounds based on a determination of whether or not the child received a FAPE (20 U.S.C. § 1415[f][3][E][i]). The Second Circuit has determined that "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression'" and if the IEP affords the student with an opportunity greater than mere "trivial advancement" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130; see also Perricelli, 2007 WL 465211, at *15), in other words, is likely to provide some "meaningful" benefit (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. §§ 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.6[a][1]; see Walczak, 142 F.3d at 132). The LRE is defined as "one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled" (Carlisle Area Sch. v. Scott P., 62 F.3d 520, 535 [3d Cir.1995])."

The burden of persuasion in an administrative hearing challenging an IEP is on the party seeking relief (see Schaffer, 126 S. Ct. at 531, 536-37 [finding it improper under the IDEA to assume that every IEP is invalid until the school district demonstrates that it is not]).

I will now turn to the procedural claims raised by petitioners. Petitioners contend that the program proposed by the March 2006 and June 2006 CSE was impermissibly predetermined and therefore resulted in a denial of meaningful parental participation. First, I note that petitioners'

12

May 11, 2006 due process complaint notice is not part of the impartial hearing record. Thus, the record does not indicate whether petitioners' predetermination claims were properly raised first in their due process complaint notice. Additionally, the impartial hearing officer did not make a determination regarding whether respondent impermissibly predetermined the student's recommended program. Accordingly, petitioners' claims that pertain to the issue of predetermination are not properly before me (Application of a Child with a Disability, Appeal No. 05-080; Application of a Child with a Disability, Appeal No. 04-043; Application of a Child with a Disability, Appeal No. 04-019; Application of the Bd. of Educ., Appeal No. 02-024). Although I have determined that the issue of predetermination is not properly before me, I have reviewed the impartial hearing record and I find petitioners' claims unpersuasive. The record shows that as of March 3, 2006, petitioners had placed their son at Wisdom Ranch (Parent Exs. 121D at pp. 1-2; 123B). Despite the student's mother's assertion that she "felt like a non-member of the Committee," the record establishes that respondent considered input from petitioners and discussed program options for the student (see Tr. pp. 1382, 1599; Parent Exs. 1 at pp. 5-6; 126 at p. 6). Additionally, the record demonstrates that the March 2006 CSE took into consideration letters provided by petitioners in support of their request for residential placement before making its recommendations (Tr. pp. 1599, 1601-04, 1606; Parent Ex. 1 at p. 5). Similarly, at the June 2006 CSE meeting, respondent's CSE reviewed a letter from the student's psychiatrist and contacted him by telephone regarding the content of his June 15, 2006 letter (Parent Ex. 126 at pp. 6, 8). The record also shows that the June 2006 CSE reviewed and considered the February 2006 psychological evaluation report from Ascent in developing its recommendations (id. at p. 9). Furthermore, the record demonstrates that the June 2006 CSE discussed several program options for the student, including exploring additional day treatment programs or remaining at KEA (id. at p. 6). Based on the foregoing, the record does not support petitioners' claim that their son's program was predetermined, which resulted in a denial of meaningful parental participation.

    Petitioners assert that the programs recommended in the March 2006 IEP and the June 2006 IEP were not appropriate to meet the student's special education needs. The impartial hearing officer determined that respondent offered the student an appropriate program, but did not offer any basis to support her findings. For reasons set forth in greater detail below, I agree with the impartial hearing officer's conclusion that petitioners failed to establish that at the time that the March 2006 and June 2006 IEPs were formulated, that respondent failed to offer the student an appropriate program.

    I will first address petitioners' claims with respect to the 2005-06 school year. Petitioners assert that respondent's CSE did not adequately evaluate the student. They further contend that respondent improperly relied on information from March 2003 to develop the March 2006 and June 2006 IEPs. The record does not support their claims. A review of the record shows that it includes intelligence testing, academic testing, and a social history conducted by respondent in March 2003 (Parent Exs. 20; 21; 22). It also contains the student's cumulative health record through November 2002 (Parent Ex. 18). The student's initial IEP, developed on March 26, 2003 indicated that he was due for reevaluation by March 12, 2006 (Parent Ex. 16 at p. 1). The student was successful academically and behaviorally during the 2003-04 and 2004-05 school years (Parent Exs. 5 at pp. 4-5; 7 at pp. 4-5). In August 2005, respondent requested and obtained consent to reevaluate the student (Parent Exs. 91 at p. 1; 92; see 8 NYCRR 200.4[b]).

