UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
P.K. and P.K., on behalf of P.K.,

Plaintiffs,

- against -

Case No. CV 07-8494

THE BEDFORD CENTRAL SCHOOL DISTRICT,

Defendant.

------------------------------------------------------------X

**MEMORANDUM OF LAW
ON BEHALF OF
<u>DEFENDANT BEDFORD CENTRAL SCHOOL DISTRICT</u>**


Respectfully submitted,

INGERMAN SMITH, LLP
Attorneys for Defendant
  BEDFORD CSD
550 Mamaroneck Avenue, Suite 209
Harrison, New York 10528
(914) 777-1134


*Of Counsel:*

RALPH C. DeMARCO

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| STATEMENT OF FACTS | 1 |
| ARGUMENT | 10 |
| POINT I<br>THE DISTRICT IS ENTITLED TO JUDGMENT ON THE<br>LAW AND THE FACTS. | 10 |
| A. THE STATE HAS COMPLIED WITH THE<br>PROCEDURES IN THE IDEA. | 12 |
| B. THE PARENTS ARE NOT ENTITLED TO<br>REIMBURSEMENT. | 12 |
| 1. THE SRO CORRECTLY HELD THAT THE<br>IEPs WERE APPROPRIATE. | 12 |
| 2. THE IHO CORRECTLY HELD THAT THE<br>PRIVATE RESIDENTIAL FACILITY WAS<br>NOT APPROPRIATE. | 17 |
| 3. THE IHO CORRECTLY HELD THAT<br>EQUITABLE CONSIDERATIONS DO NOT<br>SUPPORT THE PARENTS' CLAIMS. | 22 |
| POINT I I<br>THE SRO CORRECTLY HELD THAT THE PARENTS<br>ARE NOT ENTITLED TO REIMBURSEMENT<br>FOR THE PRIVATE PSYCHOLOGICAL EVALUATION. | 24 |
| CONCLUSION | 25 |

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of the Defendant, BEDFORD CENTRAL SCHOOL DISTRICT, (hereinafter "DISTRICT") in support of its request for a judgment dismissing the Complaint filed by P.K. and P.K. on behalf of their son, P.K., under the Federal Individuals with Disabilities Education Act, 20 U.S.C. Section 1401, et seq., and Article 89 of the New York State Education Law. Specifically, MR and MRS. K. seek review of the Decision of the State Review Officer ("SRO") for the New York State Education Department, which denied their request for reimbursement of tuition, room, board, transportation and escort service fees associated with their unilateral placement of P.K. at a residential facility, known as Wisdom Ranch School, located in Idaho, during the 2005-2006 and 2006-2007 school years and which denied their request for reimbursement for the private psychological evaluation report done on P.K. by another residential facility, known as Ascent Wilderness Program, located in Idaho, in February 2006.[1]

The DISTRICT submits that the SRO Decision is entitled to due deference from this Court. The DISTRICT respectfully requests that this Court issue a judgment dismissing the Complaint, in its entirety.

## STATEMENT OF FACTS

At all relevant times during the hearing, P.K., born July 12, 1989, was a male high school student classified by the DISTRICT's Committee on Special Education ("CSE") as a student having an emotional disability.

---

[1] On page 2 of Petitioners' Complaint, Petitioners request that the SRO Decision be annulled and vacated. On page 33 of the Complaint, Petitioners also request that the IHO Decision be reversed. To the extent that Petitioners request that the IHO Decision be reversed, the DISTRICT submits that any such request must not include the IHO's determination that the Ascent Wilderness Program was inappropriate for P.K., as Petitioners did not appeal such determination to the SRO. Any claims by Petitioners with respect to the appropriateness of Ascent have been waived. See SRO Decision, at page 10 (footnote 3). Indeed, nowhere in Petitioners' Complaint have they affirmatively requested relief regarding the Ascent Wilderness Program, nor have they affirmatively raised any claims regarding the appropriateness of the Ascent Wilderness Program.

By way of background, P.K. was placed for the ninth (9th) grade by the CSE in a New York State approved residential facility known as Devereaux Glenholme, ("Devereaux") located in Washington, Connecticut, during the 2003-2004 school year. P-13. Prior to being placed at Devereux, P.K. had been hospitalized because of his "very unstable mood, depression, suicidal ideation and oppositional behavior in school and in his parents['] home." P-120. P.K. had suffered personal trauma, losing an aunt to suicide and having his mother diagnosed with breast cancer, which had a grave impact on his anxiety and fear levels. T, at 1485-1486. P.K. wrote the word "pain" on his arm, displayed aggressive behavior in school and received multiple school suspensions. T, at 1486. MR. and MRS. K. reported that P.K. "was increasingly self-medicating with marijuana during the [Summer 2002]," but had been screened for drug use since December 2002. P-13, at 3-4.

At the annual review meeting held on June 3, 2004, the CSE reviewed P.K.'s significant progress at Devereaux and recommended that he return from residential placement to be placed for the tenth (10th) grade in an in-DISTRICT therapeutic support program known as KEA, or "Keys for Emotional Awareness," located at Fox Lane High School, during the 2004-2005 school year. P-7; T, at 101. MR. and MRS. K. were in full agreement with the recommendations made by the CSE. P-7; D-E; T, at 466-467. The KEA Program was developed in 2002, based on extensive DISTRICT research, to provide a continuum of special education services, including academic and emotional supports, for fragile students who had anxiety, levels of depression and/or a history of psychiatric hospitalizations, which may have involved suicidal ideation. T, at 1455-1459.

By all accounts, P.K. had a great first year in the KEA Program during the 2004-2005 school year. T, at 1514. P.K. even referred to himself as a "poster child for the program." T, at 1923-24. At an annual review meeting on March 22, 2005, the CSE reviewed P.K.'s great

progress and recommended that he remain for the eleventh (11th) grade in the KEA Program for the 2005-2006 school year.  P-5.  MR. and MRS. K. were in full agreement with the recommendations made by the CSE.[2]  P-5; T, at 471.

Sadly, P.K. began using drugs during the Summer 2005.  T, at 804.

Upon returning to the KEA Program in September 2005, P.K. initially performed fine, but then began having trouble staying focused in school.  T, at 1530-1531.  P.K. was sometimes tense, agitated and depressed.  T, at 1998.  P.K. told the School Psychologist, Denise Taylor, how he thought of abusing drugs and how it was difficult for him to concentrate in school.  T, at 1849.

