**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____X

P.K. and P.K., on behalf of P.K,

                  Plaintiffs,

           -against-

BEDFORD CENTRAL SCHOOL DISTRICT,
               Defendant
----------------------------------------------------------X

Leah L. Murphy (LLM/8934)
KUNTZ, SPAGNUOLO &
MURPHY P.C.
Attorneys for Plaintiffs
444 Old Post Road
Bedford Village, NY 10506
(914) 234-6363

Index No.: 07 CIF. 8494

## MEMORANDUM OF LAW ON BEHALF OF PLAINTIFFS P.K. AND P.K.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT………………………………………..3

STATEMENT OF FACTS…………………………………………………11

ARGUMENT……………………………………………………………39

POINT I

PLAINTIFFS ARE ENTITLED TO JUDGMENT
ON THE LAW AND FACTS…………………………………………….39


POINT II

THE PARENTS ARE ENTITLED TO TUITION REIMBURSEMENT AS THE
PRIVATE PROGRAM IS APPROPRIATE TO MEET P.K.'S NEEDS AND THE
EQUITIES BALANCE IN FAVOR OF AN AWARD OF TUITION
REIMBURSEMENT………………………………………………………48

CONCLUSION……………………………………………………………52

## PRELIMINARY STATEMENT

P.K. K. ("P.K."), born July 12, 1989, is a troubled young man.  In the three years since he was first classified with an emotional disturbance by the Bedford Central School District ("District"), he has had six psychiatric hospitalizations, one arrest, two residential school placements, two wilderness programs, one therapeutic day treatment program and countless bouts with the demons of his condition – anxiety, depression, mood instability and substance abuse.   In January 2006, P.K. was admitted (for the second time that school year) into Four Winds Psychiatric Hospital after engaging in high risk behavior, being heavily involved with substance abuse and "stating he wanted to end his life."  (P-120[1]) Within days of his admission, P.K. began to verbally threaten the hospital staff and patients.  (D-B)  On his second day there, he allegedly assaulted his roommate.  On the third day of his hospital admission P.K. became extremely agitated, impulsive and tried to elope.  On two occasions during P.K.'s admission, the hospital had to institute a "code orange" which required inter-muscular shots of thorazine, sequestering to a "quiet room" and moving him off the adolescent unit "to ensure safety".  (D-B)   On January 16, 2006, P.K. was placed on restraints/seclusion for a twenty-four hour period as a "risk of danger to self/others."   (D-B)  P.K. was discharged by escort the following day with instructions and recommendations by Four Winds Staff that he attend the Ascent wilderness program where he could be closely supervised in a highly structured setting.  (D-B; T-501-03)

P.K.'s parents, P.K. and P.K., understandably described this period as a "crisis." (P-95; T-253, 261; T-2278)  P.K. was in seclusion immediately prior to his discharge

---

[1] The Record the Court is being asked to review consists of the transcripts of the hearing before the IHO, as reviewed by the SRO, including Parents Exhibits referenced as  "P-__;"  District Exhibits referenced as "D-__" and the transcription of the impartial hearings held before the IHO over ten days in 2006 on July 11, July 12, July 28, September 12, September 14, September 26, November 9, November 14, December 8, and December 1, referenced as  "T-__."

from the hospital, had exhibited aggressive behavior, suicidal ideation and was in need of an escort to Ascent.  (T-251; T-1289; D-B; P-120)  Painfully aware that P.K. needed an intensive therapeutic intervention, the K.s unilaterally placed him in the short-term Ascent Wilderness Program because P.K. was at risk of hurting himself and others.  (P-120; D-B; T-262, 264; T-1294).  After P.K. completed the Ascent program the K.s placed their son at Wisdom Ranch School, a highly structured residential school in a therapeutic setting located in Arco, Idaho.  This hearing was brought by the K.s who seek tuition reimbursement for all costs associated with educating P.K. including the Ascent Program and the Wisdom Ranch School for the relevant portions of the 2005/06 and 2006/07 school years.

During the relevant time period, the District staff recommended that the K.s return P.K. to the KEA (Keys to Emotional Awareness) Program at the Fox Lane High School.  (T-265)  KEA is described as an in District therapeutic day program for emotionally fragile adolescents.  KEA was not working for P.K.  He was failing all his classes (P-32), sleeping through periods in the KEA psychologist's office (T-239; T-2101; T-2264;) not getting his work done; threatening other students; becoming more agitated (T-2100); fidgety (T-2144); not going to where he was supposed to go (T-2103) and  being generally oppositional to staff.  (T-239)  In fact, on the same day as his hospitalization in January 2006, it was the KEA staff that called P.K.'s parents to take him home "because he was threatening another student and . . . was so out of control."  (T-250-51)  By all accounts, P.K. was not functioning in any meaningful way in the KEA program for the 2005/06 school year.  (T-266)

P.K.'s classification (emotional disturbance) is not in dispute.  (T-1808)  Nor is

his eligibility for services under federal and state special education laws.  (T-1808)  The dispute in this hearing is the extent to which the intersection between P.K.'s emotional condition and substance abuse can be considered in recommendations for a free appropriate public education.  The District's Committee on Special Education ("CSE") recommendations are entirely based upon a "but for the substance abuse" supposition. (T-1654, T-1808)  The CSE admittedly failed to recognize P.K.'s substance abuse as an integral component of his disability and instead speculated that its recommendations would be appropriate if P.K. could just stop using drugs or alcohol.  Throughout the hearing, the District advanced the incredible position that it has no obligation to address the whole child, just the good behaving one.  As a result of this narrow and flawed position, rather than undertake a comprehensive evaluation to review P.K.'s actual and current level of functioning, the extent of his substance abuse and its impact upon educational needs, each of the District's witnesses testified that their recommendations were based upon how P.K. *could* function if substance abuse were not an issue.  Failing to assess his present needs, the members of the CSE looked only at how P.K. had functioned the prior school year, a period when they erroneously believed, P.K. was "substance free."[2]

The Assistant Director for Special Education, Laurie Bauer's testimony demonstrates that in continuing to recommend the failed KEA Program[3] the CSE carved

---

[2] In fact, the uncontroverted evidence shows that in the less restrictive KEA setting, P.K. had actually begun to decompensate during the 2004/05 school year as early as November 2004, exhibiting symptoms of depression, impulsivity, anger and substance abuse.  Both the KEA psychologist and P.K.'s own therapist expressed concern that P.K. was not in the right program.  (T-401)

[3] Several of the District witnesses testified that P.K. was not functioning in the KEA program for the 2005/06 school year.  Bill Tozzo, the math instructor testified that "KEA was not working."  (T-1435)  P.K.'s report card for the 2005/06 school year reveals that he was failing his courses.  (P-32)  Kieran O'Gorman, the KEA teacher testified that during the 2005/06 school year, P.K. "was not alert and much of his day was spent really just not engaging in school."  (T-2102).

out the issue of P.K.'s substance abuse.  She stated:  "I think the data clearly showed *without the chemical dependency*, that KEA provided the appropriate level of academic support and behavioral support."  (T-1654)  She also admitted that the CSE's recommendations were based on the opinion that "but for the substance abuse, KEA would be an appropriate program."  (T-1808)

Candace Brady, a standing member of the CSE, who attended the March 9, 2006 (P-1) CSE meeting as the special education teacher, testified that the members of the CSE felt that P.K. was not really accessible to learning and "this accessibility may have been as a result of his substance abuse."  (T-1129)  She testified that "the committee felt that the substance abuse may have been standing in the way of him being successful in that [KEA] program."  (T-1132)  Alyysa Kant, the standing member of the CSE who attended both the November 17, 2005 (P-4) and June 19, 2006 (P-126) CSE meetings as the school psychologist, testified that the recommendations by the CSE were based upon how P.K. had done the prior year in the KEA program.  (T-1384)  When asked what information was generated by the school district about P.K.'s functioning during the March 9, 2006 CSE meeting, Jennifer Fields, another standing member of the CSE as a school psychologist, testified that "the previous year was discussed and that he was functioning quite well in school.  That he was being mainstreamed in a lot of classes.  And that at some point, drug use started to become more active.  There was decompensation in his behavior at school."  (T-700)  Dr. Fields also testified that the CSE looked at "the previous year, he had a successful 10th grade year."  (T-721)  Kieran O'Gorman, one of P.K.'s special education teachers in the KEA program testified that "P.K.'s needs were therapeutic, and he needed that therapeutic piece.  I believe that once his substance abuse

could be controlled, . . . that if that was maintained, he would be successful with us to treat the therapeutic piece and the academic support." (T-2114) Mr. O'Gorman also testified that he believed that "KEA *could* work for P.K., . . . that the substance abuse was overwhelming him. . . . that was what was interfering with him being able to transition to academics." (T-2152) Tony Monchinsky, P.K.'s other KEA teacher testified that he thought the KEA model could work for P.K. He stated "I had felt at the time that P.K.'s main problem, he had to kick the drugs. . . . If he could get beyond the drug issue, let's see if things would work for him." (T-2230) Mr. Monchinsky testified that "I thought he could make progress in the KEA program. There were other factors involved, namely the drugs." (T-2239)

But to "kick the drugs" P.K. needed to be removed from the lesser restrictive environment, have his emotional condition addressed and placed in a highly structured, closely supervised residential setting. P.K.'s needs were not just about drug use. The District failed miserably to actually identify P.K.'s needs, establish annual goals related to those needs, and provide for the use of appropriate special education services. All the evaluative information concerning P.K. identified in the relevant IEPs was from his initial classification. There was no current information before the CSE in recommending KEA.