13

The student attended respondent's KEA program for approximately 15 days in September 2005 before being hospitalized at Silver Hill (IHO Ex. 1). The student returned to school on November 3, 2005 and was in attendance for approximately 14 more days (id.) before the school psychologist initiated psychoeducational testing on November 28, 2005 (Tr. p. 1894; Dist. Ex. G at p. 2). The psychologist conducted additional testing the following day (id.). Further attempts at assessment were unsuccessful due to the student's inability to remain focused (Tr. pp. 1873, 2027-28).

At the time of the March 2006 CSE meeting, the student had not attended respondent's school for two months (IHO Ex. 1). The March 2006 CSE reviewed the student's February 1, 2006 report card (Tr. pp. 1126, 1130; Parent Ex. 1 at p. 7) and letters provided by petitioners (Tr. pp. 98, 1125, 1130, 1412, 1419; Parent Ex. 1 at p. 5). The KEA psychologist presented the CSE with a synopsis of the student's 2005-06 educational history and the general education and special education teacher members of the CSE reported on the student's school performance (Tr. p. 1600). The March 2006 CSE did not have treatment notes or discharge summaries from the student's psychiatric hospitalizations available for review (Tr. pp. 294, 1139). There was no updated psychological evaluation for the March 2006 CSE to review (Tr. pp. 98, 1126, 1629, 1738).

Although petitioners argue that the CSE used the same information to recommend the KEA program for the student in 2006 as it did to recommend a residential program in 2003, the record indicates that the March 2006 CSE considered information, beyond the student's 2003 standardized evaluations. The student had been in respondent's school for the 2004-05 school year and part of the 2005-06 school year and respondent's staff was familiar with him (Tr. pp. 1061, 1391, 1454, 1831, 2087, 2179). Petitioners had been in regular contact with respondent and provided respondent with some information regarding the student's condition (Dist. Ex. F). Respondent had contact with professionals who provided mental health services to the student outside of the school (Tr. pp. 806-07, 812, 814, 837, 1868, 1931, 1986, 2000-01; Dist. Ex. F).

The record also indicates that the March 2006 CSE asked numerous questions regarding the student's substance abuse (Tr. p. 1129). Petitioners were asked whether they had considered options other than AA to address the student's substance abuse (Tr. p. 718). Respondent's staff questioned the consistency and continuity of the student's care as it related to substance abuse (Tr. p. 1606) and expressed concern regarding the disjointedness of support provided to the student and the incomplete exploration of community services (Tr. pp. 1428, 1430, 1432, 1608). Respondent's staff expressed further concerns regarding the reactionary placement of the student when he was in crisis (Tr. p. 1135; Parent Ex. 1 at p. 6). Petitioners confirmed that they had not explored the possibility of an intensive drug treatment program with follow-up treatment and wrap-around services (Tr. p. 1608; Parent Ex. 1 at p. 6).

The March 2006 CSE also reviewed the letters submitted by petitioners and concluded that some of the professionals who had drafted the letters had limited knowledge of the student (Tr. pp. 1603-09) or of respondent's KEA program (Tr. pp. 1931-32, 1742). Respondent's staff members concluded that petitioners' letters were not consistent with their own observations of the student and that a residential placement was beyond what the student needed (Tr. pp. 2119-

14

20). The CSE Chairperson noted that for a brief period in November 2005, when the student was substance free, he was open to intervention and assistance (Tr. pp. 1609, 2029).