Toward the end of September 2005, MR. and MRS. K. came to the realization that P.K. was abusing drugs and placed him in Silver Hill Hospital, ("Silver Hill"), which is a psychiatric and drug treatment facility located in New Haven, Connecticut.[3]  T, at 233, 484 and 1531.  After approximately one (1) week, Silver Hill referred P.K. for step-down care in the Partial Hospitalization Program at Four Winds Hospital, ("Four Winds"), which is a psychiatric facility located in Katonah, New York, where he was admitted on October 7, 2005.  P-130; D-B.  P.K. was subsequently discharged from Four Winds on October 21, 2005, with diagnoses of mood disorder and poly-substance dependence and placed on a combination of antidepressant (Lexapro) and antipsychotic (Sereoquel) medications.  P-130; T, at 492.

---

[2]  Although she initially claimed that P.K. experienced a downward spiral and began to resume his old behaviors of aggression, threatening other students, defying authority and acting out in the Spring 2005, MRS. K. conceded on cross-examination that she never received anything in writing to this effect from the DISTRICT, never expressed any concern to this effect to the CSE and never voiced her concerns to this effect to Linda Schluter, Assistant Superintendent, or to Laurie Bauer, Assistant Director of Special Education.  T, at 468-473.  MRS. K. went on to admit on cross-examination that she told Ms. Schluter that the KEA Program was instrumental in turning P.K.'s life around at a meeting on June 13, 2005.  T, at 477.

[3]  At the outset of the hearing in July 2006, the DISTRICT sought copies of P.K.'s records at Silver Hill and provided MR. K. and MRS. K. with the requisite authorization form.  MR. K. and MRS. K. refused to sign the form for many months, thereby preventing the DISTRICT from having access to these documents during the hearing.  MRS. K. then disingenuously returned the signed form to the DISTRICT on the second to last day of hearing on December 8, 2006, T, at 2173.

Upon learning that P.K. was not going to school following his discharge from partial hospitalization at Four Winds, the KEA Team, consisting of Laurie Bauer, the Assistant Director of Special Education, Denise Taylor, School Psychologist, Kieran O'Gorman, Special Education Teacher, and Tony Monchinski, Special Education Teacher, met with MR. and MRS. K. on November 1, 2005, to brainstorm methods to transition P.K. back to school in the KEA Program. T, at 1531-1533.  Ultimately, the KEA Team, along with MR. and MRS. K., agreed to a plan under which P.K. would be provided with a shortened class schedule and special transportation to bring him directly to the closest school entrance to the KEA classroom where he would be met by a KEA staff member.  T, at 1860.  The shortened day provided P.K. with a sense of structure to his day, allowed him to avoid the stimuli of coming in with the other groups of students, and gave him an opportunity to focus on catching up with his work as part of his transition back into the school system.  T, at 1760.  The shortened day also helped to keep P.K. safe by having him avoid temptations during unstructured times such as hanging out with other students in the commons.  T, at 1351 and 1861.  The shortened day further allowed P.K. to leave school early to continue to attend Alcoholics Anonymous ("AA") meetings in the afternoon.  T, at 1534-1538.

At a program review meeting on November 17, 2005, the CSE formalized this plan into P.K's IEP.  P-3.  MR. and MRS. K. were in full agreement with the recommendations made by the CSE.  P-3; T, at 1543-1547.

Upon his return to the KEA program in November 2005, P.K. had days when he was engaged and participated and days when his level of participation decreased due to lethargy.  T, at 1539 and 1547.  P.K. spoke to KEA staff about his need to smoke and his cravings for nicotine and drugs.  T, at 1547-1548, 1906-1908 and 2123.  P.K. commented to Ms. Taylor about how often he was thinking about using drugs, and how these thoughts created anxiety for him.  T, at 1927.  P.K. also commented to Mr. Monchinski how one could never lose the taste for cocaine.  T,

- 4 -

at 2223-2224. By December 2006, P.K. began to decline as he tried to stay clean and sober. T, at 1870. Significantly, P.K. only received a couple of school suspensions for smoking and was not displaying aggressive behavior in school. T, at 1624-1627.

Meanwhile, P.K.'s behavior at home became especially disruptive during the period from September 2005 through January 2006. T, at 855-856. P.K. frequently engaged in misconduct, such as pushing MR. K., throwing dishes at and verbally abusing MR. and MRS. K. and slamming objects around the house. T, at 855-856. At one point, P.K. was arrested on felony criminal charges and spent the night in jail following a confrontation in which he was armed with a knife and cut another adolescent's finger who had not returned his drug paraphernalia. T, at 252, 550-552 and 2038.

Following his relapse into drug abuse on January 1, 2006, MR. and MRS. K. brought P.K. to Four Winds on January 9, 2006, where he remained hospitalized until January 18, 2006. D-B; T, at 252-53. In the records related to this hospitalization, MR. and MRS. K. reported that P.K. threatened to strangle himself with a vacuum hose and to jump out of a car and Four Winds reported that P.K. was placed in a secure wing because he had aggressive episodes with other patients.[4] D-B.

By letter, dated January 12, 2006, MR. and MRS. K raised concerns to the DISTRICT about P.K.'s placement in the KEA Program. P-95. On January 17, 2006, the entire KEA Team met with MR. and MRS. K. to go over their concerns. P-96. Although they explained that P.K. had just been hospitalized and discussed some of the criminal case stemming from the knife incident, neither MR. nor MRS. K. told the KEA Team that P.K. had threatened to strangle himself with a vacuum hose and to jump out of a car or that P.K. had aggressive episodes at Four

---

[4] Even though the DISTRICT had sought copies of P.K.'s records at Four Winds at the outset of the hearing in July 2006, the records containing this information were not provided to the DISTRICT by MR. K. and MRS. K. until more than halfway through the hearing on November 9, 2006. T, at 1579.

Winds. T, at 1585, 1630-31, 1901, 1921, 1932-33, 1819, 2124-25 and 2240-41. Ultimately, MR. and MRS. K. informed the KEA Team, for the first time, that they were sending P.K. to a residential wilderness program known as the Ascent Wilderness Program, ("Ascent") located in Naples, Idaho, the very next day. [5] T, at 1585.