P.K.'s treating psychiatrist explained how his emotional condition could become complicated by the substance abuse. Students, like P.K., who are depressed or have mood difficulties, will engage in substance abuse in an effort to "self-medicate," engage in "high risk behavior" and as a display of very poor judgment. (T-494-95) P.K.'s mood disorder afflicted him with rapid fluctuations in his mental state going from reasonable periods of calm to sudden depression, irritability and anger. (T-493) Dr. Uy testified that

kids that are depressed and moody use mood altering substances to try and make themselves feel better.  (T-495)  After multiple failed in-patient, out patient and day treatment programs, P.K. was clearly at risk of failing unless he was placed in a closely supervised environment.  (T-503)  Given the confluence of P.K.'s emotional state, the substance abuse and his exposure to those high risk influences, P.K. was a candidate for a residential placement.

The District's narrow view of P.K.'s substance abuse resulted in repetitive and pre-determined placement decisions which ultimately denied P.K. a free appropriate public education and the K.s full and meaningful participation in the development of an individual education program for their son.  Mrs. K. testified that at the March 9, 2006 CSE meeting "[i]t became evident within the first ten minutes once they went around the room that they were not going to address P.K.'s emotional needs.  That it became an issue for the school that this was a drug problem for P.K., and from that point on, no matter what I said, I was not heard.  I felt as if I were a non-member of the committee." (T-290)

With no assistance from the District, P.K.'s parents were forced to place him first in the Ascent therapeutic wilderness program and then a residential school in a therapeutic setting located at Wisdom Ranch School in Arco, Idaho.  Since P.K.'s attendance in these programs, where his severe emotional condition is appropriately addressed, he has become able to access his education.  P.K. has thrived at the appropriate Wisdom Ranch School and is scheduled to graduate in the Spring.

denying their claim for tuition reimbursement for a private unilateral placement of P.K. at the Wisdom Ranch School, in Arco, Idaho (including the SUWS therapeutic component), transportation costs and for reimbursement for a psychological evaluation.

The SRO wrongfully denied the Parents claims and dismissed their challenge of the appropriateness of the District's recommendation placing their severely disabled son in the failed Keys to Emotional Awareness ("KEA") program at Fox Lane High School for the 2005/06, Summer 2006 and 2006/07 school years.   The decision of the State Review Office upholding the appropriateness of the District's placement for P.K. is fatally flawed.  The District could produce no records from the 2004/05 school year upon which the 2005/06 and 2006/07 programs at issue were based.   The SRO failed to address the fundamental principal that decisions over a student's program must have a factual basis.  His decision is erroneous as a matter of law.

The State Review Officer ("SRO") erred in interpreting the law and facts of this matter by adopting the testimony of the KEA psychologist that "the CSE would not make a residential placement based on the fact that a student had substance abuse problems." (SRO Decision p. 17).  The SRO found that school districts are not required to provide medial treatment for substance abuse issues.  (SRO decision p. 17)  That decision is wrong and should be reversed.  Where medical, social, emotional or even substance abuse problems are intertwined with the student's educational problems, courts recognize that the local educational agency must fund residential programs.  Furthermore, the SRO erred in finding that there was sufficient information before the CSE regarding prior years.  The CSE had not information from the prior school year.

The K.s seek reimbursement for all costs associated with the education of their

son for the 2005/06, extended school year services for the summer 2006 and 2006/07

school years, including the cost of Wisdom Ranch School, transportation expenses, escort

services and reimbursement for the costs of evaluating P.K. in the District's absence to do

so.

## STATEMENT OF FACTS

P.K., was first classified with an emotional disturbance by the District's Committee on Special Education ("CSE") on March 26, 2003, when he was an eighth grade student at the Fox Lane Middle School. (P-16) P.K. had attended the District's schools since kindergarten. (P-22) P.K. had been exhibiting great difficulty socially, behaviorally, emotionally and academically and in spite of various interventions continued to flounder. (T-116, T-117; P-21, P-22, P-23, P-20, P-19). He evidenced limited academic productivity and was suspended from school for behavioral incidents on several occasions including having created a list of "people to kill." (P-21, P-22; P-107, P-109, P-110, P-111, P-113, P-114, P-115; T-122 -123) Concerned about P.K.'s behavior and academic performance, P.K.'s parents had him evaluated privately by Dr. Laurence Baker (P-19) and then at Four Winds Hospital (a psychiatric facility) where P.K. had been admitted into the Partial Hospitalization Program in December 2002 (P-120).

Diagnosed with depression and oppositional defiant disorder, P.K. had become afflicted with the same mental illness which had wreaked havoc upon his family. (P-20, P-22) P.K.'s paternal grandmother was bipolar and had spent most of her life in and out of psychiatric institutions. (T-120). His father had been diagnosed with depression. (T-120). P.K.'s uncle was on disability leave from employment due to his anxiety and depression and (T-120) depression claimed the life of P.K.'s paternal aunt, who put a gun in her mouth and killed herself when she was just 23 years old. (T-120)

After his first hospitalization, P.K.'s parents referred him to the CSE for an evaluation on January 9, 2003. (P-41) In an eerie foreshadowing of things to come,

11

Mrs. K. testified that she referred P.K. to the CSE because he was "totally non-functioning.  He would show up in the classroom and zip his ski jacket up over his head and lay his head on the table and that would be his day."  (T-134)  P.K. also began to "self-medicate" with drugs at this time.  (T-134)  After his first hospitalization, P.K. began treatment with Suzanne Hanna who he saw on a regular basis for the next three years.  (T-141, T-159, T-378-79; P-120).

Dr. Baker's evaluation indicated depression and suggested a non-verbal learning disability.  (P-19)   The District's evaluation indicated overall cognitive functioning within the high average range, elements of depression and anxiety and attentional difficulties.  (P-21; P-22)  The CSE classified P.K. with an emotional disturbance and recommended a resource room program five hours a week with individual counseling once a week.  (T-142, P-16)

Unfortunately, P.K.'s behavioral and emotional difficulties continued to escalate and in May 2003 he was admitted again into Four Winds Hospital as an inpatient due to suicidal ideation and mood instability.  (T-147; P-120)  P.K. had written the word "pain" on his arm and his parents had to call the police to take him to the hospital because he was so out of control.  (T-147)  After a two and one-half week hospital stay P.K. was referred to the Four Winds Partial Hospital Program and then the Intensive Day Treatment program ("IDT") which transitions students from hospital to school programs.

During periods when P.K. returned to the middle school setting it was observed that he had a decreased ability to monitor his own behaviors, particularly in an unstructured setting. (T-157)  A number of incidents resulted in more disciplinary actions where P.K. was confrontational and combative with other students.  (T-157)  The school

psychologist reported that P.K.'s anxiety had increased.  (P-15)

At the K.'s request, an emergency CSE meeting was convened on May 8, 2003.
(P-15; P-48)  At that meeting, it was decided that the CSE would begin the process of
looking at residential programs.  (T-158; P-15)  Mrs. K. testified about the
recommendations made by P.K.'s treating therapist, Suzanne Hanna at the CSE meeting
as follows:

> It was discussed that P.K. thrived in a structured environment, that "part of what
> P.K. does is that he feels so out of control, that he actually ups the anti so other
> people will put him back in control.  He would keep escalating it so that someone
> can control him.  A structured environment, P.K. feels safe and he knows its'
> predictable.  That was the consensus and still is today.  (T-165)

*After* the CSE recommended that residential placements be explored, the K.s were
asked by the District's director of special education, Laurie Bauer, to arrange for and
provide the District with a psychiatric evaluation of P.K. and provide a Four Winds
Discharge Summary since both documents would have to be sent with the referral
packets to the residential schools.  (T-166-68; P-58, P-67; T-1722)  The K.s complied.
(T-166; P-24; P-67)   Three years later, during the 2005/06 school year, Ms. Bauer made
no similar requests because *she* was steadfastly unwilling to consider a residential
placement.  Ms. Bauer made no request for hospital discharge summaries, made no
request to either conduct a District psychiatric evaluation or ask the K.'s to arrange for a
psychiatric evaluation and Ms. Bauer made no attempt to obtain current relevant
information about P.K.'s psychiatric condition.

*After* the CSE recommended a residential placement for P.K. in 2003, Laurie
Bauer also signed a "statement of assurance" to the State Education Department.  The
document, certifies that the CSE had included the appropriate county or State agents of

community support services ("Network Services") in participating in making the recommendations for residential school.  (T-1727; P-131)   Despite her assurance to the contrary, Ms. Bauer "did not explore network" and admitted that the statement was false. (T-1732)   Three years later, during the 2005/06 school year, Ms. Bauer used the "statement of assurance" as a measure to deny the K.'s request to consider a residential placement.