Additionally, although petitioners claim that the March 2006 IEP was developed without sufficient evaluative data, the record indicates that petitioners failed to provide the March 2006 CSE with pertinent information about the student upon which to base its determination. For example, petitioners did not advise the CSE of the student's threats of self-harm, aggression when hospitalized or reports of abuse (Tr. pp. 717-18, 1137, 1423, 1629, 1932-33, 2124-25, 2361-62). Based on the student's performance in the KEA program during the 2004-05 school year, respondent's staff remained convinced that if the student's substance abuse issues were dealt with, he could be successful in the KEA program (Tr. pp. 721, 1132). Respondent's staff acknowledged that at the time of the March 2006 CSE meeting, respondent was aware of the student's substance abuse and legal problems; psychiatric hospitalization; fidgetiness and anxiety; depression; lethargy and sleeping in school; a problematic, but not abusive, relationship with his brother; and non-compliance and verbal aggression within school (Tr. pp. 1421-22, 1735, 1754, 1755, 1816, 1926, 1820-22). Based on the record before me, I find that at the time that the March 2006 IEP was developed, respondent had evaluated the student (although with limited success due to the student's inability to focus), reviewed prior educational records and his current report card, and gathered as much information as possible about him by soliciting parental input and taking information provided by petitioners about the student under consideration in forming its recommendations (see Application of a Child with a Disability, Appeal No. 06-036). In light of the foregoing, I find that the March 2006 IEP was based on sufficient evaluative data.

Petitioners also argue that the March 2006 IEP was insufficient because respondent did not conduct an FBA. State regulations require that an FBA be performed as part of an initial evaluation of a child suspected of having a disability if the child's behavior impedes his or her learning or that of others (8 NYCRR 200.4[b][1][v]). In addition, the IDEA as well as state and federal regulations mandate that the CSE "shall…in the case of a child whose behavior impedes his or her learning or that of others, consider, when appropriate, strategies, including positive behavioral interventions, and supports to address that behavior" (20 U.S.C. 1414[d][3][B][i]; 34 C.F.R. § 300.324[a][2][i]; see 8 NYCRR 200.4[d][3][i]). Where behavior impedes a child's learning, the CSE must properly assess that behavior as an initial step in developing an appropriate IEP (Application of the Bd. of Educ., Appeal No. 05-123; Application of the Bd. of Educ., Appeal No. 05-031; Application of a Child with a Disability, Appeal No. 03-057; Application of a Child with a Disability, Appeal No. 02-032; Application of a Child with a Disability, Appeal No. 01-094; Application of the Bd. of Educ., Appeal No. 01-060). Respondent did not attempt to conduct an FBA; however, the record indicates that the KEA program had built-in behavioral interventions, which respondent's staff found effective (Tr. p. 1690). I note that respondent attempted to evaluate the student, but could not complete its evaluations, because the student was distracted (Tr. p. 1873). In developing its recommendations, the March 2006 CSE took into consideration petitioners' input as well as information provided from the student's private mental health providers (Tr. pp. 2027-28; Parent Ex. 1 at p. 5). Moreover, the record shows that the KEA team planned to work with the student to help him manage his behaviors (Tr. p. 1949). Under the circumstances of this case, I disagree with petitioners' contention that the lack of an FBA resulted in a denial of a FAPE to the student.