P.K. was subsequently placed by MR. and MRS. K. in Ascent. Upon entering in January 2006, P.K.'s primary problem was his "ongoing fairly severe substance abuse." T, at 1015. Upon his discharge in March 2006, P.K. left Ascent with diagnoses of poly-substance dependence disorder, conduct disorder adolescent-onset type, physical abuse of child, dysthymic disorder and disruptive behavior disorder. P-121C-F.

By letter, dated February 16, 2006, MR. and MRS. K requested a CSE meeting. P-97.

By letter, dated February 23, 2006, MR. and MRS. K. notified the DISTRICT that they intended to unilaterally place P.K. at public expense in a residential experiential learning facility known as the Wisdom Ranch School, ("Wisdom Ranch") located in Arco, Idaho, effective March 13, 2006. P-101.

At a program review meeting on March 9, 2006, the CSE reviewed P.K.'s status, including a number of letters from private providers which were submitted by MR. and MRS. K. P-1 and P-34-37. Ultimately, the CSE recommended that P.K. return for the eleventh (11th) grade in the KEA Program for the remainder of the 2005-2006 school year. P-1. The consensus of the CSE was that P.K.'s primary problem was drug abuse and that MR. and MRS. K. should explore community supports and network services through Westchester County. P-1. T, at 1608. MRS. K. was not in agreement with the recommendations of the CSE. P-1.

As previously indicated, MR. and MRS. K. subsequently placed P.K. at Wisdom Ranch.

---

[5]  The abrupt removal of P.K. from the KEA Program by MR. K. and MRS. K. prevented the DISTRICT from completing his triennial reevaluation. T, at 2026-28.

At an annual review meeting on June 19, 2006, the CSE reviewed P.K.'s status, including a letter and evaluation from private providers which were submitted by MR. and MRS. K. P-38, P-121E and P-126. Ultimately, the CSE recommended that P.K. be placed for the twelfth (12th) grade in the KEA Program. P-126. The consensus of the CSE was that the data available at the meeting showed that, without his drug abuse problems, the KEA Program provided the appropriate level of academic and emotional support for P.K. T, at 1654.

P.K. remained at Wisdom Ranch through at least the end of the hearing in December 2006, except for approximately two (2) weeks in July 2006 when Wisdom Ranch sent him to another residential facility known as SUWS, located somewhere near Wisdom Ranch, because he was not committed to staying at Wisdom Ranch and to following the rules. T, at 745.

By their attorney's letter, dated May 11, 2006, and received on May 23, 2006, MR. and MRS. K. commenced the underlying Impartial Hearing for various reimbursement claims against the DISTRICT for the remainder of the 2005-2006 school year. The parties later agreed to amend the Impartial Hearing to include reimbursement claims for the 2006-2007 school year. The DISTRICT rejected MR. and MRS. K.'s request for relief and hearing dates were held on July 11, July 12, July 28, September 12, September 14, September 26, November 9, November 14, December 8, and December 11, 2006. The parties submitted Post-Hearing Briefs to the Impartial Hearing Officer ("IHO") on or before February 2, 2007.

In her Decision and Order, dated March 9, 2007, the IHO ruled in favor of the DISTRICT, and denied all of the reimbursement claims made by MR. and MRS. K.

By Verified Petition, with supporting papers, dated April 12, 2007, MR. and MRS. K. appealed from the IHO Decision and Order by seeking review from the SRO for the New York State Education Department. The DISTRICT joined issue by Verified Answer, with supporting papers, dated April 27, 2007.

In his Decision, dated May 30, 2007, the SRO ruled entirely in favor of the DISTRICT and dismissed MR. and MRS. K.'s appeal, in its entirety.  SRO Decision, at 1, 15-16 and 18-22. In denying MR. and MRS. K.'s reimbursement claims for the 2005-2006 school year, the SRO held as follows:

> Although petitioners argue that the CSE used the same information to recommend the KEA program for the student in 2006 as it did to recommend a residential program in 2003, the record indicates that the March 2006 CSE considered information, beyond the student's 2003 standardized evaluations. The student had been in respondent's school for the 2004-05 school year and part of the 2005-06 school year and respondent's staff was familiar with him. Petitioners had been in regular contact with respondent and provided respondent with some information regarding the student's condition. Respondent had contact with professionals who provided mental health services to the student outside of the school.
>
> The record also indicates that the March 2006 CSE asked numerous questions regarding the student's substance abuse.  Petitioners were asked whether they had considered options other than AA to address the student's substance abuse. Respondent's staff questioned the consistency and continuity of the student's care as it related to substance abuse and expressed concern regarding the disjointedness of support provided to the student and the incomplete exploration of community services. Respondent's staff expressed further concerns regarding the reactionary placement of the student when he was in crisis. Petitioners confirmed that they had not explored the possibility of an intensive drug treatment program with follow-up treatment and wrap-around services. The March 2006 CSE also reviewed the letters submitted by petitioners and concluded that some of the professionals who had drafted the letters had limited knowledge of the student or of respondent's KEA program. Respondent's staff members concluded that petitioners' letters were not consistent with their own observations of the student and that a residential placement was beyond what the student needed. The CSE Chairperson noted that for a brief period in November 2005, when the student was substance free, he was open to intervention and assistance. Additionally, although petitioners claim that the March 2006 IEP was developed without sufficient evaluative data, the record indicates that petitioners failed to provide the March 2006 CSE with pertinent information about the student upon which to base its determination. For example, petitioners did not advise the CSE of the student's threats of self-harm, aggression when hospitalized or reports of abuse. Based on the student's performance in the KEA program during the 2004-05 school year, respondent's staff remained convinced that if the student's substance abuse issues were dealt with, he could be successful in the KEA program. Respondent's staff acknowledged that at

the time of the March 2006 CSE meeting, respondent was aware of the student's substance abuse and legal problems; psychiatric hospitalization; fidgetiness and anxiety; depression; lethargy and sleeping in school; a problematic, but not abusive, relationship with his brother; and non-compliance and verbal aggression within school. Based on the record before me, I find that at the time that the March 2006 IEP was developed, respondent had evaluated the student (although with limited success due to the student's inability to focus), reviewed prior educational records and his current report card, and gathered as much information as possible about him by soliciting parental input and taking information provided by petitioners about the student under consideration in forming its recommendations. In light of the foregoing, I find that the March 2006 IEP was based on sufficient evaluative data.