When the K.s requested exploration of residential programs during the 2005/06 school year, Ms. Bauer did not ask the K.s for more information.  She didn't ask if there were any current psychiatric evaluations or hospital records to assist the District in assessing P.K.'s needs.  In response, Ms. Bauer simply told the K.s that it was *now* required by the State Education Department regulations that before *any* recommendations are made for a more restrictive residential treatment program, the K.s would have to meet with the local "Mental Health Association."  (T-267)  The regulations Ms. Bauer referred to were not new.  It was in place when the District's CSE had recommended P.K. go to a residential school back in 2003.  It was in place when Ms. Bauer signed the statement of assurance that she had requested (when in reality she had not) the participation of "community support services" in the decision making. (P-131)

After P.K. was discharged from the inpatient hospitalization at Four Winds on May 21, 2003, he attended the partial hospitalization program there.  (P-120)  P.K. continued to exhibit significant emotional issues with an increase in his level of anxiety, depression and agitation.  (P-120)  In mid-June 2003, P.K. was admitted as an in-patient, once again, to Four Winds Hospital for five days due to significant depression.  From there, P.K. was placed by his parents at the Summit Achievement Program, a six week

intensive wilderness program in Maine. (T-171) When P.K. returned from Maine he entered a weekly therapy program at Four Winds Hospital called "Seeds for Change" run by his therapist, Suzanne Hanna and psychologist, Dr. Christine Nichols. (T-172). Dr. Nichols, would later become the District's psychologist for the program at issue here, Keys to Emotional Awareness or "KEA.". (T-172)

The CSE reconvened on July 21, 2003 for P.K.'s annual review. (T- 176; P-13) At the meeting the psychiatric evaluation and the Four Winds discharge summary were added to the District's evaluations for review. (T-179; P-13; P-24) The CSE reviewed the psychiatric evaluation conducted by Dr. Gil Lichtshein which indicated a working diagnosis of mood disorder with a rule out of bipolar disorder. (P-24; P-13) Dr. Lichtshein wrote "I do believe that there is a significant mood disorder and although there have not been any clear cut manic episodes, his mood instability, rages and overall lability along with some disruptive behaviors, may be suggestive of a possible bipolar diathesis." (P-24) Dr. Lichtshein recommended placement in a residential treatment facility for the following reasons:

> Patrick has clearly demonstrated highly unstable behavior over the past seven months that has necessitated two inpatient psychiatric hospitalizations, two partial hospital program admissions and an intensive day treatment program placement. He clearly requires a more structured and therapeutic setting that can ensure his safety and stability and that can provide an environment in which he can grow and demonstrate more appropriate behaviors. (P-24)

While the same description could be made for P.K. during the 2005/06 school year – unstable behavior, several psychiatric hospitalizations and the unsuccessful KEA day program – his needs for a more structured setting went ignored.

At its July 21, 2003 CSE meeting, the CSE recommended that P.K. attend the

Devereux Glenholme School, a state approved residential therapeutic setting located in Connecticut, for the 2003/04 school year. (T-176; P-13; P-74) Even though P.K. had not actually been accepted (P.K. wasn't accepted into Devereux until August (P-74)), the CSE put Devereux Glenholme on his IEP because Laurie Bauer supported the recommendation. (P-13)

P.K. made a good adjustment to the residential treatment program provided at Devereux/Glenholme. (T-180) Overall he made many gains on the goals and objectives he had been working on in therapy and had decreased challenging authority, reduced task avoidant behavior and improved his social skills. (P-80) P.K. was removed from taking medication while at Glenholme. The staff working directly with P.K. reported in a counseling summary dated June 2, 2004 that *"P.K. continues to appear to be reliant upon Glenholme's setting that provides predictability and structure. P.K. continues to make progress here, and will benefit from continued time in the program to build on this success, internalize the gains he has made, and further develop his coping skills and anxiety management skills."* (P-80)

At P.K.'s annual review for the 2004/05 school year, held on June 3, 2004, the professionals working directly with P.K. recommended continued time in the program. (T-186; P-7) P.K.'s program social worker, Melissa Countryman, reported to the CSE that P.K.'s odds of decompensating were extremely high. (T-187) The Devereux Staff encouraged the CSE to maintain the current placement because "their best educated experience has taught them that it wouldn't be successful if we took him out." (T-187)

Despite that recommendation, the CSE decided to return P.K. to an in district day treatment program known as "Special Class KEA" for the 2004/05 school year. (P-7)

Anxious to have their son return home and cognizant that the psychologist of the KEA program was Dr. Christine Nichols (who had worked with P.K.) the K.s agreed to the change. (T-183; P-7) Dr. Nichols had worked with P.K. in the "Seeds for Change" teen group with his therapist Suzanne Hanna the prior summer. (T-184)

The K.s felt hopeful that Dr. Nichols could support P.K. in this less restrictive placement. (T-184) The K.s were also concerned about the anxiety level P.K. exhibited with the "token economy" methods employed at Devereux Glenholme. The token economy fed into P.K.'s fear that if he didn't do everything right he would be punished. (T-182; T-191)

The CSE recommended that P.K. be given extended school year services and remain in Glenholme for the Summer of 2004. (P-7)

Not surprisingly, and as predicted by the Devereux staff, P.K.'s reentry to the District program was unsuccessful. (T-205) Initially, P.K. was a "model student" in the KEA program. (T-201, T-397) P.K. resumed his therapy with Suzanne Hanna twice a week (T-204, T-395) and she and the KEA psychologist, Dr. Christine Nichols, spoke on a regular basis. (T-205, T-396)

Early on in the school year, in November 2004, P.K. started to act out again. (T-205) The K.s were called regarding an incident where P.K. threw a plant at a classroom aide. Ms. K. met with the KEA staff who discussed that P.K. was starting to exhibit old behaviors again. He was agitated and acting out. (T-205) P.K. returned to treatment with a psychiatrist, Dr. Lerman, and was placed on psychiatric medication once again. (T-206)

The K.s shared all this information with the KEA team who agreed with the K.s'

interventions.  (T-206)  Despite P.K.'s undisputed deterioration, the District has *no record* of *any* of the KEA teams meetings, reports or P.K.'s progress notes from any KEA staff for the entire 2004/05 school year.  All records were either discarded or lost (T-1699) and the entire KEA team from the 2004/05 school year was discharged.  (T-217-18; P-87, P-89)   There was no articulation or transition conducted which would prepare the new KEA team with information about the individual needs of the students. There is no evidence that the CSE during the 2005/06 school year had "prior educational records" of P.K.'s functioning in the KEA program for the 2004/05 school year.  They didn't even bother to speak to *anyone* from KEA who worked with P.K. about P.K.'s needs.  (T-1975; T-2135; T-2245)

It is undisputed that by March 2005, P.K. was once again exhibiting his physically aggressive behavior against his peers. (T-207; P-85, P-86) P.K. was suspended on March 11, 2005 for "threatening another student" and again on May 2, 2005 for "threatening and antagonizing another student to fight."  (T-207; P-85, P-86).  P.K. also began self-medicating with mood altering substances again in late spring, April.  (T-227)

In the Spring of 2005, the K.s were called to meet with the KEA program psychologist, Dr. Nichols, who stated that she was concerned about seeing P.K. repeat old behaviors.  (T-207)  After the second suspension in May 2005, (P-86), the K.s met with Dr. Nichols who stated that both she and P.K.'s therapist, Suzanne Hanna, were "both concerned that maybe KEA – that this program as it was, was not working for P.K. anymore."  (T-210)

Suzanne Hanna testified that she had many conversations with KEA psychologist, Dr. Nichols about P.K.'s emotional deterioration.  (T-399)  Ms. Hanna noticed that P.K.

was increasingly anxious, and that his depression and anxiety manifested itself in P.K.'s becoming "very fidgety." (T-400) During the latter part of the 2004/05 school year, P.K. was easily distracted, tearful, having difficulty sleeping and began to lose a significant amount of weight. (T-400) Ms. Hanna shared all this information with Dr. Nichols. (T-400) According to Ms. Hanna, "things got really bad the last marking period of the year." (T-401) Ms. Hanna suspected that P.K. began self-medicating in the early Spring or Winter of that school year. (T-402)

According to Ms. Hanna's testimony, Dr. Nichols "definitely agreed that P.K. was struggling" in the KEA program. (T-403) Towards the end of the school year, Ms. Hanna testified that both she and Dr. Nichols agreed that P.K. would need a very structured and strong intervention over the summer (T-403) and that they would speak in the beginning of the school year about a change in placement. (T-407).

Ms. K. had conversations with both Ms. Hanna and Dr. Nichols in April and May 2005 that KEA might not be working for P.K. anymore. (T-210; T-224) According to Ms. K., P.K. was totally non-functioning. "He would come home from school and lay in bed, and he would not move. He was extremely depressed. . . . He [was] very agitated, very on edge. And he starts to up the anti again where he becomes very difficult to control." (T-225)

The CSE had already recommended (and the K.s had agreed) to a continuation of the Special Class KEA program for the 2005/06 school year at P.K.'s annual review held on March 22, 2005. (P-5) In the subsequent KEA team meetings, it was agreed that P.K. would be closely monitored over the summer to determine what, if any, changes would be made to his program in the fall. (T-210) It was anticipated that all parties would

reconvene in the fall to see what, if any, steps should be taken.  That didn't happen, however, because the entire KEA staff didn't return in the fall, they were all fired on May 5, 2005.  (T-218, P-87)

The new KEA staff, Denise Taylor (school psychologist), Kieran O'Gorman (special education teacher) and Tony Monchinsky (special education teacher) each testified that at the start of the 2005/06 school year, other than P.K.'s IEP they had *no information* about P.K.'s current functioning because there were no documents maintained by the KEA staff from the 2004/05 school year.  (T-1971; T-1699)

None of them spoke to the prior KEA staff and the only information relied upon by the new KEA team was P.K.'s report card and IEP.  (T-1975; T-2135; T-2245; P-5; P-32)  None of the new KEA staff, including Ms. Taylor spoke to either Dr. Nichols or Suzanne Hanna prior to the beginning of the school year,  (T-1977) so none of them knew that P.K.'s emotional state was in decline.