15

Moreover, despite their contention, petitioners have not presented sufficient evidence to show that the March 2006 IEP did not meet the student's special education needs at the time that it was developed. Respondent's staff testified that the services and supports recommended by the March 2006 CSE would have addressed the student's academic and emotional needs (Tr. pp. 1127, 2118). They indicated that the present levels of performance represented the discussion that took place at the March 2006 CSE meeting and accurately reflected the student's needs (Tr. pp. 1652-53, 1950-51, 2117-18). Specifically with respect to the student's substance abuse problem, the March 2006 CSE recommended services including family support and a substance abuse program that would provide the student with consistency in dealing with his substance abuse problem (Tr. pp. 1133-34). Respondent also invited a representative from the Mental Health Association to the CSE meeting to provide petitioners with information on these services (Parent Ex. 1 at p. 5). The KEA psychologist testified that given the student's strong cognitive skills despite his emotional difficulties, counseling and support within the student's classes would be appropriate both academically and therapeutically (Tr. pp. 1945, 2115). Respondent's staff opined that the recommended program modifications, assistive technology, and support for school personnel on behalf of the student were all appropriate (Tr. pp. 1127, 1648-49). Specifically, respondent's staff testified that preferential seating was important for the student as it would allow him to be near an appropriate role model or close to the teacher who could refocus the student or provide him with necessary support (Tr. pp. 1947, 2115). The CSE Chairperson also indicated that the student benefited from the use of a word processor to help him brainstorm and facilitate the writing process (Tr. pp. 1649, 1652, 1949, 2116). The support for school personnel meant that both the KEA psychologist and special education teachers would provide consultation to the student's general education teachers so that they could help him in the classroom and understand his needs and disability (Tr. pp. 1650, 1949). The CSE Chairperson also opined that the student's testing accommodations were appropriate (Tr. pp. 1650, 1950). She noted that the student exhibited some distractibility and that flexible scheduling allowed the student to take a break and "bring himself back together" (Tr. pp. 1651, 2117). It also allowed staff to assess the student's needs on a day-by-day basis and determine whether or not he could take the test in his classroom or required a smaller environment (Tr. p. 1651). Directions explained helped to focus the student and make sure he understood the task at hand (Tr. pp. 1652, 1950, 2117). This helped the student's self-confidence (Tr. p. 1652). Use of a word processor with a spell check and grammar check would facilitate the writing process for the student (id.). According to the CSE Chairperson, the student's IEP goals and objectives were not changed because they remained appropriate for the remainder of the 2005-06 school year (Tr. pp. 1653-54, 1951-52).

Reports from evaluations conducted by the student's service providers contemporaneous with the March 9, 2006 CSE meeting, supported respondent's assertion that the student had a significant substance abuse problem. The evaluation reports also identified emotional problems. A Four Winds psychiatric assessment, completed on January 9, 2006 indicated that between January 2, 2006 and January 8, 2006, the student was consuming four 40-ounce beers per day and using three to four grams of marijuana daily (Dist. Ex. B at p. 3). The student reported having blackouts (id.). Suicidal ideation was noted (id. at p. 4). The psychiatrist noted that the student would benefit from a 28-day substance abuse program after hospitalization and recommended that a trial of mood stabilizing medication be considered (id. at p. 5).

16

A January 18, 2006 bio/psychosocial assessment of the student conducted by the clinical director of Ascent resulted in the following initial diagnostic impressions: polysubstance dependence disorder, conduct disorder-adolescent onset type, physical abuse of a child - victim and dysthymic disorder (Parent Ex. 121B at p. 8). The student's diagnoses remained the same upon discharge on March 1, 2006 (Parent Ex. 121D at p. 3). The clinical director at Ascent testified that he learned from petitioners' educational consultant that the student had a significant history of substance abuse (Tr. p. 628) as well as a lot of aggression and hostility (Tr. p. 627). The psychologist from Ascent testified that when the student entered the program his primary problem was "ongoing, fairly severe substance abuse" (Tr. p. 1015). He also cited the student's explosive anger (id.). Respondent noted that the student's private therapist indicated that the student had significant addiction concerns (Tr. pp. 1602, 1932). Educational testing conducted by Ascent in late Winter 2006 yielded results similar to the 2003 assessment of the student conducted by respondent and did not reveal any previously unidentified academic difficulties (Parent Ex. 121D).