<div align="center">***</div>

In the instant case, although respondent was not in a position to medically treat the student's substance abuse issues, the record reveals that respondent supported petitioners' efforts to treat the student's chemical dependency by bringing in its own substance abuse counselor. The record further indicates that respondent tried to accommodate the student's efforts to maintain his sobriety by increasing the level of adult support and monitoring his cravings. In addition, the record shows that respondent developed a trial plan with petitioners that provided the student with an abbreviated school day thereby allowing him access to AA meetings. Under the circumstances of this case, I find that based on the information before the CSE at the time that the March 2006 IEP was developed, it was reasonable and appropriate for the CSE to recommend against a residential placement despite petitioners' wishes. Based upon the information before me, I find that the program proposed in the March 2006 IEP, at the time it was formulated, was reasonably calculated to enable the student to receive educational benefit. In light of the foregoing, I concur with the impartial hearing officer's conclusion...that respondent offered the student an appropriate program in the least restrictive environment.

SRO Decision, at page 13-18 (citations omitted). In denying MR. and MRS. K.'s reimbursement

claims for the 2006-2007 school year, the SRO held as follows:

The record reveals that on June 19, 2006, the CSE reconvened for the student's re-evaluation/annual review. Attorneys for both parties were present. The June 2006 CSE reviewed the private psychological evaluation from Ascent and a letter from the student's private psychiatrist. Respondent's KEA staff spoke about the student's progress while he was in the KEA program. The student's psychiatrist participated in the meeting by telephone. Although petitioners indicated that they informed respondent of the student's threats of self-harm, respondent's CSE members denied having been advised of the threats or of the student's aggressive behavior while hospitalized in January 2006. The June 2006 CSE did not have

discharge summaries or treatment notes from the student's hospitalizations available for review. At the time of the June 2006 CSE meeting, the record reveals that Wisdom Ranch had not generated any progress reports for the student, and the student's mother testified that at time of the commencement of the impartial hearing, she had yet to receive them.

<div align="center">***</div>

Respondent's staff suggested that the KEA program would provide the student with a closely supervised program in a therapeutic setting and that the CSE's recommended program would address the student's emotional and educational needs. According to respondent's psychologist, the KEA program provided a therapeutic environment by offering students support in their classes and helping them to manage their emotions while trying to learn…The KEA psychologist reported that when the student was not abusing substances, he fit the class profile for students involved in the KEA program.

<div align="center">***</div>

In light of the foregoing, I concur with the impartial hearing officer's conclusion…that respondent offered the student an appropriate program in the least restrictive environment for the 2006-07 school year.

SRO Decision, at page 18-22 (citations omitted).

By Summons and Complaint, dated October 1, 2007, MR. and MRS. K. sought review of the SRO's Decision by this Court. The DISTRICT joined issue by Answer, dated October 23, 2007. Thereafter, the parties entered into a Consent Scheduling Order, signed by this Court on January 18, 2008, in which it was acknowledged that, "Given that this action is one for review on an administrative record pursuant to Fed. R. Civ. P. 26(a)(1)(E)(i), there shall be no discovery practice, including the submission of additional evidence pursuant to 20 U.S.C. §1415(i)(2)(B)(ii), other than the transmittal of the administrative record created below to the Court and Memorandum of Law by both parties."

<div align="center">

**ARGUMENT**

**POINT 1**

**THE DISTRICT IS ENTITLED TO
JUDGMENT ON THE LAW AND THE FACTS.**

</div>

Actions in Federal Court under the Individuals with Disabilities Education Act ("IDEA") generally are resolved by examination of the administrative record in a summary judgment

procedural posture. <u>Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.</u>, 281 F.Supp.2d
710, 714 (S.D.N.Y. 2003). "Federal courts reviewing administrative determinations under the
IDEA must base their decisions on the preponderance of the evidence, taking into account not
only the record from the administrative proceedings, but also any further evidence presented
before the District Court by the parties." <u>Grim v. Rhinebeck Cent. Sch. Dist.</u>, 346 F.3d 377, 380
(citing 20 U.S.C. § 1415(i)(2)(B)). The Second Circuit has interpreted the IDEA as strictly
limiting judicial review of the state administrative decisions. <u>Id.</u>, at 380-81 (citing <u>Bd. of Educ.</u>
<u>of the Hendrick Hudson Central School District v. Rowley</u>, 458 U.S. 176, at 204-08). In
determining whether school districts have complied with the IDEA, the United States Supreme
Court has recognized that courts do not have special expertise in the field of education and
should not substitute the court's judgment for that of school authorities. <u>Rowley</u>, at 206. Thus,
due deference is to be afforded to administrative decisions made by state officials who possess
expertise in the field, mindful that the judiciary generally lacks the specialized knowledge and
experience necessary to resolve persistent and difficult questions of educational policy. <u>Id.</u>, at
207-08. The above standard of judicial review was recently reiterated in <u>Viola v. Arlington</u>
<u>Central School District</u>, 414 F.Supp.2d 366 (S.D.N.Y. 2006) where this very Court explained
that, "...although our inquiry certainly is not one of 'rubber stamp' review, we nevertheless
"must give 'due weight' to the administrative proceedings, 'mindful that the judiciary generally
lacks the specialized knowledge and experience necessary to resolve persistent and difficult
questions of educational policy." <u>Id.</u> at 378 (citations omitted). In applying this standard in <u>J.R.</u>
<u>and B.R. v. Bd. of Educ. of the City of Rye School District</u>, 345 F.Supp.2d 386 (S.D.N.Y. 2004),
this very Court explained that, "We conclude that the SRO properly upheld the IHO's
determination that the...IEP was reasonably calculated to confer an educational benefit...In so
concluding, we give the requisite weight to the decisions of impartial state education officers

who are far better versed in educational policy and practice than this Court, and therefore, better suited to the difficult task of evaluating…progress under the previous and proposed IEP's." Id. at 395.

The United States Supreme Court has established the following two-part inquiry for courts reviewing administrative determinations under the IDEA: "First, has the state complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" Rowley, at 206-07.

## A.    THE STATE HAS COMPLIED WITH THE PROCEDURES IN THE IDEA.

As shown by the record, the State has complied with the procedures set forth in the IDEA. Indeed, MR. and MRS. K. have made no allegations to date claiming that the State has violated any procedures set forth in the IDEA.