P.K.'s devastating history of anxiety, aggressive behavior, hospitalizations and substance abuse began to repeat itself early on in the 2005/06 school year. (T-806; T-1980)  Ms. K. testified that she had spoken to both Denise Taylor and Tony Monchinsky about P.K.'s history and difficulty over the last school year and summer.  (T-231, 232; T-1983; T-2213)

Both Mrs. K. and Suzanne Hanna testified that P.K. was struggling both in and out of school.  (T- 232; T-806)   P.K. was cutting classes and being oppositional to staff.  (T-232)  Suzanne Hanna testified that she received a call from Denise Taylor within the first four to six weeks of school.  (T-808)  Ms. Hanna explained to Ms. Taylor that P.K. had a difficult summer and explained some of his symptoms of anxiety, depression, and

impulse control.  (T-808)  Ms. Hanna explained to Ms. Taylor that P.K. had been in trouble the previous school year and invited Ms. Taylor to call her at any time. (T-808)

The only subsequent call from Ms. Taylor to Suzanne Hanna for the *entire 2005/06 school year* was the one reflected in Ms. Taylor's notes in December 2005.  (T-812; T-1988-1989; D-F)   Ms. Hanna testified that during that brief conversation she had shared with Ms. Taylor her concerns about P.K., "that [she] was very concerned that P.K. was reporting to me that he wasn't doing any work in classes.  That he was sitting playing cards.  That he basically felt it was a hopeless case.  That he felt he was too far behind in his academics to catch up."  (T-814)

Ms. Hanna testified that she didn't believe Ms. Taylor knew P.K.'s history and she explained the difficulties P.K. had had over the spring and summer.  (T-809)  There was no recommendation for "Network" or community services at that time.  (T-810)

With regard to Network Services, Ms. Hanna testified that the family had available resources to access all the services Network could provide, privately.  The K.'s were in family therapy, P.K. was in individual therapy, AA, working with a substance abuse counselor (who was a community resource, not employed by the school) and was participating in a teen group with Mr. Scott Gillette.   (T-812)

On September 27, 2006, P.K. was admitted to the Silver Hill Hospital for substance abuse.  (T-232)  He was thereafter discharged on October 4, 2005 and referred to Four Winds psychiatric hospital to address his emotional disability.  (T-233)  The staff from Silver Hill hospital informed P.K.'s parents that a rehabilitation program would not address P.K.'s psychiatric needs.  (T-235; P-120)

After P.K. was discharged from Four Winds, it was decided that he would be

placed on a "shortened day" in the KEA program.  (T-237-38; T-1910; P-3).  The KEA

psychologist testified that one of the purposes for the shortened day was to place P.K. in

"protective custody."   (T-1910)  She testified as follows:

> . . . That we would keep P.K. in a sheltered and in as tight a place as we could to
> try to support everything that the parents were trying to help P.K. do at home so
> that we would – during that time period, as I recall, the phrase that was used was
> that P.K. would be either at home or at school.  Those were the only places that he
> was allowed to be.  That we would make the school environment as safe for him
> as we could to support everything that he was trying to do with AA and trying to
> keep himself clean and working in a better direction.
> We designed the plan of the shortened day with a lot of time in our classroom.
> Coming in a little later in the morning to avoid all the buses.  Leaving earlier in
> the afternoon, eliminating some of the classes and keeping him in our protective
> custody.  If he had to go somewhere in the building, whether it was to meet
> Melanie Ryan [the substance abuse counselor] or the guidance counselor, one of
> us would always be with him. (T-1910-11)

Mr. O'Gorman, P.K.'s KEA teacher testified that after his hospitalization, P.K.

"was either in the KEA room or the KEA classes or with protected custody."  (T-2098)

Mr. O'Gorman testified that the purpose of the "protective custody" was to help P.K.

"isolate himself from forces that would lead him back to substance abuse."  (T-2099)

In a candid acknowledgement of the need for a closely supervised setting, when

Ms. Taylor was asked what the KEA staff was attempting to "protect" P.K. from she

testified "Outside influences, from other students in the building."  (T-2007).  That

"protective custody" – similar to what could be offered in a residential school -- was not

successful in KEA.

KEA teacher, Mr. O'Gorman testified that the "protective custody" . . . "was not

very successful.  I know that he had found friends that were influencing him to not – he

did not seem to be sticking with where he was supposed to go."  (T-2103)

Mr. O'Gorman also testified that P.K. was "not being able to access school the

way he had in the past. That it was difficult to stay away from the people he had been with when he was having trouble before." (T-2152) Perhaps that was because the KEA staff was inviting a student who "might be dealing" drugs (T-2223) into the KEA room.

KEA teacher, Tony Monchinsky testified that P.K. began to "hang out" with a student who went to Fox Lane High School who District staff suspected might be "drug involved" or "might be dealing." (T-2223) Mr. Monchinsky testified that this other student, who was not a member of KEA, might be "wandering the halls. To try to keep *him* out of trouble, we would get him to where he belonged, call security or as a last resort, tell him come in and sit and talk to Ms. Taylor." (T-2254) So, while the KEA team was attempting to provide P.K. with a "protective custody" they invited the very student he was to be protected from into their room.

Even with the altered schedule P.K.'s ability to access his education was severely limited. (T-239) He no longer attended any mainstream classes. (T-238) P.K. did no work. He was sleeping. (T-239) His own teachers testified that he had difficulty doing actual writing tasks. (T-2090; T-2111) KEA teacher Kieran O'Gorman testified that he spoke to the K.s about how "P.K. seemed to be having more agitation and we were concerned about how the protected custody was working." (T-2099)

Mr. O'Gorman also testified that P.K. was "extremely tired and constantly sleeping or putting his head down. . . .He was not alert and much of his day was spent really just not engaging in school." (T-2101-02) Mr. O'Gorman stated that academically, "he was not producing. . . . The behavior, what I observed, was not going where he had to go all the time. Not being in the classroom when he needed to be in the classrooms. I believe there were some times he was outdoors where he should not have

been outdoors." (T-2103)

KEA teachers also described P.K. as "fidgety and having difficulty keeping his head up." (T-2123; T-2143) During November and December 2005, P.K. would be sleeping in the KEA room. Mr. O'Gorman testified that "sometimes he'd go into the office and sleep. It was difficult to arouse him. It was often difficult to arouse him." (T-2144) The unstable behavior was evident as P.K. was oppositional. (T-2145).

KEA teacher Mr. Monchinsky testified that by mid-November P.K. sat in class with his head down. (T-2205) "He seemed out of it. He wasn't paying attention." (D-N; T-2205) P.K. became antagonistic with students and staff. (D-N; T-2207; T-2208)

On several occasions P.K. provoked Mr. Monchinsky; (T-2210; T-2212) cut classes (T-2213); and left the building to smoke cigarettes; (P-117; D-N; T-2213) On another occasion, P.K. drew a machine gun in his notebook with the word "kill" next to it. (D-N; T-2211). P.K. also "cursed out" Mr. Monchinsky on several occasions (T-2233).

While CSE chairperson, Laurie Bauer attempted to compare the CSE action in 2003 (when residential placement was recommended) to 2006 by pointing to P.K.'s sparse disciplinary record, she failed to acknowledge that P.K.'s own teachers "turned a blind eye" to disciplinary infractions which might have raised red flags and provided the CSE with a record of P.K.'s deteriorating behavior. (T-2197-98)

Despite a display of conduct which would typically have a student referred for disciplinary action, there is little disciplinary record attributable to P.K. for the 2005/06 school year. According to the KEA teachers, P.K. was not routinely referred for disciplinary action. KEA teacher, Mr. Monchinsky admitted that he often would "let

stuff slide" even though some people might think that is "turning a blind eye." (T-2197-98)  All these behaviors "send up red flags" and Mr. Monchinsky shared them with the K.s but he didn't always "write up" P.K. (T-2262)

The K.s shared with the KEA staff the anguish they were experiencing at home with P.K. In particular, the fact that P.K. had been arrested for assaulting another student with a knife. (T-2267) Mr. Monchinsky testified that P.K.'s interaction with his peers demonstrated that his "perspective was off." (T-2270)    Academically, P.K. was failing (P-32).

Throughout the 2005/06 school year, no one from the District made any attempt to determine how to address P.K.'s needs and deteriorating performance. (T-248) There was no functional behavior assessment, no referral for a psychiatric evaluation and a supposed  behavior intervention plan was never implemented specifically for P.K. (T-249)

On November 17, 2005 (P-4) the CSE convened to discuss P.K.'s deterioration. Mrs. K. testified that they were discussing the fact that P.K. was shut down and it was obvious to everyone that KEA just wasn't working. (T-249)  Without a clear understanding of P.K.'s actual functioning, the inadequate program modifications, placement and schedule changes were simply insufficient to address P.K.'s intense needs and he was not being provided with an educational program designed to afford him educational benefits. In fact, he was failing all of his classes. (P-40)

On January 9, 2006, KEA teacher, Mr. Monchinsky called P.K.'s parents to come take P.K. home. According to Mr. Monchinsky, P.K. was out of control and had to be wrestled into a classroom after attacking another student. (D-N) That same day, P.K.

was hospitalized for the third time that year, at Four Winds on January 9, 2006.  (P-120; D-B).

By letter dated January 12, 2006, the K.s requested another CSE meeting.  The CSE was informed that P.K. was hospitalized, in "crisis" and they knew he could not safely return to the inadequate KEA program.  (P-95; T-253)  No one from the District requested any information from the K.s concerning P.K.'s condition.  Nor did anyone, including Laurie Bauer, from the District request hospital records, discharge summaries or psychiatric evaluations.  The KEA staff was well aware of P.K.'s unstable behavior.  Mr. Monchinsky's own notes reflect the aggression and threats P.K. was exhibiting.  (P-N)  On December 12, 2005, Mr. Monchinsky reflects that "P.K. refuses to take exam.  Sits listening to headphones. Has to be asked to turn them down.  *Drawing a machine gun with word "kill" in notebook."*  (P-N)  On December 13, 2005, Mr. Monchinsky notes:  "When I tell P.K. I spoke to his mom, he tells me 'you're an asshole.' And "I should call you mom, tell her to come over.'  . . . I had called his parents to voice my concerns (P. sleeping in classes;  not taking his global exam;  drawing a gun with word 'kill' in notebook;  hanging around with __; smoking outside."  (P-N)  All those offenses that caused Mr. Monchinsky concern should have been reported to school administration for further action but he turned "a blind eye."