Petitioners further maintain that the program proposed by the CSE in March 2006 was inadequate because it did not recommend residential placement. They assert that in light of his emotional condition and substance abuse issues, the student required a highly structured, closely supervised residential setting. The CSE Chairperson testified that when the CSE recommended residential placement for the student in 2003, the student was experiencing distorted thoughts and family trauma, exhibiting self-mutilating behaviors, could not develop appropriate peer or adult relationships, and was aggressive and impulsive (Tr. pp. 1811-13). According to the CSE Chairperson, in 2006, respondent did not determine that the student exhibited distorted thoughts or suicidal ideation like it determined in 2003 (Tr. pp. 1811-12). She noted that, in 2006, the student had made excellent connections with adults as well as with peers (Tr. pp. 1812-13). In addition, the CSE Chairperson noted that, in 2003, the student had experimented with marijuana but was not actively taking drugs, whereas in 2006, he was chemically and physically dependent and using multiple substances (Tr. p. 1812). The KEA psychologist stated that the CSE would not make a residential placement based on the fact that a student had substance abuse problems (Tr. p. 1818). Generally school districts are not required to provide medical treatment for substance abuse issues (see Blickle v. St. Charles Cmty. Unit Sch. Dist. No. 303, 1993 WL 286485 [N.D. Ill. Jul. 29, 1993]; Brian M. v. Boston Public Schs., 401 IDELR 341 [Mass. SEA 1989]; Letter to Scariano, 213 IDELR 133 [OSEP 1988]). Moreover, although school districts must provide an opportunity for parents to participate in the development of their child's IEP, mere parental disagreement with a school district's proposed IEP and placement recommendation does not amount to a denial of meaningful participation (see Sch. for Language and Communication Development v. New York State Dep't of Edu., 2006 WL 2792754, at *7 [E.D.N.Y. Sept. 26, 2006] ["Meaningful participation does not require deferral to parent choice"]; Paolella v. District of Columbia, 2006 WL 3697318, at *1 [D.C. Cir. Dec. 6, 2006]). The IDEA guarantees an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Tucker, 873 F.2d at 567 [internal quotation omitted]; see Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132).

In the instant case, although respondent was not in a position to medically treat the student's substance abuse issues, the record reveals that respondent supported petitioners' efforts to treat the student's chemical dependency by bringing in its own substance abuse counselor (Tr.

17

p. 1672). The record further indicates that respondent tried to accommodate the student's efforts to maintain his sobriety by increasing the level of adult support and monitoring his cravings (Tr. p. 1536). In addition, the record shows that respondent developed a trial plan with petitioners that provided the student with an abbreviated school day thereby allowing him access to AA meetings (Tr. pp. 1535, 1538). Under the circumstances of this case, I find that based on the information before the CSE at the time that the March 2006 IEP was developed, it was reasonable and appropriate for the CSE to recommend against a residential placement despite petitioners' wishes.

Based upon the information before me, I find that the program proposed in the March 2006 IEP, at the time it was formulated, was reasonably calculated to enable the student to receive educational benefit (Viola v. Arlington Central School District, 414 F. Supp. 2d 366 at 382 [S.D.N.Y. 2006] [citing to J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386, 395 n.13 [S.D.N.Y. 2004]; see Cerra, 427 F.3d at 195; see also Mrs. B., 103 F.3d at 1120; Application of a Child with a Disability, Appeal No. 06-112; Application of a Child with a Disability, Appeal No. 06-071; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021). In light of the foregoing, I concur with the impartial hearing officer's conclusion, for the reasons set forth above, that respondent offered the student an appropriate program in the least restrictive environment. Having determined that the challenged March 2006 IEP offered the student a FAPE, I need not reach the issue of whether Wisdom Ranch was appropriate for the 2005-06 school year, and the necessary inquiry is at an end (Mrs. C., 226 F.3d at 66); Walczak, 142 F.3d at 134; Application of a Child with a Disability, Appeal No. 05-038; Application of a Child with a Disability, Appeal No. 03-058).

Next, I will consider petitioners' claim for reimbursement for summer 2006. Petitioners requested ESY services for summer 2006 (Parent Ex. 132). Students shall be considered for ESY services in accordance with their need to prevent substantial regression (8 NYCRR 200.6[j]; Application of the Bd. of Educ., Appeal No. 04-102). Substantial regression is the inability of a student to maintain developmental levels due to a loss of skill or knowledge during the months of July and August of such severity as to require an inordinate period of review at the beginning of the school year to reestablish and maintain IEP goals and objectives mastered at the end of the previous school year (8 NYCRR 200.1[aaa]). In a June 16, 2006 letter to respondent, petitioners indicated that they would be keeping their son at Wisdom Ranch for summer 2006 (Parent Ex. 132). Petitioners asserted in their letter that the March 2006 CSE acknowledged that during the previous summer the student exhibited difficulty with less structure (Parent Exs. 1 at p. 5; 132) and therefore, petitioners requested that respondent recommend ESY services for the student at Wisdom Ranch (Parent Ex. 132). Petitioners advised respondent that if Wisdom Ranch, or a satisfactory alternative, was not recommended, they would seek tuition reimbursement for the student's summer 2006 placement at Wisdom Ranch (id.). The June 2006 CSE discussed petitioners' request (Parent Ex. 126 at p. 5). The CSE, with the exception of petitioners, determined that the student was not eligible for an ESY (Tr. p. 1632; Parent Ex. 126 at p. 6). Petitioners cited an incident that took place during the previous summer in which the student allegedly pulled a knife on another person and the student's then current felony charge as proof of the student's need for an ESY (Parent Ex. 126 at p. 6). Respondent asserted a lack of regression, noting that the student began the 2005-06 school year with a good work ethic and good grades (id.). Under the circumstances of this case, I find that the evidence in the record