## B.    THE PARENTS ARE NOT ENTITLED TO REIMBURSEMENT.

### 1.    THE SRO CORRECTLY HELD THAT THE IEPs WERE APPROPRIATE.

In the decision of Schaffer v. Weast, 126 S.Ct. 528 (2005), the United States Supreme Court held that the "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief."[6] Id., at 537. The United States Supreme Court rejected the argument that every IEP is assumed invalid until the school district demonstrates that it is not. Id., at 536. A purpose behind the Individuals with Disabilities Education Act ("IDEA")

---

[6] On August 15, 2007 Governor Spitzer signed into New York State law, Chapter 583 of the Laws of 2007, amending Education Law §4404(1), so that the school district or the state agency responsible for providing education to students with disabilities shall have the burden of proof, including the burden of persuasion and burden of production, in any impartial hearing, except that a parent or person in parental relation seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of the private placement. This amendment was effective sixty (60) days after the Governor signed it into law, i.e. October 15, 2007. Since MR. and MRS. K. filed their request for an impartial hearing on February 23, 2006, they are still bound by the decision of Schaffer v. Weast, which sets forth that they have the burden of proof for this hearing as the party seeking relief.

is to ensure that students with disabilities have available to them a free appropriate public education. 20 U.S.C. Section 1400(d)(1)(A). A free appropriate public education includes special education and related services designed to meet the student's unique needs, provided in conformity with a comprehensive written IEP. 20 U.S.C. Section 1401(9). See 20 U.S.C. Section 1414(d). A free appropriate public education is offered to a student when the board of education complied with the procedural requirements set forth in the IDEA and when the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits. Rowley, 458 U.S. 176, 206, 207 (1982). In J.R. and B.R., supra, at 395, this very Court explained that, "This determination [as to the appropriateness of the IEP] is necessarily prospective in nature; we therefore must not engage in Monday-morning quarterbacking guided by our knowledge of [the student's] subsequent progress [at the private school], but rather consider the propriety of the IEP with respect to the likelihood that it would benefit [the student] at the time it was devised."

The 2005-2006 and 2006-2007 IEPs developed for P.K. by the CSE at its meetings on March 9, 2006, and June 19, 2006, respectively, were appropriate and reasonably calculated to provide him with meaningful educational progress in the least restrictive environment. P-1 and P-126.

In the 2005-2006 IEP, the CSE recommended that P.K. return for the eleventh (11th) grade in the KEA Program. P-1. Specifically, the CSE recommended that P.K. continue to be placed in the Special Class KEA three (3) periods per day for forty (40) minutes per period and receive counseling two (2) times per week for thirty minutes per session under a shortened school day with special transportation. In addition to goals and objectives targeting his special education needs in the areas of writing and social/emotional/behavioral, the CSE recommended that P.K. receive program modifications consisting of preferential seating, support for school

personnel consisting of behavioral intervention consultation for teacher, as well as testing accommodations consisting of flexible scheduling, flexible setting, directions explained, use of word processor, use of spell check device and use of grammar check device. P-1.

In the 2006-2007 IEP, the CSE recommended that P.K. be placed for the twelfth (12th) grade in the KEA Program. P-126. Specifically, the CSE recommended that P.K. be placed in the Special Class KEA two (2) periods per day for forty (40) minutes per period and receive counseling two (2) times per week for thirty minutes per session. P-126. The CSE noted that counseling was also available to P.K. on an as-needed basis, in the event he needed assistance, and that P.K was to be supported in his general education classes by the special education teachers/aides from the KEA Program. P-126. In addition to goals and objectives targeting his special education needs in the areas of study skills, writing and social/emotional/behavioral, the CSE recommended that P.K. receive program modifications consisting of preferential seating, copy of scaffolded class notes, modified homework assignments, support for school personnel consisting of behavioral intervention consultation for teacher, as well as testing accommodations consisting of flexible scheduling, flexible setting, directions explained, use of word processor, use of spell check device and use of grammar check device. P-126.

The 2005-2006 and 2006-2007 IEPs were designed by the CSE to address P.K'.s emotional disability in a structured, therapeutic environment for fragile students. T, at 1360. The KEA Program provides P.K. with academic and emotional support and serves as a "home base" with a nurturing and safe environment where he could return to from his other mainstream classes. T, at 1515-1516. The IEPs listed P.K.'s standardized test scores and accurately described his abilities and needs in the areas of educational achievement and learning characteristics, social development, physical development and management needs, noting for example that P.K needs to develop appropriate boundaries with other students, he needs

continued additional support of special education services to be successful in regular education classes, he needs to learn how to stay on task and reduce task-avoidant behaviors, and he needs for help increasing is frustration tolerance and controlling impulsive behavior. P-1 and P-126. Further, the IEPs contain goals and, where applicable, objectives tailored to P.K.'s deficits in study skills, writing and social/emotional/behavioral skills with particular attention to improving his homework organization, improving his ability to self-correct grammatical errors and independently write essays, and improving socially acceptable behaviors in the school environment. P-1 and P-126.

The DISTRICT offered extensive testimony from Ms. Bauer, Ms. Taylor, Mr. O'Gorman and Mr. Monchinski, who all combined to credibly testify about, <u>inter alia</u>, the history and development of the program, therapeutic milieu, curriculum, staff-student ratio, physical layout of the program, consultant psychiatric services, substance abuse services, functional behavioral assessments, behavior intervention plans and availability of network services to wrap around the school day. T, at 1455-1826.

P.K. was likely to make meaningful educational progress under his 2005-2006 and 2006-2007 IEPs in the KEA Program, which provided him with the appropriate level of academic and emotional supports in school. The KEA Program also had access to drug abuse services for P.K., such as the substance abuse counselor, and could collaborate with community supports and network services through Westchester County to wrap around the school day.

P.K.'s alleged academic and emotional performance at Wisdom Ranch is not relevant. "The inadequacy of an IEP is not established...simply because parents show that a child makes greater progress in a single area in a different program." <u>Walczak v. Florida Union Free Sch. Dist.</u>, 142 F3d 119, 133 (2nd Cir. 1998)(citing <u>Fuhrmann v. East Hanover Bd. of Educ.</u>, 993 F.2d 1031, 1039-40 (3d Cir.1993)(Child's "dramatic progress" in alternative program chosen by

parents does not, by itself, establish that proposed IEP was not "reasonably calculated to enable the child to receive educational benefits")).