Rather than schedule a CSE meeting, Laurie Bauer convinced the K.s to meet with the KEA team.  The K.s, always cooperative, agreed and a meeting with the KEA team was held on January 17, 2006. (T-255)

At the KEA meeting the K.s renewed their request for a more supportive and structured placement for P.K.  The K.s requested a residential program.  P.K. was going

to be placed in an therapeutic setting, the Ascent Wilderness program on a temporary basis where P.K. could be comprehensively evaluated. (T-262)

The K.s requested exploration of residential programs. Ms. Bauer did not ask the K.s for more information. She didn't ask if there were any current psychiatric evaluations or hospital records to assist the District in assessing P.K.'s needs. In response, Ms. Bauer simply told the K.s that it was *now* required by the State Education Department regulations that before *any* recommendations are made for a residential treatment program, the K.s would have to meet with the local "Mental Health Association." (T-267)

In fact, the regulations Ms. Bauer referred to were not new. It was in place when the District's CSE had recommended P.K. go to a residential school back in 2003. It was in place when Ms. Bauer signed a statement of assurance that she had requested (when in fact she had not) the participation of "community support services" in the decision making. (P-131)

Given that pronouncement, the K.'s reasonably believed they were required to meet with a social services agency before a CSE meeting could be scheduled. (T-266) When the K.s left the meeting, KEA teacher Tony Monchinsky admitted that he turned to them and said "get a lawyer, . . . they'll listen to you more seriously once you do that." (T-267; T-2344))

In the meantime, P.K. was discharged on January 17, 2006 from the psychiatric hospital and brought by an adolescent transport service to Ascent, a therapeutic program, for a comprehensive assessment of his needs. (P-121B).

The K.s complied with Ms. Bauer's directive to meet with community mental

health representatives and thereafter requested, for the third time that year, a CSE meeting. (T-273) The meeting was scheduled for March 9, 2006. In the meantime, the K.s arranged for a private educational evaluation in the absence of the District's compliance with its obligation to reevaluate P.K. (P-101; T-289) and provided the District with notice of their intention to unilaterally place P.K. in a residential school (Wisdom Ranch School). At the March 9, 2006 CSE meeting, no effort was made to properly assess P.K.'s needs. (T-292) No functional behavior assessments were conducted, (T-292) he was deemed by the school psychologist, Ms. Denise Taylor, to be too restless and fidgety to conduct his mandated reevaluation assessment (T-1610); no updated medical information was gathered – the only medical in his file was from November 2002 – even though Laurie Bauer opined that his substance abuse was a "medical issue." (T-1687) No psychiatric evaluation was suggested despite the students having written the word "kill" next to a drawing of a machine gun in his notebook. (P-N)

The same information used to initially classify P.K. in March 2003 (and used to send P.K. to a residential placement for the 2003/04 school year and then used to remove P.K. from the same residential placement and back into the district program for the 2004/05 school year) was also used to deny the K.s' request for a residential placement for the latter part of the 2005/06 school year. (T-292)

While the District proclaims it has a psychiatrist, there is no evidence that the school's psychiatrist had any involvement with P.K. (T-2353) The *only* document listed on the IEP as having been reviewed by the CSE at the March 9th meeting was P.K.'s report card which shows he was failing. (P-1; P-32) No records, reports from the previous years KEA staff were available or reviewed.

Ms. K. testified that she pleaded with the CSE about P.K.'s academics: "He's not doing anything in school. He got F's from the first quarter on. He's doing nothing in school. He's sleeping. He's keeping his head on the desk. I don't know. They play cards. They do whatever they want to." (T-247)

At the March 9, 2006 (P-1) CSE meeting, Patricia K. shared with the committee her sincere belief that P.K. would need a residential school to address his severe emotional disability. (P-1; P-105) To support her position Mrs. K. shared with the CSE the recommendations of P.K.'s treating psychiatrist, which states:

> I am writing this letter regarding the above named patient. Patrick has a long history of emotional difficulties. He has had several psychiatric hospitalizations and recently has attended a wilderness therapeutic program. I am strongly recommending that Patrick enters a therapeutic residential school to meet his educational and emotional needs. . . .(P-37)

Mrs. K. also provided the CSE with a letter from his therapist of three years, Ms. Hanna which states

> I have been working with Patrick K. on and off for the past three years. Pies a very complex kid who is struggling with multiple issues. P. has a mood disorder as well as significant addition concerns. When P. is in intense treatment in conjunction with living in an extremely structured environment he can thrive, however, when P. is given the ability to make choices of his won he shows very poor judgment and little to no impulse control. P. desperately wants to get better and is usually extremely compliant when in a residential setting. I do not feel that at this time P. is capable of living at home and attending public school where the temptations are far too great. His addictive personality along with his mental illness does not allow P. the ability to keep himself safe. If you have further questions please do not hesitate to call. (P-34)

The K.'s also supplied the CSE with a letter from the psychologist, Dr. Jeffrey Schroeder, who had recently evaluated P.K. at the Ascent Program which stated:

> I have followed and participated in P.'s treatment at ASCENT wilderness therapeutic program. I agree with the recommendation of P.'s ASCENT clinician and the Professional Educational Consultant working with P.'s family that it

would be counterproductive to have P. return to his former school, any other mainstream public school, or any Day program schooling format after his tenure at Ascent.  P. will need the educational structure, the behavioral focus, and the therapeutic interventions of a Residential Therapeutic School in order to maintain the progress he has made here.  (P-35)

The K.'s also brought the letter of a social worker, Mr. Scott Gillette, who had

been working with K. family in treatment for several months which stated:

During the course of this treatment we were forced to intervene on P. and place him in a hospital first and then in a therapeutic treatment facility where he currently resides.  He has demonstrated poor judgment and in inability to control his impulses.  This combined with his mental illness dictate the need for a structured therapeutic setting.  Although the KEA program is an exceptional environment for certain students, it is my professional opinion that P. K. will not be able to thrive in this program being that his needs are so great.  He is currently enrolled in the Asscent program, which is a setting that will best suited to meet all of his needs at this time.  Please contact me if you should have any questions.  (P36)

Each of the professionals working directly with P.K. (including Mr. Gillette who

*was* familiar with the KEA program) suggested that due to P.K.'s poor judgment,

inability to control his impulses and severe mental illness he would need a structured

residential setting.

At the March 9th CSE meeting, when Ms. K. provided the CSE with the letters

she testified that she was ignored.  She stated:  "Truthful, they just weren't – I felt that at

that meeting, that I wasn't going to be heard no matter what I said.  I got that very very

quickly." (T-294)

No one from the District, at any time asked for any information from the family

about P.K., including the hospital discharge summaries.  (T-294)  No one from the

District made any effort to contact any of the people who were working with P.K. to

determine his needs.  (T-294)

P.K.'s regular education math teacher, Mr. Bill Tozzo, who was in attendance at the March 9th meeting, testified that he was aware that P.K. was using drugs because the "KEA aide" had told him. (T-1412) Mr. Tozzo testified that there was discussion at the meetings about P.K.'s aggressive behaviors. (T-1421). Mr. Tozzo also knew about the criminal proceedings. (T-1422) Mr. Tozzo testified that the K.'s were not asked for more information at the meetings. (T-1423)

Mr. Tozzo testified that the CSE discussed that the changes previously made to the KEA program were not successful for P.K. (T-1425) When asked whether he believed P.K. was functioning in school for the 2005/06 school year, Mr. Tozzo answered that P.K. was not functioning in school for the whole year. (T-1426).

Mr. Tozzo testified that Mrs. K. was crying and upset at the meeting and had told the CSE that P.K. was "in crisis." (T-1426) When Mr. Tozzo was asked whether he thought P.K. should stay in a residential program Mr. Tozzo testified that his recommendation was to leave him where he was. (T-1435) Mr. Tozzo stated "KEA was not working." (T-1435). That information did not make it into the minutes of the challenged IEPs.

No one from the District, at any time during this period, asked for any information from the family about P.K., including the January hospital discharge summaries. (T-294) No one from the District made any effort to contact any of the people who were working with P.K. to determine his needs. The District ignored the information which was provided by P.K.'s parents. Instead the minutes reflect that "CSE members agreed that student should continue in the KEA Program as a program that could meet his needs in the least restrictive environment." (P-1) To support that inadequate and clearly

31

inappropriate recommendation, the CSE relied upon only one document:  the report card (P-1; P-32) which showed he was failing or receiving incompletes in every single class in which he was enrolled.

Even had the CSE bothered to look into P.K.'s CSE file (and there is no credible evidence that any member actually did) the most current information in the student's file to support the District's inappropriate determinations was over -- or dangerously close to being over -- three years old.

Despite the student's severe emotional state, only one social emotional goal was recommended on the IEP generated from the March 9th meeting.  The only goal developed for this severely impaired child was "to demonstrate an improvement in socially acceptable behaviors in the school environment."  (P-1)

The K.'s rejected the CSE's recommendations and placed P.K. in the Wisdom Ranch School. The K.'s objected to the description of the CSE meeting as found in the IEP by letter dated April 5, 2006 (P-105)  They then requested a hearing by letter dated May 11, 2006.  (Complaint, Exhibit "C")   Hearing officer Mary Noe was appointed two weeks later on May 25, 2006.