does not establish that the student would have experienced substantial regression during the summer, and, therefore, I concur with respondent that ESY services were not required.

I now turn to petitioners' claim that the June 2006 IEP was not appropriate to meet their son's special education needs. As set forth in great detail below, I disagree. The record reveals that on June 19, 2006, the CSE reconvened for the student's re-evaluation/annual review (Parent Ex. 126). Attorneys for both parties were present (id. at p. 5). The June 2006 CSE reviewed the private psychological evaluation from Ascent (Tr. pp. 1366, 1612, 1937-38; Parent Ex. 126 at pp. 8-9) and a letter from the student's private psychiatrist (Tr. pp. 1368, 1376, 1612, 1615; Parent Exs. 38; 126 at pp. 8-9). Respondent's KEA staff spoke about the student's progress while he was in the KEA program (Tr. pp. 1376, 1612). The student's psychiatrist participated in the meeting by telephone (Tr. pp. 1368, 1612, 1615, 1937). Although petitioners indicated that they informed respondent of the student's threats of self-harm (Tr. p. 2362), respondent's CSE members denied having been advised of the threats or of the student's aggressive behavior while hospitalized in January 2006 (Tr. pp. 1630, 1819, 1953, 2241). The June 2006 CSE did not have discharge summaries or treatment notes from the student's hospitalizations available for review (Tr. p. 1388). At the time of the June 2006 CSE meeting, the record reveals that Wisdom Ranch had not generated any progress reports for the student, and the student's mother testified that at time of the commencement of the impartial hearing, she had yet to receive them (Tr. p. 310).

The private psychological evaluation indicated that the student was of above average to superior intelligence and performing at or slightly above his age and grade level in academic content areas (Parent Ex. 123C at pp. 6-8). The psychologist noted a gap between the student's IQ and academic performance and suggested that it might be indicative of a learning disability but might also be indicative of the cognitive and motivational impediments of severe substance abuse (id. at pp. 7-8). He further noted that testing indicated the possibility of an ADHD - primarily inattentive type and suggested that further evaluation for the possibility of ADHD could be helpful (id. at pp. 7-9). According to the psychologist, socially, the student projected an extreme version of a "tough guy" image-arrogant, indifferent to others' troubles, hostile, quick to anger and "blow up," and defiant toward authority and accepted social standards (id. at p. 9). The psychologist opined that emotionally, the student's intimidating exterior hid a deep fear of his own weakness, instability and dependence (id.). The psychologist recommended a long-term structured residential treatment program for the student (id.).

The private psychiatrist noted that the student had a history of mood lability and depression and that he remained in a fragile state (Parent Exs. 38; 126 at p. 6). The psychiatrist reportedly indicated that part of the student's depression and mood disorder was a result of substance abuse (Tr. p. 1616). He reported that the student had progressed at Wisdom Ranch and opined that the student would decompensate if moved to a less structured program (Parent Ex. 38). The psychiatrist stated that Wisdom Ranch was indicative of the type of therapeutic and closely supervised environment that the student required to help him with his emotional and academic needs (id.). He urged the CSE to support the student in continuing his treatment and schooling at Wisdom Ranch (id.). Respondent's staff indicated that the student had been successful in school for two years prior to his substance abuse and opined that were his substance abuse treated, he could be successful in the KEA program (Tr. pp. 1385-86, 1936; Parent Ex. 126 at p. 6).