MR. and MRS. K's attorney argues that the CSE could not have properly changed P.K.'s placement from Devereaux to the KEA Program in 2004 without updated evaluations. T, at 86. This is incorrect, since the CSE had sufficient anecdotal data and records from Devereaux. P-7; D-E. Even if did not, that does not mean that P.K. is now entitled to a residential placement from the CSE, especially since MR. and MRS. K. were in full agreement with the change from Devereaux to the KEA Program. T, at 466-67.

The DISTRICT submits that the IEPs are both procedurally and substantively appropriate. Nevertheless, an IEP will be set aside for procedural violations only if there is "some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the IEP formulation process, or caused the deprivation of educational benefits." Roland M. v. Concord School Committee, 910 F.2d 983, 995 (1st Cir. 1990), cert. denied, 499 U.S. 912, 111 S.Ct. 1122 (1991). Procedural flaws do not automatically require a finding of a denial of a free appropriate public education, but procedural inadequacies that individually or cumulatively result in the loss of educational opportunity, or seriously infringe on a parent's participation in the creation or formulation of the IEP, clearly constitute a denial of a free appropriate public education. Application of a Child with a Disability, Appeal No. 04-003, at 5 (S.R.O. 2004).

Based upon the foregoing, the DISTRICT submits that the 2005-2006 and 2006-2007 IEPs were reasonably calculated to allow P.K. to receive educational benefits and that MR. and MRS. K. have failed to meet their burden to show otherwise. Accordingly, the SRO correctly held that the IEPs were appropriate. The SRO properly found that, "…[D]espite their contention, petitioners have not presented sufficient evidence to show that the March 2006 IEP did not meet

the student's special education needs at the time that it was developed. Respondent's staff testified that the services and supports recommended by the March 2006 CSE would have addressed the student's academic and emotional needs." SRO Decision, at page 16. The SRO also properly found that "…[T]he record shows that the June 2006 IEP addressed the student's emotional, academic and behavioral needs in a highly supervised therapeutic setting. In developing its recommendations for the 2006-07 school year, the record establishes that respondent considered observations and recommendations from the student's private providers." SRO Decision, at page 21. In so ruling, the SRO upheld the CSE's determination that P.K. was not entitled to extended school year services over the Summer 2006. SRO Decision, at page 9.

### 2. THE IHO CORRECTLY HELD THAT THE PRIVATE RESIDENTIAL FACILITY WAS NOT APPROPRIATE.

Since the SRO determined that the 2005-2006 and 2006-2007 IEPs were appropriate, the SRO did not find it necessary to go on to make a determination as to the appropriateness of the services obtained for P.K. at Wisdom Ranch and SUWS. The DISTRICT submits that this Court should uphold the IHO's determination that the services privately obtained for P.K. by MR. and MRS. K. are not appropriate. In the event that this Court is unsure whether the private services are appropriate, the DISTRICT submits that this Court must remand the issue back to the SRO for determination.

The parents bear the burden of proof with regard to the appropriateness of the services which they obtained for the child at the private school during the school year at issue. Application of a Child with a Disability, Appeal No. 04-026, at 6 (S.R.O. 2004); Application of a Child with a Disability, Appeal No. 06-084, at 8 (S.R.O. 2006). In order to meet that burden, the parents must show that the services were "proper under the IDEA (School Committee of Town of Burlington, Massachusetts, supra, at 370, 105 S.Ct. at 2002), i.e., that the private school offered an educational program which met the child's special education needs." Application of a

Child with a Disability, Appeal No. 06-084, at 8 (S.R.O. 2006). One of the requirements of the IDEA is that children with disabilities be placed in the least restrictive environment. 20 U.S.C. Section 1412(a)(5)(A). Since the parents' claim for tuition reimbursement is premised upon the provisions of the Federal statute, they must also show that the placement which they selected is the least restrictive environment for the child. P.J. v. State of Connecticut, 788 F.Supp. 673, 683 (D. Conn. 1972)(citing former section codified at 20 U.S.C. Section 1412(5)(B)); Application of a Child with a Disability, Appeal No. 92-7 (S.R.O. 1992), decision sustained sub nom., Lord v. Board of Education of Fairport Central School District, 92-CV-6286 (W.D.N.Y. 1994)); Application of a Child with a Disability, Appeal No. 06-084 (S.R.O. 2006). In Walczak, supra, the Second Circuit recognized the importance of least restrictive environment by holding that the concept applies even when no mainstreaming is possible for the disabled student. Id., at 132. In doing so, the Second Circuit observed that "[w]hile some children's disabilities may indeed be so acute as to require that they be educated in residential facilities, it is appropriate to proceed cautiously whenever considering such highly restrictive placements." Id. More recently, in M.S. v. Board of Education of the City School District of the City of Yonkers, 231 F.3d 96 (2nd Cir. 2000), cert. denied, 69 U.S.L.W. 3627 (2001), the Second Circuit reiterated the parents' obligation to comply with the least restrictive environment.

"A residential placement is not appropriate if it is merely supportive of a disabled student's education." Application of a Child with a Disability, Appeal No. 03-066 (S.R.O. 2003)(citation omitted). A residential placement is one of the most restrictive placements for students and is only appropriate when it is required in order for the student to receive an educational benefit, not when parents simply claim that the student is progressing in a residential setting and therefore appropriate. Id.

MR. and MRS. K. have neither shown nor proffered any credible witnesses or documentary evidence establishing that P.K. requires twenty-four (24) hours, seven (7) days per week supervision in order to benefit from instruction. The testimony of MR. and MS. K.'s so-called educational consultant, Robert Spear, is bereft of the necessary detail to support such a highly restrictive placement. Mr. Spear is not a member of the Independent Educational Consultants Association. T, at 1204. Mr. Spear testified that he never placed any other students at Wisdom Ranch and claimed not to remember what accreditations were held by Wisdom Ranch. T, at 1203-1205. Although he testified that he gave much weight to the Ascent discharge report in which Mr. Schrom specifically recommended individual and group therapy for P.K., Mr. Spear subsequently admitted that he did not know whether Wisdom Ranch had any clinicians on staff or what kind of training the staff received at Wisdom Ranch. T, at 1217 and 1232. Mr. Spear testified that he did not know what kind of special education services were offered at Wisdom Ranch. T, at 1243. Mr. Spear initially testified as to the standard procedure for the development of treatment goals at Wisdom Ranch, then hedged on whether the treatment goals would be in writing given the small size of Wisdom Ranch and later admitted that he did not discuss the development of treatment goals with Wisdom Ranch. T, at 1237-1239. Quite frankly, Mr. Spear's description of Wisdom Ranch as "extremely therapeutic" and "fit[ting] P.K.'s specific history with therapy" either lacks any foundation or is disingenuous. T, at 1236.