The K.s requested extended school year services for P.K. for the Summer 2006 and provided notice to the District that they would seek reimbursement for tuition for the Summer.  (P-132)

When the K.s returned to the CSE on June 19, 2006 for P.K.'s annual review for the Summer and 2006/07 school year, despite production of a complete and thorough evaluation recommending residential school in a therapeutic setting, (P-123C) and a request for residential placement for both the Summer 2006 and the 2006/07 school year,

once again the CSE denied P.K.'s management needs would require a summer program or that given P.K.'s demonstrated regression in the Summer 2005 that he qualified for extended school year services. (P-126)

Despite the fact that the CSE had before it the full psycho-educational evaluation by Dr. Jeff Schroeder (P-123C) and another report by P.K.'s psychiatrist, Dr. George Uy, for the 2006/07 school year, (P-38) the CSE once again ignored the parents concerns and recommended the failing KEA program. (P-126) In fact, the CSE decreased the level of support P.K. would receive in the KEA program from three periods per day to 2. (P-126)

The Parents provided notice to the District that they were rejecting the recommendations of the CSE and of their intention to seek reimbursement for the 2006/07 school year tuition at Wisdom Ranch School. (P-133) Thereafter, the Parents challenge to the District's recommendations for the 2006/07 school year was consolidated with the initial impartial hearing request. (P-127).

The Wisdom Ranch school provided the appropriate environment to allow P.K. to make progress. There's no token economy. There's no level system. It gives the students opportunities to be able to be as normal as possible, where they have the opportunity to be in a safe environment to make their own choices and decisions and to learn from experience. (T-287)

P.K. needed a more closely supervised and structured day program. He needed residential placement. (T-288; P-34; P-35; P-36) Mrs. K. testified that "[i]n order for P.K. to feel safe, he needed the predictability and the structure that comes with residential. And the reason that Wisdom Ranch was such a great place for P.K. is because when his emotional needs are being addressed, he starts to excel academically.

He can learn again. His grades are back up. He's reading. He's doing very well academically." (T-289)

At Wisdom Ranch School, P.K.'s special education needs were supplied by a certified special education teacher. All the requirements on his IEP were being met - he could retake tests; take breaks if he needs them and he was in a very small class environment where he gets a lot of one-on-one instruction. (T-300) P.K. graduated with his high school diploma from Wisdom Ranch School in March 2007. (Complaint)

The evidence supported a program such as Wisdom Ranch School (and SUWS) to address his needs.

P.K.'s therapist, Suzanne Hannah testified that P.K. was aggressive because of his anxiety. (T-385) and P.K. resisted taking medication because he viewed it as a sign of weakness. (T-386) Ms. Hannah testified that P.K.'s needs resulted in her recommendation for more support because he needed more structure and his behaviors were "too high risk." (T-387)

Ms. Hannah testified that she did not believe P.K. needed "traditional talk therapy" to progress. (T-864) "I don't think that traditional talk therapy was the only way to go with P.K., because he hasn't always been responsive to it in the past." (T-864) Ms. Hannah agreed that Wisdom Ranch was appropriate for P.K. because it provided P.K. with a highly structured schedule, certain expectations that they have to live by and a nurturing environment. (T-869)

Ms. Hannah explained that a "therapeutic" setting is "a setting where people are where they're in a nurturing environment. Where they can process emotions, feeling. Where they have mentors and staff members who they can go to that they can talk to.

Where they have certain responsibilities. Certain restrictions." (T-873)

P.K.'s treating psychiatrist, Dr. Uy, agreed. He testified that P.K. exhibited "mood lability" meaning that "there could be periods when he could be reasonable, calm, collected and then there would be a rapid change in mood to becoming depressed, irritable, angry." (T-493) Dr. Uy testified about the inter-relationship between the depression and substance abuse as follows:

> . . . with individuals who are depressed or who may have mood difficulties, the substance abuse comes in to play usually because that individual is trying to self-medicate themselves in terms of depression. Sometimes because of their psychiatric illness, they're at a higher risk in terms of getting high risk behavior.

(T-494) Dr. Uy testified that P.K. needed a more structured program where he could be more closely supervised. (T-501)

Dr. Uy opined that P.K. would need a residential facility where his emotional and academic needs could be addressed. (T-502) How P.K.'s individual emotional needs could be appropriately addressed was ignored by the IHO and SRO. Those decision makers found that Wisdom Ranch School was inappropriate only because it didn't offer what is considered a traditional "therapeutic" program. However, the mantel of the Individuals with Disabilities Education Act is individualizing the instruction to meet the unique needs of the student.

P.K.'s particular make-up made a traditional "therapeutic" setting one which could not offer him educational benefit. The IHO and SRO ignored the overwhelming testimony of those persons who had made it their business to understand P.K.'s needs. John Schrom, the Ascent program director for P.K. testified that P.K. was "very untrusting." (T-630). P.K.'s level of distrust led him to view the world as an unsafe place. (T-634) In adopting that eschewed world view, P.K. became very aggressive as a

means to protect himself.  (T-635)

        To deal with the emotional pain he experienced, P.K. would self-medicate with alcohol and drugs.  (T-634)   Mr. Schrom testified that a therapeutic environment is one where P.K. "could continue to develop his self-esteem, self-confidence, have experiences that would provide success for him."  (T-903)  Mr. Schrom opined that the Wisdom Ranch School was an environment which could address his needs.  He stated:  "A therapeutic environment is one that provides students with an opportunity to look at themselves, be challenged, physically, mentally, emotionally.  Provide ongoing feedback to them.  Let them find success on many levels."  (T-903)

        Wisdom Ranch School provided the experiential therapeutic education in an environment that provides students with the ability to gain responsibility through choice making, decision making and guidance from the trained adults.  (T-904)

        Dr. Jeff Schroeder conducted a comprehensive evaluation of P.K. and testified about his assessment of P.K.'s needs (P-123C) and how they could be addressed.  Dr. Schroeder explained that a "therapeutic program" means "something that is designed to initiate and support positive emotional changes in anyone."  (T-964)

        Dr. Schroeder testified that there are many ways to "do therapy."  In P.K.'s case, it was clear that he needed a more experiential learning paradigm.  The "do to get" philosophy.  (T-965)  Dr. Schroeder explained the "do to get" philosophy as follows:  "you act and that's the way you get what you want rather than just talking about things. So the various kind of experiential learning, hands on learning, whether we're talking about classroom learning or more emotional attitude kind of learning.  The experiential approach is going to work better than talk therapy. . . .He was going to need to have

success experiences." (T-966)

Dr. Schroeder testified that P.K.'s needs would be met with a program that "has a primarily experiential component rather than just kind of sitting in an office and doing talk therapy. . . Something that was based on group interaction, because P.K. would accept that kind of confrontation better, at least from peers, than he would from anyone in a position of authority." (T-967) Dr. Schroeder agreed with the Parents' educational consultant, Mr. Rob Spears that P.K. needed a "hands-on experiential approach more than he needs a psychiatric or kind of just psychotherapy approach." (T-968)

Dr. Schroeder also opined that a standard public school class environment would not lead to progress for P.K. because "his emotional problems would keep him from being – from learning. From being available to the class. He would return to substance abuse. He would return to the various kinds of behavioral problems that he had. He wouldn't be in class. If he was there, he wouldn't really be present." (T-971) Dr. Schroeder made the assessment which was lacking in the District's review of P.K. They didn't look beyond the drug problem to the emotional disability he was exhibiting.

Mr. Rob Spear testified that P.K. would need "an environment that was going to be structured. An environment that was going to hold him accountable. An environment that he could not manipulate. And an environment were he, P.K. would feel safe enough in himself so that he could continue to make adjustments to his behavior." (T-1173) Mr. Spear also was clear that the traditional standard therapy situation was not going to be his recommendation. (T-1173)

At Wisdom Ranch School, P.K. would have access to psychological services and Alcoholics Anonymous meetings but the "therapy" would not be "forced down his

throat."  (T-1223, 1227)

Wisdom Ranch School Director, Mr. Monte MacConnell, testified about the program.  Mr. MacConnell described Wisdom Ranch School as an "experiential alternative school in a ranch setting."   Physical activities are used to not only educate the students "but give them life experiences by which they can gain a greater sense of independence and personal success." (T-730)  He described the school, that it consisted of twenty boys all of whom have had difficulty in the traditional school environment.  (T-731)

Mr. MacConnell testified that the school is accredited by the State of Idaho and Northwest Association of Accredited Schools and that students who graduate receive a high school diploma from the State of Idaho. (T-732)  All the teachers are certified teachers and the Director of the educational program, Mr. Hal Jardine, has a specialty in special education.  (T-733)

Mr. MacConnell described the experiential learning environment at Wisdom Ranch School and detailed the structured learning environment where academics are interspersed with ranch work, vocational skills, work training and work experience.  (T-735)  Mr. MacConnell also testified that one-on-one assistance is available to students. (T-735)

Mr. MacConnell testified that psychological services are available to students at Wisdom Ranch.  Arrangements are made for students with local providers of the services. (T-738, 755)  P.K. sees a psychiatrist to oversee his medication management.  (T-757)  Mr. MacConnell also explained the relationship the school has with a local "therapeutic wilderness program" (SUWS) where a student can meet with someone with a clinical

background.  (T-738)

Mr. MacConnell testified that P.K. was doing well at Wisdom Ranch School.  He attended his classes and was doing well with the academic work.  (T-743)  P.K.'s report cards reflect his successful academic work.  (P-123B, P-135).   Traditional therapeutic interventions were available to P.K. while in attendance at Wisdom Ranch School.  P.K. had access to AA meetings and was seen by a local psychiatrist for medication management.  In addition, when it was deemed appropriate by the Wisdom Ranch School staff that P.K. participate in a more intensive therapeutic intervention, he was enrolled for a two week period in the SUWS Adolescent Program for intensive psychological therapy. (D-L)

## ARGUMENT

## POINT I

## PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THE LAW AND FACTS

The IDEA authorizes federal courts to award reimbursement to parents who unilaterally place their disabled child at a private school.  Burlington School Comm. v. Dept. Of Educ., 471 U.S. 368, 370 (1985).  Where as in the instant case, the parents prove that the student was in need of special education services, the IEP developed by the school district was inappropriate; that the unilateral placement by the parent was proper and the equities balance in favor of an award of tuition reimbursement, the court may order reimbursement for the parents.  Florence v. Carter, 510 U.S. 7, 12 (1993)   The District Court should find that the K.'s should be reimbursed for the cost of sending P.K. to the Wisdom Ranch School (and SUWS).  The School District failed to comply with the procedures set forth in the IDEA, the IEPs developed through the IDEA's procedures

failed to provide P.K. with services which were "reasonably calculated to enable the child to receive educational benefits"; the private placement was in all respects appropriate and the K.'s cooperated fully, provided the requisite notice and equitable factors favor an award of tuition reimbursement.