19

For the 2006-07 school year, the June 2006 CSE recommended that the student return to respondent's KEA special class where he would receive individual counseling one time per week and group counseling one time per week (Parent Ex. 126 at p. 1). For his core academic classes the student would attend general education classes with the support of a special education teacher or aide from the KEA program (Tr. pp. 1464-65; Parent Ex. 126 at p. 1). In addition, the student would attend KEA 10:1+2 special class resource room twice daily for 40 minutes (Parent Ex. 126 at p. 1). The program was the same program recommended by the March 2006 CSE with the exception that the student's English and social studies classes would be co-taught by a general education and special education teacher rather than being taught as self-contained classes (Tr. pp. 1464-65). Also, the student's IEP indicated that he would have counseling available to him on an as needed basis, in addition to his scheduled weekly sessions (Parent Ex. 126 at p. 1). The KEA program included regular consultation by a psychiatrist, similar to the previous year (Tr. pp. 1468-69).

The student's present levels of performance were updated on his IEP and tests scores from petitioners' private psychological evaluation were added to the student's IEP (Parent Ex. 126 at p. 4). Respondent's staff indicated that the present levels of performance reflected the student's abilities (Tr. pp. 1657, 2236). The June 2006 IEP included an additional program modification, which allowed the student's homework assignments to be reduced and modified, and an additional supplementary aide, which afforded the student a copy of scaffolded class notes (Parent Ex 126 at pp. 1-2). The student's testing accommodations remained the same as in his previous IEP; however, a notation was added to indicate that the flexible setting was to include monitoring of the student's distractibility and anxiety (id. at p. 2). The student's IEP included a recommendation for an FBA (id. at pp. 2, 6). Recommended goals and objectives targeted the student's study skills, writing, and social-emotional-behavioral needs (id. at pp. 9-10).

Respondent's staff suggested that the KEA program would provide the student with a closely supervised program (Tr. p. 1386) in a therapeutic setting (Tr. pp. 1386, 1941-42) and that the CSE's recommended program would address the student's emotional and educational needs (Tr. pp. 1386, 1945, 1952). According to respondent's psychologist, the KEA program provided a therapeutic environment by offering students support in their classes and helping them to manage their emotions while trying to learn (Tr. pp. 1941-42). The student's IEP indicated that he would be supported in general education classes by the special education teacher/aides from the KEA program (Tr. p. 1946; Parent Ex. 126 at p. 1). The student's special education teacher reported that in addition to classroom support, the resource room would assist the student with skills and work completion and that the counseling would provide him with therapy (Tr. p. 2121). The program psychologist reported that she was able to work with students to understand "triggers" that might "set them off" (Tr. p. 1942). In addition, program staff worked with classroom teachers and other school personnel to develop proactive strategies for managing students (Tr. pp. 1943-44). The KEA psychologist reported that when the student was not abusing substances, he fit the class profile for students involved in the KEA program (Tr. pp. 1944-45).

The KEA psychologist stated that the recommendations made by the Ascent psychologist could be addressed in the KEA program (Tr. pp. 1939-40). Specifically, an ADHD screening and FBA could be conducted within the KEA program and the program could offer the student an academic component, as well as counseling on an individual, small group and as needed basis (Tr. pp. 1940-41). In the KEA program, the student could continue to work with the substance abuse counselor in respondent's school (id.). The CSE recommended program included two daily resource room periods where the student could receive support with his daily work (Tr. pp. 1945-46).

The CSE Chairperson stated that achievement testing revealed a relative weakness in the student's spelling ability, which was addressed as part of the student's academic program (Tr. pp. 1621-22). The student's June 2006 IEP provided for access to a word processor for writing assignments and for the use of a word processor and spell check device during testing (Parent Ex. 126 at p. 2). Scaffolded class notes were added to the June 2006 IEP based on observations from the student's special education teachers that the notes gave the student a chance to focus on instruction and provided the student an outline from which to study (Tr. pp. 1655, 1947, 2234). Modified homework assignments were added to the student's IEP to help reduce his frustration with homework (Tr. pp. 1655-56, 1947-48, 2234). The CSE Chairperson testified that the CSE's previous recommendation for a behavioral consultation with the student's general education teachers remained appropriate (Tr. pp. 1656-57, 2236). According to the CSE Chairperson, the student's testing accommodations were appropriate for helping him deal with distractions and reinforce exactly what was expected of him on a test (Tr. p. 1950).