The DISTRICT submits that it is apparent from the record that the main, and perhaps, only reason why P.K. was privately placed by MR. and MRS. K. at Ascent, Wisdom Ranch and SUWS was because of family problems caused by his drug abuse and unsafe and out of control behavior at home. "With regard to the difficulties which petitioners may have had in supervising the child at home, it is well settled that difficulties at home do not afford an educational basis for making a residential placement." Application of a Child with a Disability, Appeal No. 95-33

(S.R.O. 1995). See <u>Application of a Child with a Disability</u>, Appeal No. 01-084 (S.R.O. 2002).
Not only did MRS. K. acknowledge serious family problems with P.K., but P.K.'s private social
worker, Suzanne Hanna, C.S.W., testified that P.K.'s behavior at home worsened and he became
more aggressive and abusive to MR. and MS. K.  T, at 539-540 and 843.  On several occasions,
P.K. got into physical altercations with MR. K.  T, at 843, 855, 856 and 883-884.  P.K. also
began to throw and break things, cursed excessively at MR. and MS. K. and told them he would
not follow their rules.  T, at 843-844.

From March through at least the end of the hearing in December 2006, MR. and MRS. K.
unilaterally placed P.K. at Wisdom Ranch, which is more than 2,400 miles away from their
home within the DISTRICT.  T, at 78.  Shockingly, P.K. receives no special education services
and no clinical services at Wisdom Ranch.  This was made quite clear by the testimony of Monte
MacConnell, Wisdom Ranch Owner/Director.  Moreover, P.K.'s records from Wisdom Ranch
lack sufficient specificity and do not support on the documents face the need for residential
placement for P.K. P-123A-C.  There were only a few records supplied from Wisdom Ranch and
it is disturbing to find no written treatment goals and no written academic plan for a student like
P.K.  P-123A-C.  Furthermore, a review of the details of the alleged academic curriculum at
Wisdom Ranch offers no clue as to the rigors of the curriculum or whether it meets New York
State standards.  P-123A-C.

As to special education services, Mr. MacConnell testified that there is nothing he would
consider to be special education services at Wisdom Ranch other than "giv[ing] a student more
time to take a test, turn a paper in many times before a final copy, those types of things…"  T, at
749-750.  As to clinical services, Mr. MacConnell testified that Wisdom Ranch was "not like
private therapy" and that he would not characterize Wisdom Ranch as a therapeutic setting.  T, at
739.  Mr. MacConnell also testified that no staff member at Wisdom Ranch provides therapy to

the students. T, at 755-756. The fact that P.K. receives no clinical services at Wisdom Ranch is contrary to the professional opinions of MR. and MRS. K.'s own witnesses. P.K.'s private psychiatrist, George Uy, M.D., clearly testified that P.K. should be treated through a combination of individual therapy, family therapy and mediation treatment. T, 495. John Schrom, Ascent clinical Director, testified that, following Ascent, it was important for P.K. to be placed in a "therapeutic environment" where the staff included individuals with a clinical background who "understand the clinical nature." T, at 902-904. Jeffrey Schroeder, Ph.D., Ascent Psychologist, likewise testified that he expected clinical personnel to be present at P.K.'s placement following Ascent and recommended the placement provide treatment personnel to monitor P.K.'s social relationships. T, at 1004-1008. The fact that P.K. was able to stop taking his medications for a time at Wisdom Ranch and had to be later sent for therapeutic guidance at SUWS is also a testament to the inappropriateness of P.K.'s placement at Wisdom Ranch. T, at 744-745 and 868.

Under these circumstances, the claims made by MR K. and MRS. K. for reimbursement of tuition, room and board, transportation and escort fees associated with Wisdom Ranch must be denied since it does not provide the student with necessary professional therapy and clinical counseling therapy and does not provide special education services to meet his academic needs. See Application of a Child with a Disability, Appeal No. 05-075 (S.R.O. 2005).

For approximately two (2) weeks in July 2006, MR. and MRS. K. apparently allowed Wisdom Ranch to place P.K. in SUWS, which is residential facility located somewhere near Wisdom Ranch in Idaho. T, at 744-745. MR. and MRS. K. presented no testimony from anyone employed by SUWS. In fact, the only witnesses with any remote knowledge of SUWS who testified at the hearing were Mr. MacConnell, Ms. Hanna and Mr. Spear. Their testimony lacks any educational or clinical insight about what SUWS is allegedly doing for P.K. Also, P.K.'s records from SUWS lack sufficient specificity and do not support on the documents' face the

need for residential placement. D-L. The SUWS primary treatment goals seem watered-down and are dubious in that it states P.K. will complete an academic curriculum, which conflicts with the testimony of Mr. McConnell who stated P.K. was not receiving any academics while at SUWS. D-L. T, at 769. Furthermore, a review of the details of the alleged academic curriculum at SUWS offers no clue as to the rigors of the curriculum or whether it meets New York State standards. D-L.

Based upon the foregoing, the DISTRICT submits that MR. and MS. K. have not proven the appropriateness of the services they obtained for P.K. at Wisdom Ranch (including SUWS). Accordingly, the IHO correctly held that the private residential facility was not appropriate.

### 3.    THE IHO CORRECTLY HELD THAT EQUITABLE CONSIDERATIONS DO NOT SUPPORT THE PARENTS' CLAIMS.

Since the SRO determined that the 2005-2006 and 2006-2007 IEPs were appropriate, the SRO did not find it necessary to go on to make a determination as to whether equitable considerations support the MR. and MRS. K.'s claims. The DISTRICT submits that this Court should uphold the IHO's determination that equitable considerations do not support MR. and MRS. K.'s claims. In the event that this Court is unsure whether equitable considerations support MR. and MRS. K.'s claims, the DISTRICT submits that this Court must remand the issue back to the SRO for determination.