All states receiving federal education funding under the Individuals with Disabilities Education Improvement Act ("IDEIA") must comply with federal requirements designed to provide a "free appropriate public education" ("FAPE") for all disabled children, including special education as well as related services. 20 U.S.C. § 1412(1). The special education and related services must be tailored to the unique needs of the disabled student by means of an Individualized Education Program. ("IEP"). The IEP consists of a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive. In order to provide a FAPE, an IEP must be "reasonably calculated" to enable the child to receive "meaningful educational benefits" in light of his or her needs. Board of Education of Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 206-07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

The IDEA defines a free appropriate public education as including both special education and related services. 20 U.S.C. § 1401(9). "Special education" means specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability and it includes instruction "conducted in the classroom, in the home, in hospitals and institutions, and in other settings." 20 U.S.C. § 1401(29). The term "related services" means transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit

from special education."  20 U.S.C. § 1401(26)   There is no dispute that P.K. is a "child with a disability" entitled to receive an education that is both appropriate and free.  The mandate of the IDEIA is that the education to be provided must be "reasonably calculated to enable the child to receive educational benefits."  Board of Education of Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 207 (1982).

Despite the IDEIA's preference for mainstream placements, the IDEIA also recognizes that some disabled students, like P.K., need full-time care in order to receive educational benefit.  Regulations promulgated under the statute by the U.S. Department of Education require that, "if placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child."  34 C.F.R. § 300.302 (2000).  In other words, if a residential placement is educationally necessary because of a student's disability, and the District does not provide it, then the District's IEP is not "reasonably calculated to enable the child to receive educational benefits" as required by the law.  The IDEIA requires that the District pay for a disabled student's residential placement if the student, because of his disability, cannot reasonably be anticipated to benefit from instruction without such a placement.  Mrs. B. v. Milford Board of Ed., 103 F.3d 1114, 1122 (2d Cir. 1997)

The K.s brought this action to support their belief that a residential placement was part of the special education and related services the District should have provided to P.K. in order for him to have a free appropriate public education.  Whether the State Review Officer accurately applied statutory and regulatory terms in the IDEIA and New York State implementing regulations to P.K.'s educational and emotional history is a

mixed question of law and fact, which warrants de novo review.  This case deals with statutory interpretations of whether a residential placement is part of the special education and related services the District should have provided in order for P.K. to have a free appropriate public education, where his educational needs were intertwined with his emotional disability and issues of substance abuse.

The SRO denied the K.'s request for reimbursement for a residential placement largely on the grounds that "school districts are not required to provide medical treatment for substance abuse issues."  (SRO Decision at p. 17).  That was wrong.  P.K.'s emotional problems and substance abuse issues are inextricably intertwined with his educational problems and the interpretation of the statutory requirements concerning medical services require a heightened review by this Court.

The District Court must use a modified de novo standard of review in evaluating the state's administrative proceeding.  The Court must give "due weight" to the administrative proceedings, mindful that the judiciary "lacks the specialized knowledge and experience necessary to resolve questions of educational policy."  A.S. ex rel S. v. Norwalk Bd. of Educ., 183 F.Supp.2d 534, 539 (D. Conn.. 2002)   However, The court must review conclusions of law -- based on interpretations of federal statutes by de novo review.  Muller v. Comm. on Spec. Educ. Of East Islip Union Free Sch. Dist., 145 F.3d 95, 102 (2d Cir. 1998)

The IDEIA also provides that "in any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, and shall grant such relief as the court determines is appropriate."  20 U.S.C. §

1415(i)(2).   In an IDEIA action "the inquiry. . . is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes. . ." New Paltz Central School District v. St. Pierre, o/b/o M.S., 307 F. Supp.2d 394, 397, (N.D.N.Y. 2004) quoting A.S. ex rel S. v. Norwalk Bd. of Educ., 183 F.Supp.2d 534, 539 (D. Conn.. 2002)   The Court must determine if there is sufficient evidence in the record to support the review officers' findings.  Where, as in the instant proceeding, the evidence does not support the determination of the State Review Officer, the decision should be annulled.

The Supreme Court has held that, in reviewing whether a proposed program is appropriate, the district court's inquiry generally should focus on two issues:  (1) whether the State has complied with the procedures set forth in the IDEA, and (2) whether the particular individualized education program developed through the IDEA's procedures was "reasonably calculated to enable the child to receive educational benefits."   Board of Education of Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 206-07 (1982).

### A.  THE DISTRICT FAILED TO COMPLY WITH THE PROCEDURAL REQUIREMENTS OF THE IDEIA

An appropriate educational program begins with an IEP which accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).   P.K.'s

IEP for 2005/06 school year from a CSE meeting held on March 9, 2006, contains goals and objectives that are not appropriate as they do not correspond to P.K.'s needs.  The District failed to adequately evaluate P.K.

The only document noted on P.K.'s March 9, 2006 IEP to support its recommendations is his report card which shows he was failing his classes.  (P-1; P-32).  The other documents in P.K.'s files, while clearly not reviewed by the CSE, are either out of date or nearly close to three years old.  The physical examination is dated September 24, 2001 (P-18);  the psychological evaluation is dated March 7, 2003 (P-22); the educational evaluation was dated March 10, 2003 (P-21) and the psychiatric evaluation - - which recommended residential placement – was from June 23, 2003 (P-24).  The only functional behavior assessment, dated  March 21, 2003, (P-23)  was never updated, despite a clear indication that P.K.'s behaviors were impeding his ability to access his education.  No classroom observation was ever conducted.  The CSE made no attempt to update or even conduct a mental health evaluation of P.K. despite his history of serious interfering behaviors and noticeable decline during the 2005/06 school year.  The CSE erred in failing to have updated evaluative material;  failing to provide appropriate services to address P.K.'s needs;  failing to have appropriate, measurable annual goals to address his needs and failing to consider a residential placement.  Application of a Child With a Disability, Appeal No. 04-097.

The CSE also erred in failing to allow the K.s full and meaningful participation in the development of an appropriate program to address P.K.'s needs.  The CSE ignored the information provided by the parents to the CSE at both the March 9, 2006 and the June 19, 2006 CSE meetings.    The CSE had a pre-determined view of the

44

recommendations it would be making for P.K., based upon the narrow and flawed view that all of P.K.'s academic problems stemmed from his substance abuse alone. The District's predetermination not to offer P.K. a residential placement because of their uneducated guess at his needs, amounted to a procedural violation of IDEA. Such predetermination of P.K.'s placement effectively deprived the K.s of meaningful participation (Ms. K. felt like a "nonmember") in P.K.'s individualized education program process, it caused substantive harm and therefore deprived P.K. of the free appropriate public education to which he is entitled. Deal v. Hamilton County Board of Education, 392 F.3d 840 (6th Cir. 2004).

The CSE's cursory and negative review of the information brought to its attention by the K.s at both the March and June CSE meetings demonstrate a serious infringement upon their right to participate in the process. Both Mr. and Mrs. K. testified that Tony Monchinsky's recommended they "get a lawyer" before the CSE meeting so that the District "will listen" also shows that the CSE had already determined that P.K. would not be recommended or even considered for a residential placement regardless of his needs. (T-2344; T-267-68)

## B. THE IEPS ARE NOT CALCULATED TO PROVIDE P.K. WITH EDUCATIONAL BENEFIT AND THEY ARE INAPPROPRIATE

P.K.'s substance abuse and emotional disability are admittedly complex in its causation and degree of interrelatedness to his capacity to cope with the demands of a high school education. The District itself considered P.K.'s substance abuse to be related to his educational progress until the need for a residential placement and the expense associated with that placement became an issue. The District referred P.K. to a substance abuse counselor located in the high school (T-1672) and developed a shortened day with

"protective custody" to have P.K. removed from the influences which may lead him to drugs and alcohol abuse.

The SRO viewed P.K.'s substance abuse as a "medical" issue for which the District was not responsible. P.K.'s emotional issues were interrelated with his substance abuse and it was wrong to attempt to separate the impact of his conditions. The SRO wrongly segregated P.K.'s substance abuse from his emotional disability. Full time residential placement was necessary for P.K. for educational reasons. He was not being educated in the public school setting and a recommendation for the KEA program was not reasonably calculated to provide P.K. with educational benefit.