The June 2006 CSE recommended that an FBA be conducted during the 2006-07 school year (Parent Ex. 126 at pp. 2, 6). The KEA psychologist indicated that the purpose of the assessment would be to identify the student's "triggers" so as to help him avoid responding to the triggers in an inappropriate manner (Tr. p. 1948). The June 2006 CSE added a study skills goal to the student's IEP related to turning in homework on time (Tr. p. 1952). The student's special education teacher opined that the recommended study skills and writing goals were appropriate (Tr. p. 2237). Based on the foregoing, the record shows that the June 2006 IEP addressed the student's emotional, academic and behavioral needs in a highly supervised therapeutic setting. In developing its recommendations for the 2006-07 school year, the record establishes that respondent considered observations and recommendations from the student's private providers (see Parent Ex. 126 at pp. 8-9). Based upon the information before me, I find that the program proposed in the June 2006 IEP, at the time it was formulated, was reasonably calculated to enable the student to receive educational benefit (Viola, 414 F. Supp. 2d at 382 [citing to J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386, 395 n.13 [S.D.N.Y. 2004]; see Cerra, 427 F.3d at 195; see also Mrs. B., 103 F.3d at 1120; Application of a Child with a Disability, Appeal No. 06-112; Application of a Child with a Disability, Appeal No. 06-071; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021). In light of the foregoing, I concur with the impartial hearing officer's conclusion, for the reasons set forth above, that respondent offered the student an appropriate program in the least restrictive environment for the 2006-07 school year. Having determined that the challenged June 2006 IEP offered the student a FAPE for the 2006-07 school year, I need not reach the issue of whether Wisdom Ranch was appropriate, and the necessary inquiry is

21

at an end (Mrs. C., 226 F.3d at 66; Walczak, 142 F.3d at 134; Application of a Child with a Disability, Appeal No. 05-038; Application of a Child with a Disability, Appeal No. 03-058).

I must now consider petitioners' request for reimbursement for the private psychological evaluation conducted at Ascent. As set forth in greater detail below, I decline to award such reimbursement. State regulations provide that a parent has the right to an independent educational evaluation (IEE) at public expense if the parent disagrees with an evaluation obtained by the school district. If a parent requests an IEE at public expense, the school district must, without unnecessary delay, ensure either an IEE is provided at public expense or initiate an impartial hearing to show that its evaluation is appropriate or that the evaluation obtained by the parent does not meet the school district criteria. If the impartial hearing officer finds that a school district's evaluation is appropriate, a parent may not obtain an IEE at public expense (34 C.F.R. § 300.502; 8 NYCRR 200.5[g]; Application of the Bd. of Educ., Appeal No. 05-009; Application of a Child with a Disability, Appeal No. 04-082; Application of a Child with a Disability, Appeal No. 04-027). In the instant case, there is nothing in the record that indicates that petitioners disagreed with a district evaluation, nor does the record show that they had requested a private evaluation of their son. I note that respondent made an effort to evaluate the student, but attempts to do so were not successful due to the student's inability to focus (Tr. pp. 1873, 2027-28). I also note that the private evaluation provided respondent with information not otherwise contained in its own evaluations. I further find that the private evaluation is not duplicative of any evaluation in the record. Although the private psychological evaluation provided respondent's CSE with useful information regarding the student in making its recommendations, the evaluation did not identify any new educational needs. Additionally, although respondent considered the Ascent psychologist's recommendation that the student required residential placement in conjunction with experiential learning paradigms; however, the CSE did not accept his recommendation. In light of the foregoing, I decline to award reimbursement for the cost of the private psychological evaluation.

I have considered the parties' remaining contentions and find them to be without merit.

**THE APPEAL IS DISMISSED.**

Dated:    Albany, New York
          May        , 2007
                30

PAUL F. KELLY
STATE REVIEW OFFICER