Equitable considerations must support the parents' claim. Applications of Board of Education of Albion Central School District and Child with a Disability, supra, at 8 (citing School Committee of Town of Burlington, Massachusetts, supra). While Federal and State laws and regulations accord the parents of disabled students significant substantive and procedural rights in the classification and placement of their children, parents have a concomitant obligation to reasonably cooperate with school staff and refrain from attempting to thwart prescribed procedures. Tucker v. Bay Shore Union Free School District, 873 F.2d 563 (2nd Cir. 1989),

overruled on other grounds, <u>Florence County School District Four</u>, <u>supra</u>.  In this regard, the

IDEA contains a specific provision dealing with payment for the education of children enrolled

by their parents in private schools without consent of or referral by the school district.  20 U.S.C.

Section 1412(a)(10)(C).  The statutory language incorporates a number of requirements with

which parents must comply as a condition to obtaining reimbursement, such as giving prior

notice to the school district of their dissatisfaction and impending private school placement,

complying with evaluation requests and acting reasonably.  20 U.S.C. Section

1412(a)(10)(C)(iii)(I) - (III).  These requirements illustrate the equitable nature of the remedy of

reimbursement.  Indeed, they focus on factors that make it inequitable to award reimbursement

of part, or even all, of the expenses incurred by parents for unilateral placements.

The record shows that MR. and MRS. K. were never interested in obtaining a free

appropriate public education, but only wanted P.K. to attend Ascent, Wisdom Ranch and SUWS.

MR. and MRS. K. have clearly disregarded their legal obligation to notify the DISTRICT in

advance that they intended to unilaterally place P.K. at the Ascent and SUWS at public expense.

The abrupt removal of P.K. from the KEA Program by MR. and MRS. K. prevented the

DISTRICT from completing his triennial reevaluation.  T, at 2026-2028.

MR. and MRS. K. withheld important information regarding P.K.  Until the end of this

hearing, MR. and MRS. K. never shared with the CSE or DISTRICT that, in January 2006, P.K.

threatened to strangle himself with a vacuum hose and to jump out of a car and Four Winds

reported that P.K. was placed in a secure wing because he had aggressive episodes with other

patients.  D-B.  Until the Ascent bio-psychosocial assessment was disclosed in this hearing, MR.

and MS. K. never informed the CSE or DISTRICT of the extent of P.K.'s drug abuse.  P-121B.

Until the Ascent psychological evaluation report was shared with the CSE at its meeting on June

19, 2006, MR. and MS. K. never informed the CSE or DISTRICT that P.K. had suffered physical abuse from his brother. P-121E and P-126.

MR. and MRS. K. feigned cooperation with the DISTRICT. At the outset of this hearing in July 2006, the DISTRICT sought copies of P.K.'s records at Silver Hill and provided MR. and MRS. K. with the requisite authorization form. T, at 315. MR. and MRS. K. refused to sign the form for many months, thereby preventing the DISTRICT from having access to these documents during the hearing. MRS. K. then disingenuously returned the signed form to the DISTRICT on the second to last day of hearing on December 8, 2006, T, at 2173. On this same day, MR. and MS. K also provided the DISTRICT with a one page discharge plan from Silver Hill which they allegedly had just recently located at their home. T, at 2173. Despite the CSE's recommendation that they explore network services and community supports, MR. and MRS. K. never really followed-up with Westchester County. T, at 1623-1624. While MRS. K testified that she did not do so because Betsy Litt, Case Manager for Westchester County Children's Mental Health Services, allegedly told her that such services were not an option for P.K., Ms. Litt's subsequent testimony indicates that she never made such statements. T, at 565-566 and 2327-2329.

MR. and MS. K. never signed and returned the consent form to allow the CSE to explore additional day treatment therapeutic programs for P.K., even though this form was personally given to them at the meeting on June 19, 2006. P-126; T, at 2374.

Based upon the foregoing, the DISTRICT submits that MR. and MRS. P.K. have not proven that equitable considerations support their claims. Accordingly, the IHO correctly held that equitable considerations do not support MR. and MRS. K.'s claims.

## POINT II

### THE SRO CORRECTLY HELD THAT THE PARENTS ARE NOT ENTITLED TO REIMBURSEMENT

### FOR THE PRIVATE PSYCHOLOGICAL EVALUATION.

The DISTRICT's prior evaluations of P.K. were and are timely and appropriate. P-9, P-12, P-18, P-20, P-21, P-23, P-25, P-26, P-27, P-28, P-29, P-30, P-31 and D-E. Moreover, the abrupt removal of P.K. from the KEA Program by MR. K. and MRS. K. prevented the DISTRICT from completing his triennial reevaluation. T, at 2026-28. The SRO correctly held that "In the instant case, there is nothing in the record that indicates that petitioners disagreed with a district evaluation, nor does the record show that they had requested a private evaluation of their son. I note that respondent made an effort to evaluate the student, but attempts to do so were not successful due to the student's inability to focus. I also note that the private evaluation provided respondent with information not otherwise contained in its own evaluations." SRO Decision, at page 22.

Accordingly, the IHO correctly held that MR. and MRS. K. are not entitled to reimbursement for the private psychological evaluation report done of P.K. by the Ascent Wilderness Program in February 2006.

### CONCLUSION

Based upon the record and for the reasons set forth herein, the Defendant, BEDFORD CENTRAL SCHOOL DISTRICT, respectfully requests that this Court issue a judgment dismissing the Complaint, in its entirety, together with attorneys' fees, costs and disbursements, and for such other and further relief as this Court may deem appropriate.

Dated: Harrison, New York
      March 3, 2008

<div style="margin-left:3em">

Respectfully submitted,
INGERMAN SMITH, LLP
By:
    RALPH C. DeMARCO (RD 1339)
Attorneys for Defendant
 BEDFORD CSD
550 Mamaroneck Avenue, Suite 209
Harrison, New York 10528
(914) 777-1134

</div>

TO:    LEAH L.MURPHY, ESQ.
        KUNTZ, SPAGNUOLO & MURPHY P.C.
        Attorneys for Plaintiffs
         P.K. and P.K. o/b/o P.K.
        444 Old Post Road
        Bedford Village, New York 10506
        (914) 234-6363