The SRO analysis limits addressing P.K.'s needs to a distinction between his unwillingness and inability to behave properly. The grey area between normal, voluntary conduct and involuntary physiological response, is where Congress chose to locate behavioral problems such as P.K.s In Independent School District No. 284 v. A.C., 258 F.2d 769 (8th Cir. 2001), the Eighth Circuit Court of Appeals found that "the mere fact that Congress regards emotional disturbances as disabilities entitling a child to special education shows that, at least in Congress's judgment, social and emotional problems are not ipso facto separable from the learning process." Id.

In Indpendent Schools, the student at issue had moved into the District when she was 15 years old. A.C.'s school related problems included classroom disruption, profanity, insubordination and truancy. Outside of school, she used alcohol and illegal drugs and was sexually promiscuous. A.C. repeatedly ran away from home, was thought to have forged checks, and was hospitalized three times for threatening or attempting suicide. All involved with the student agreed that her behavior was interfering with her academic

progress. Id. at 771. Her mother advocated for a residential placement but the District recommended either a self contained class or day treatment program. The parent dissatisfied with the choices enrolled A.C. in a residential treatment center in Idaho and sought tuition reimbursement. While the District was willing to pay the "educational" costs of the school, it was unwilling to fund the costs related to therapy or lodging. Framing the issues as whether "a residential placement is part of the special education and related services the District must provide in order to give A.C. a free appropriate public education," the Court found that the residential placement for A.C. was necessary for her to receive an education. The Eighth Circuit reversed the district court which had found that "the residential placement is necessary only to treat Plaintiff's social and emotional problems, not for educational purposes. . . " Id. At 775.

The Eighth Circuit found that a "[i]f the problem prevents a disabled child from receiving educational benefit, then it should not matter that the problem is not cognitive in nature or that it causes the child even more trouble outside the classroom than within it. What should control our decision is not whether the problem itself is "educational" or 'non-educational" but whether it needs to be addressed in order for the child to learn." Id. at 777. P.K. had already been determined to be emotionally disturbed. The Eighth Circuit found that "read naturally and as a whole, the law and the regulations identify a class of children who are disabled only in the sense that their abnormal emotional conditions prevent them from choosing normal responses to normal situations. Id., citing Honig v. California Superintendent of Public Instruction v. Doe, 484 U.S. 305, 320 (1988). The SRO erred in his interpretation of the requirements of the IDEA by segregating P.K.'s substance abuse from an already identified emotional disturbance.

The record before the SRO did not permit the conclusion that P.K.'s behavioral problems are separable from the learning process. He slept in class, missed assignments, was oppositional and generally unavailable for learning. The psychologist, psychiatrists and therapists working with P.K. made it clear that he could not receive educational benefit in the public school setting. P.K. needed a residential placement to be educated. The KEA program was a self-described "therapeutic day program" which was simply insufficient to address P.K.'s severe needs.

## POINT II

**THE PARENTS ARE ENTITLED TO TUITION REIMBURSEMENT AS THE PRIVATE PROGRAM IS APPROPRIATE TO MEET P.K.'S NEEDS AND THE EQUITIES BALANCE IN FAVOR OF AN AWARD OF TUITION REIMBURSEMENT**

**A.    The Wisdom Ranch School and Ascent Evaluation Program Offered P.K. an Educational Program that was Appropriate and met P.K.'s Special Education Needs**

In addition to proving that the IEP is inadequate, the K.s have established that the programs chosen by them for a unilateral placement offered appropriate services for P.K. This burden is stringent but not impossible to meet.   The parents must establish that the private placement is appropriate for the child, not that it is perfect. M.S.v. Bd. Of Educ. of the City Sch. Dist. of Yonkers, 231 F.3d 96, 105 (2d Cir. 2000); Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999).   Parents satisfy their burden by showing that their unilateral placement offered an educational program that met their child's special needs. *Walczak,* 142 F.3d at 119.   The parents' unilateral placement need not have certified special education teachers or an IEP for the disabled student in order to qualify as appropriate. Florence County Sch. Dist. Four v. Carter, 510

U.S. 7, 14, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993)   Moreover, while an IEP devised by a school district must provide the student with an education in the least restrict environment, a parent's inability to place his child in the least restrictive environment does not bar parental reimbursement. <u>M.S. 231 F.3d at 105,</u> citing <u>Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss</u>, 144 F.ed 391, 400 (6th Cir. 1998)   .

P.K. was placed by his parents at the Ascent Program and thereafter, Wisdom Ranch School for the balance of the 2005/06 school year, the Summer of 2006 and the 2006/07 school year where he currently attends.  As the director of the school, Monte McConnell, testified Wisdom Ranch School "is an experiential alternative school in a ranch setting."  (T-730).  Wisdom Ranch uses physical activities to not only educate the students scholastically but give them life experiences by which they can gain a greater sense of independence and personal success."  (T-730)  The Ascent Program director who worked directly with P.K. testified that he thought Wisdom would be appropriate because it offers an experiential education in an environment that provides students with the ability to gain responsibility through choice making, decision making with guidance from the adults that are there. (T-904)  According to Mr. Schrom Wisdom provided a placement that "would provide him with ongoing support, ongoing self-esteem development, self-confidence development and really help him find success academically." (T-928)  Dr. Jeff Schroeder, the psychologist who conducted the updated psychological evaluation opined that P.K. would need "a program that has a primarily experiential component rather than just kind of sitting in an office and doing talk therapy."  (T-967)

Wisdom Ranch has twenty all male students, who have had difficulty thriving in

traditional classroom environments.  (T-731).  The school is an accredited high school by the State of Idaho and Northwest Association of Accredited Schools.  (T-732)  Students who graduate receive a high school diploma from the state of Idaho.  (T-732)  All the teachers in the school are certified teachers.  (T-733)  The school administrator or principal, Hal Jardine, has thirty-five years of experience in special education.  (T-733) Psychological and psychiatric services are available to students through "arrangements with a couple of different doctors to oversee students that are on medication."  (T-738) P.K. sees a physician to oversee his medication management.  (T-756)  They also have a relationship with a therapeutic wilderness program (SUWS) where staff with clinical therapeutic background is available for consultation.  (T-738)  P.K. went to SUWS Adolescent Program through Wisdom Ranch "to give him time to reflect. . . and gain therapeutic guidance."  (T-744)  (D-L)

The entire program is designed to "help our students become successful academically."  (T-747)  At Wisdom Ranch School program modifications are available for students to reach their academic goals.  (T-747)  Dr. Schroeder described the "therapeutic" component of a residential school having to be "positive emotional change."  (T-972)  Where the recommendations, like here, are for an environment that was either therapeutic or supportive, coordinated traditional therapeutic services are not required to demonstrate a proper placement.  P.K. is in a therapeutic environment where he has thrived academically.  The school provides the structured environment with around the clock supervision that P.K. needs.  (T-298)   The K.s educational consultant, Rob Spear, testified that P.K. needed an environment that was going to hold him accountable, one that he couldn't manipulate.  (T-1173)  He needed to be academically

involved, where he could learn to value his capacity to learn. (T-1176) P.K. needed to

be in an environment where he could be "experientially involved" and actually do

physical work (T-1173) and he needed an environment where he could build

relationships with his peers and staff. (T-1176) All those components were present at the

Wisdom Ranch School. When Mr. Spear visited P.K. in July, he announced that he had

"read eight books." (T-1183) P.K. has made significant educational progress as

exhibited by his report cards. (P-123B, P-135) The record supports a finding that the

private placements of the K.s for P.K. is appropriate.

**B.    The K.s are entitled to Reimbursement as the Equities Balance in Favor of an
       Award of Tuition Reimbursement**

The K.s are equitably entitled to reimbursement. The record reveals that at all

times, the K.s cooperated with the District in planning for their son's education. The K.s

attended all meetings and whenever asked for any information from the District that

information was provided. All the KEA staff that worked with P.K. during the 2005/06

school year testified that the K.s were very cooperative. (T-2001-2002; T-2147; T-2261).

In addition to cooperating in assisting the District in recommending an appropriate

placement for P.K., the K.s provided the requisite notice to the District of their intentions.

On January 12, 2006, the K.s notified the District that they were in "crisis" and requested

a CSE meeting. (P-95) Thereafter, the K.s agreed to meet with the KEA team instead of

moving ahead with their CSE. (T-268) The K.s both spoke to personnel from the Mental

Health Department as requested by the District. (T-273: T-275). Thereafter, the K.s

notified the District that they intended to place P.K. in a private school (P-101; P-132; P-

133) and attended all meeting of the CSE in hopes that the matter could be resolved. (P-

1; P-126)  Wisdom Ranch School was a solution arrived at by the K.s after it became

clear that the District had pre-determined not to consider a residential placement for P.K.

## CONCLUSION

For all the forgoing reasons, the Sort's decision should be annulled and this court

should find that the K.s have sustained their burden that the District's recommended

placements for the 2005/06 Summer 2006 and 2006/07 school year are inappropriate, that

the Wisdom Ranch School is appropriate and that a balance of the equities mandates an

award of tuition reimbursement as they have shown that they cooperated with the District

and provided the requisite notice entitling them to an award tuition reimbursement, costs

for the transportation of P.K. to his private placement and reimbursement for the

independent educational evaluation.

Dated:          March 19, 2008
                Bedford Village, New York 10506


                            Respectfully submitted,

                            KUNTZ, SPAGNUOLO & *MURPHY*, P.C.
                            *Attorneys for PK. And P.K.*
                            444 Old Post Road
                            Bedford Village, New York 10506

                            By:_____/s/_____
                                   Leah L. Murphy (LLM 8934)