UNITED STATES DISTRICT COURT                  ECF
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
P.K. and P.K., on behalf of P.K.,

                        Plaintiffs,

      - against -
                                Case No. CV 07-8494

THE BEDFORD CENTRAL SCHOOL DISTRICT,

                        Defendant.
-------------------------------------------------------------X

## REPLY
## MEMORANDUM OF LAW
## ON BEHALF OF DEFENDANT
## BEDFORD CENTRAL SCHOOL DISTRICT

                        Respectfully submitted,

                        INGERMAN SMITH, LLP
                        Attorneys for Defendant
                         BEDFORD CSD
                        550 Mamaroneck Avenue, Suite 209
                        Harrison, New York 10528
                        (914) 777-1134

*Of Counsel:*

RALPH C. DeMARCO

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT**  **PAGE 1**

**ARGUMENT**  **PAGE 2**

**POINT 1**  **PAGE 2**
THE PLAINTIFFS' MEMORANDUM OF LAW
IMPROPERLY CONTAINS INFORMATION
OUTSIDE THE ADMINISTRATIVE RECORD

**POINT 2**  **PAGE 3**
THERE IS NO LEGAL AUTHORITY FOR THE
PLAINTIFFS' ATTORNEY'S SUGGESTION
THAT THIS CASE SHOULD BE SUBJECT
TO HEIGHTENED JUDICIAL REVIEW

**POINT 3**  **PAGE 5**
P.K. HAD SIGNIFICANT SUBSTANCE ABUSE PROBLEMS,
WHICH WERE NOT THE RESPONSIBILITY OF THE DISTRICT

**POINT 4**  **PAGE 10**
THE SRO HAS NEITHER MISAPPREHENDED NOR
MISAPPLIED THE LAW OR FACTS IN THIS CASE

A.  THE SRO PROPERLY REJECTED THE PLAINTIFFS'  **PAGE 10**
CLAIM THAT THE CSE PREDETERMINED THE OUTCOME
OF MEETINGS.

B.  THE SRO PROPERLY HELD THAT THE MARCH 2006  **PAGE 12**
AND JUNE 2006 IEPs WERE BASED ON SUFFICIENT DATA.

C.  THE SRO PROPERLY HELD THAT THE MARCH  **PAGE 14**
2006 AND JUNE 2006 IEPS WERE APPROPRIATE FOR P.K.

**POINT 5**  **PAGE 21**
IN THE UNLIKELY EVENT THAT THIS COURT RULES
AGAINST THE DISTRICT ON THE APPROPRIATENESS
OF THE IEPs, THIS COURT MUST REMAND THE ISSUE
BACK TO THE SRO FOR DETERMINATION AS TO THE

APPROPRIATENESS  OF THE PRIVATE SERVICES AND
AS TO WHETHER EQUITABLE CONSIDERATIONS
SUPPORT THE PARENTS' CLAIMS

**CONCLUSION**                                    **PAGE 22**

## PRELIMINARY STATEMENT

This Reply Memorandum of Law is submitted on behalf of the Defendant, BEDFORD CENTRAL SCHOOL DISTRICT, ("DISTRICT") in support of its request for a judgment dismissing the Complaint filed by the Plaintiffs, P.K. and P.K., on behalf of their son, P.K., under the Federal Individuals with Disabilities Education Act, ("IDEA") 20 U.S.C. Section 1401, et seq., and Article 89 of the New York State Education Law. Specifically, MR. and MRS. K. seek review of the Decision of the State Review Officer ("SRO") for the New York State Education Department, which denied their request for reimbursement of tuition, room, board, transportation and escort service fees associated with their unilateral placement of P.K. at a residential facility, known as Wisdom Ranch School, located in Idaho, during the 2005-2006 and 2006-2007 school years and which denied their request for reimbursement for the private psychological evaluation report done on P.K. by another residential facility, known as Ascent Wilderness Program, located in Idaho, in February 2006.

The SRO Decision is entitled to due deference from this Court. The Second Circuit has interpreted the IDEA as strictly limiting judicial review of the state administrative decisions. Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380-81 (citing Bd. of Educ. of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, at 204-08). In determining whether school districts have complied with the IDEA, the United States Supreme Court has recognized that courts do not have special expertise in the field of education and should not substitute the court's judgment for that of school authorities. Rowley, at 206. Thus, due deference is to be afforded to administrative decisions made by state officials who possess expertise in the field, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy. Id., at 207-08. The above

standard of judicial review under the IDEA was recently reiterated in <u>Viola v. Arlington Central School District</u>, 414 F.Supp.2d 366 (S.D.N.Y. 2006) where this very Court explained that, "…although our inquiry certainly is not one of 'rubber stamp' review, we nevertheless "must give 'due weight' to the administrative proceedings, 'mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." <u>Id.</u> at 378 (citations omitted).

Based on the administrative record, and for the reasons set forth in the DISTRICT's Memorandum of Law and this Reply Memorandum of Law, the DISTRICT respectfully requests that this Court issue a judgment dismissing the Complaint, in its entirety.

**ARGUMENT**

**POINT 1**

**THE PLAINTIFFS' MEMORANDUM OF LAW
IMPROPERLY CONTAINS INFORMATION
OUTSIDE THE ADMINISTRATIVE RECORD.**

Actions in Federal Court under the Individuals with Disabilities Education Act ("IDEA") generally are resolved by examination of the administrative record in a summary judgment procedural posture. <u>Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist.</u>, 281 F.Supp.2d 710, 714 (S.D.N.Y. 2003). "Federal courts reviewing administrative determinations under the IDEA must base their decisions on the preponderance of the evidence, taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." <u>Grim v. Rhinebeck Cent. Sch. Dist.</u>, 346 F.3d 377, 380 (citing 20 U.S.C. § 1415(i)(2)(B)).

In this case, the Plaintiffs and Defendant expressly agreed that, other than the administrative record, there would be no additional evidence submitted to this Court.

Specifically, the parties entered into a Consent Scheduling Order, signed by this Court on January 18, 2008, in which it was acknowledged that, "Given that this action is one for review on an administrative record pursuant to Fed. R. Civ. P. 26(a)(1)(E)(i), there shall be no discovery practice, including the submission of additional evidence pursuant to 20 U.S.C. §1415(i)(2)(B)(ii), other than the transmittal of the administrative record created below to the Court and Memorandum of Law by both parties."

In the Plaintiffs' Memorandum of Law, the Plaintiffs' attorney has improperly made statements claiming that P.K. thrived at and graduated from Wisdom Ranch School with a high school diploma in March 2007, or words to that effect. Plaintiffs' Memorandum of Law, at pages 8 and 33. These statements are not supported in testimony or documentary evidence and contain information outside the administrative record, which closed with the last hearing date on December 11, 2006. As such, these statements constitute new evidence which is specifically prohibited by the Consent Scheduling Order.

Based on the foregoing, the DISTRICT submits that the above kind of statements must be disregarded by this Court. To do otherwise would result in prejudice to the DISTRICT, especially since the DISTRICT has not had the opportunity to question these statements under cross-examination or to obtain the disclosure of documents related to these statements.

## POINT 2

### THERE IS NO LEGAL AUTHORITY FOR THE PLAINTIFFS' ATTORNEY'S SUGGESTION THAT THIS CASE SHOULD BE SUBJECT TO HEIGHTENED JUDICIAL REVIEW.

The SRO found that the administrative record supported the DISTRICT's assertion that P.K. had significant substance abuse problems and that it was reasonable and appropriate for the CSE to reject MR. and MRS. K.'s request for a residential placement for P.K. based on the

information before the CSE at the time it developed the March 2006 and June 2006 IEPs for the remainder of the 2005-2006 school year and 2006-2007 school year, respectively.     SRO Decision, at pages 16-20.   In so ruling, the SRO explained that "[g]enerally school districts are not required to provide medical treatment for substance abuse issues."   SRO Decision, at page 17 (citing Blickle v. St. Charles Cmty. Unit Sch. Dist. No. 303, 1993 WL 286485 [N.D. Ill. Jul. 29, 1993]; Brian M. v. Boston Public Schs., 401 IDELR 341 [Mass. SEA1989]; Letter to Scariano, 213 IDELR 133 [OSEP 1988]).

Without offering any legal authority or explanation, the Plaintiffs' attorney suggests in conclusory fashion that "the interpretation of the statutory requirements concerning medical services require a heightened review by this Court." Plaintiffs' Memorandum of Law, at page 41.

This is not the standard of judicial review under the IDEA, especially under these circumstances where the SRO wrote a comprehensive Decision.  SRO Decision, at pages 1-22. As stated above, the SRO Decision is entitled to due deference from this Court.  The United States Supreme Court, the United States Court of Appeals, Second Circuit, and the United States District Court, Southern District of New York, have long interpreted the IDEA as strictly limiting judicial review of state administrative decisions and requiring that due deference be afforded to administrative decisions made by state officials who possess expertise in the field, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.  Rowley, supra, at 204-208; Grim, supra, at 380-381; Viola, supra, at 378; J.R. and B.R. v. Bd. of Educ. of the City of Rye School District, 345 F.Supp.2d 386 (S.D.N.Y. 2004).

Moreover, the administrative record shows that P.K. received no special education services and no clinical services at the Wisdom Ranch School, let alone any type of medical treatment for his significant substance abuse problems.

**POINT 3**

**P.K. HAD SIGNIFICANT SUBSTANCE ABUSE PROBLEMS,**
**WHICH WERE NOT THE RESPONSIBILITY OF THE DISTRICT.**

The Plaintiffs' attorney claims that that "P.K.'s emotional problems and substance abuse issues are inextricably intertwined with his educational problems" and that "where medical, social, emotional or even substance abuse problems are intertwined with the student's educational problems, courts recognize that the local educational agency must fund residential programs." Plaintiff's Memorandum of Law, at page 9 and 41.

Contrary to the Plaintiffs' attorney's claims, the SRO found that P.K.'s significant substance abuse problems were distinct from his emotional needs and that these significant substance abuse problems were the predominant factor that interfered with his ability to have success in the KEA Program during the 2005-2006 and 2006-2007 school years. SRO Decision, at page 2, 4-5, 17. T, at 2002; P-5. The SRO recognized that, when not abusing substances, P.K. could be successful and his emotional needs would be met in the KEA Program. SRO Decision, at page 19. T, at 1385-1386 and 1936; P-126. This is most clearly demonstrated by the fact that P.K. achieved good grades and was a model student in the KEA Program during the 2004-2005 school year. SRO Decision, at page 3. T, at 1514 and 1923-1924;

In his findings of fact, the SRO detailed P.K.'s severe chemical and physical dependency to illegal substances. Among other facts, the SRO found, in pertinent part:

> Reports from evaluations conducted by the student's service providers contemporaneous with the March 9, 2006 CSE meeting, supported respondent's assertion that the student had a significant

- 5 -

substance abuse problem. The evaluation reports also identified
emotional problems.    A Four Winds psychiatric assessment,
completed on January 9, 2006 indicated that between January 2,
2006 and January 8, 2006, the student was consuming four 40-
ounce beers per day and using three to four grams of marijuana
daily (Dist. Ex. B at p. 3). The student reported having blackouts
(id.). Suicidal ideation was noted (id. at p. 4). The psychiatrist
noted that the student would benefit from a 28-day substance abuse
program after hospitalization and recommended that a trial of
mood stabilizing medication be considered (id. at p. 5).

A January 18, 2006 bio/psychosocial assessment of the student
conducted by the clinical director of Ascent resulted in the
following    initial    diagnostic    impressions:    polysubstance
dependence disorder, conduct disorder-adolescent onset type,
physical abuse of a child – victim and dysthymic disorder (Parent
Ex. 121B at p. 8). The student's diagnoses remained the same upon
discharge on March 1, 2006 (Parent Ex. 121D at p. 3). The clinical
director at Ascent testified that he learned from petitioners'
educational consultant that the student had a significant history of
substance abuse (Tr. p. 628) as well as a lot of aggression and
hostility (Tr. p. 627).  The psychologist from Ascent testified that
when the student entered the program his primary problem was
"ongoing, fairly severe substance abuse" (Tr. p. 1015). He also
cited the student's explosive anger (id.). Respondent noted that the
student's private therapist indicated that the student had significant
addiction concerns (Tr. pp. 1602, 1932). Educational testing
conducted by Ascent in late Winter 2006 yielded results similar to
the 2003 assessment of the student conducted by respondent and
did not reveal any previously unidentified academic difficulties
(Parent Ex. 121D).[1]

SRO Decision, at pages 16-17.

In Walczak v. Florida Union Free School District, 142 F.3d 119 (2nd Cir. 1998), the Court

of Appeals, Second Circuit, observed that "[w]hile some children's disabilities may indeed be so

---

[1] Until the end of this hearing in December 2006, MR. and MRS. K. never shared with the CSE or DISTRICT that,
in January 2006, P.K. threatened to strangle himself with a vacuum hose and to jump out of a car and that Four
Winds reported that P.K. was placed in a secure wing because he had aggressive episodes with other patients.  D-B.
Until the Ascent bio-psychosocial assessment was disclosed in this hearing, MR. and MS. K. never informed the
CSE or DISTRICT of the extent of P.K.'s drug abuse.  P-121B.  Until the Ascent psychological evaluation report
was shared with the CSE at its meeting on June 19, 2006, MR. and MS. K. never informed the CSE or DISTRICT
that P.K. had suffered physical abuse from his brother.  P-121E and P-126.  The SRO confirmed later in his
Decision that MR. and MRS. K. withheld important information regarding P.K. from the March 2006 CSE and June
2006 CSE. SRO Decision, at page 15 and 19.

acute as to require that they be educated in residential facilities, it is appropriate to proceed cautiously whenever considering such highly restrictive placements." Id. Specifically, the Second Circuit wrote, in pertinent part:

> Because the law expresses a strong preference for children with disabilities to be educated, "to the maximum extent appropriate," together with their non-disabled peers, 20 U.S.C. § 1412(5), special education and related services must be provided in the least restrictive setting consistent with a child's needs. Only "when the nature or severity" of a child's disability is such "that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily" should a child be segregated. Id. In such cases, instruction may be provided not only in special classrooms but also "in the home, in hospitals and institutions, and in other settings." 20 U.S.C. § 1401(a)(16). Indeed, a school board may be required to place a child in a residential institution if such a placement is necessary to provide an appropriate education. See 34 C.F.R. § 300.302 (1998); Mrs. B. v. Milford Bd. Of Educ., 103 F.3d 1114, 1122 (2d Cir.1997).

> \* \* \*

> ...A disabled child is "not ... entitled to placement in a residential school merely because the latter would more nearly enable the child to reach his or her full potential." Abrahamson v. Hershman, 701 F.2d at 227. Indeed, it would violate IDEA's preference for the least restrictive educational setting to move a child from a day program where she is making progress to a residential facility simply because the latter is thought to offer superior opportunities. See Carlisle Area School v. Scott P., 62 F.3d at 535 (although disabled child might have benefitted more from residential placement, "the district would have erred if it had ordered the allegedly 'better' residential placement since ... an IEP must not only be designed to confer some educational benefit, but it also must deliver the programming in the least restrictive educational environment").

Id., at 122 and 132.

The Plaintiffs' attorney's reliance on Independent School District No. 284 v. A.C., 258 F.3d 769 (8th Cir. 2001)[2] is misplaced. A review of Independent School District No. 284 reveals no support for the proposition that a school district must fund a residential program when an emotionally disabled student has significant substance abuse problems. In Independent School District No. 284, the Court of Appeals, Eighth Circuit, held that a residential placement for a student with an emotional disability was necessary for the student to receive an education where the student's chronic truancy and behavior outbursts prevented her from receiving an educational benefit. Id., at 777. Although the Eighth Circuit in Independent School District No. 284 very briefly mentioned in part of a single sentence that outside of school the student had used unspecified alcohol and illegal drugs, there was no indication whether or to what extent her alcohol and illegal drug use was intertwined with or even related to her emotional disability. Id., at 771.

Under the circumstances, the SRO properly held that it was reasonable and appropriate for the CSE to reject MR. and MRS. K.'s request for a residential placement for P.K. based on the information before the CSE at the time it developed the March 2006 and June 2006 IEPs. SRO Decision, at pages 16-20. Specifically, the SRO found, in pertinent part:

> Petitioners further maintain that the program proposed by the CSE in March 2006 was inadequate because it did not recommend residential placement. They assert that in light of his emotional condition and substance abuse issues, the student required a highly structured, closely supervised residential setting. The CSE Chairperson testified that when the CSE recommended residential placement for the student in 2003, the student was experiencing distorted thoughts and family trauma, exhibiting self-mutilating behaviors, could not develop appropriate peer or adult relationships, and was aggressive and impulsive (Tr. pp. 1811-13). According to the CSE Chairperson, in 2006, respondent did not determine that the student exhibited distorted thoughts or suicidal

---

[2] The citation provided for this case in Plaintiffs' Memorandum of Law is incorrect. It is cited as 258 "F.2d" 769 but the actual cite is 258 "F.3d" 769.

ideation like it determined in 2003 (Tr. pp. 1811-12). She noted that, in 2006, the student had made excellent connections with adults as well as with peers (Tr. pp. 1812-13). In addition, the CSE Chairperson noted that, in 2003, the student had experimented with marijuana but was not actively taking drugs, whereas in 2006, he was chemically and physically dependent and using multiple substances (Tr. p. 1812). The KEA psychologist stated that the CSE would not make a residential placement based on the fact that a student had substance abuse problems (Tr. p. 1818). Generally school districts are not required to provide medical treatment for substance abuse issues (see Blickle v. St. Charles Cmty. Unit Sch. Dist. No. 303, 1993 WL 286485 [N.D. Ill. Jul. 29, 1993]; Brian M. v. Boston Public Schs., 401 IDELR 341 [Mass. SEA 1989]; Letter to Scariano, 213 IDELR 133 [OSEP 1988]). Moreover, although school districts must provide an opportunity for parents to participate in the development of their child's IEP, mere parental disagreement with a school district's proposed IEP and placement recommendation does not amount to a denial of meaningful participation (see Sch. for Language and Communication Development v. New York State Dep't of Edu., 2006 WL 2792754, at *7 [E.D.N.Y. Sept. 26, 2006] ["Meaningful participation does not require deferral to parent choice"]; Paolella v. District of Columbia, 2006 WL 3697318, at *1 [D.C. Cir. Dec. 6, 2006]). The IDEA guarantees an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Tucker, 873 F.2d at 567 [internal quotation omitted]; see Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132).

In the instant case, although respondent was not in a position to medically treat the student's substance abuse issues, the record reveals that respondent supported petitioners' efforts to treat the student's chemical dependency by bringing in its own substance abuse counselor (Tr. 17 p. 1672). The record further indicates that respondent tried to accommodate the student's efforts to maintain his sobriety by increasing the level of adult support and monitoring his cravings (Tr. p. 1536). In addition, the record shows that respondent developed a trial plan with petitioners that provided the student with an abbreviated school day thereby allowing him access to AA meetings (Tr. pp. 1535, 1538). Under the circumstances of this case, I find that based on the information before the CSE at the time that the March 2006 IEP was developed, it was reasonable and appropriate for the CSE to recommend against a residential placement despite petitioners' wishes.

Based upon the information before me, I find that the program proposed in the March 2006 IEP, at the time it was formulated,

was reasonably calculated to enable the student to receive educational benefit (Viola v. Arlington Central School District, 414 F. Supp. 2d 366 at 382 [S.D.N.Y. 2006] [citing to J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386, 395 n.13 [S.D.N.Y. 2004]; see Cerra, 427 F.3d at 195; see also Mrs. B., 103 F.3d at 1120; Application of a Child with a Disability, Appeal No. 06-112; Application of a Child with a Disability, Appeal No. 06-071; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021). In light of the foregoing, I concur with the impartial hearing officer's conclusion, for the reasons set forth above, that respondent offered the student an appropriate program in the least restrictive environment.

SRO Decision, at pages 17-18.

The DISTRICT submits that the SRO's determination is rationally based and supported by the administrative record and legal citations relied on by the SRO.

## POINT 4

### THE SRO HAS NEITHER MISAPPREHENDED NOR MISAPPLIED THE LAW OR FACTS IN THIS CASE.

The SRO wrote a comprehensive 22-page single-spaced Decision, in which he carefully considered and rejected essentially the same arguments now raised by the Plaintiffs' attorney with ample citations to legal authority and the administrative record.  SRO Decision, at pages 1-22.

**A.     THE SRO PROPERLY REJECTED THE PLAINTIFFS' CLAIM THAT THE CSE PREDETERMINED THE OUTCOME OF MEETINGS.**

In the Plaintiffs' Memorandum of Law, the Plaintiffs' attorney makes vague statements claiming that the CSE predetermined the outcome of meetings regarding P.K.'s IEP, thereby resulting in an alleged denial of meaningful participation by MR. and MRS. K.  Plaintiffs' Memorandum of Law, at pages 8 and 43-44.

Although school districts must provide an opportunity for parents to participate in the development of their child's IEP, mere parental disagreement with a school district's proposed IEP and placement recommendation does not amount to a denial of meaningful participation. Sch. For Language and Communication Development v. New York State Dept of Edu., 2006 WL 2792754 (EDNY 2006).

In rejecting the Plaintiffs' similar claim, the SRO found, in pertinent part:

> ...Although I have determined that the issue of predetermination is not properly before me, I have reviewed the impartial hearing record and I find petitioners' claims unpersuasive. The record shows that as of March 3, 2006, petitioners had placed their son at Wisdom Ranch (Parent Exs. 121D at pp. 1-2; 123B). Despite the student's mother's assertion that she "felt like a non-member of the Committee," the record establishes that respondent considered input from petitioners and discussed program options for the student (see Tr. pp. 1382, 1599; Parent Exs. 1 at pp. 5-6; 126 at p. 6). Additionally, the record demonstrates that the March 2006 CSE took into consideration letters provided by petitioners in support of their request for residential placement before making its recommendations (Tr. pp. 1599, 1601-04, 1606; Parent Ex. 1 at p. 5). Similarly, at the June 2006 CSE meeting, respondent's CSE reviewed a letter from the student's psychiatrist and contacted him by telephone regarding the content of his June 15, 2006 letter (Parent Ex. 126 at pp. 6, 8). The record also shows that the June 2006 CSE reviewed and considered the February 2006 psychological evaluation report from Ascent in developing its recommendations (id. at p. 9). Furthermore, the record demonstrates that the June 2006 CSE discussed several program options for the student, including exploring additional day treatment programs or remaining at KEA (id. at p. 6). Based on the foregoing, the record does not support petitioners' claim that their son's program was predetermined, which resulted in a denial of meaningful parental participation.

SRO Decision, at page 13.

**B.     THE SRO PROPERLY HELD THAT THE MARCH 2006 AND JUNE 2006 IEPs WERE BASED ON SUFFICIENT DATA.**

In the Plaintiffs' Memorandum of Law, the Plaintiffs' attorney claims that the CSE did not adequately evaluate P.K. and improperly relied on information from March 2003 to develop the March 2006 and June 2006 IEPs. Plaintiffs' Memorandum of Law, at pages 27 and 43.

In rejecting the Plaintiffs' similar claims, the SRO found, in pertinent part:

> ...A review of the record shows that it includes intelligence testing, academic testing, and a social history conducted by respondent in March 2003 (Parent Exs. 20; 21; 22). It also contains the student's cumulative health record through November 2002 (Parent Ex. 18). The student's initial IEP, developed on March 26, 2003 indicated that he was due for reevaluation by March 12, 2006 (Parent Ex. 16 at p. 1). The student was successful academically and behaviorally during the 2003-04 and 2004-05 school years (Parent Exs. 5 at pp. 4-5; 7 at pp. 4-5). In August 2005, respondent requested and obtained consent to reevaluate the student (Parent Exs. 91 at p. 1; 92; see 8 NYCRR 200.4[b]).

> The student attended respondent's KEA program for approximately 15 days in September 2005 before being hospitalized at Silver Hill (IHO Ex. 1). The student returned to school on November 3, 2005 and was in attendance for approximately 14 more days (id.) before the school psychologist initiated psychoeducational testing on November 28, 2005 (Tr. p. 1894; Dist. Ex. G at p. 2). The psychologist conducted additional testing the following day (id.). Further attempts at assessment were unsuccessful due to the student's inability to remain focused (Tr. pp. 1873,2027-28).

> At the time of the March 2006 CSE meeting, the student had not attended respondent's school for two months (IHO Ex. 1). The March 2006 CSE reviewed the student's February 1, 2006 report card (Tr. pp. 1126, 1130; Parent Ex. 1 at p. 7) and letters provided by petitioners (Tr.pp. 98, 1125, 1130, 1412, 1419; Parent Ex. 1 at p. 5). The KEA psychologist presented the CSE with a synopsis of the student's 2005-06 educational history and the general education and special education teacher members of the CSE reported on the student's school performance (Tr.p. 1600). The March 2006 CSE did not have treatment notes or discharge summaries from the student's psychiatric hospitalizations available for review (Tr. pp. 294, 1139). There was no updated psychological evaluation for the March 2006 CSE to review (Tr. pp. 98, 1126, 1629, 1738).

> Although petitioners argue that the CSE used the same information to recommend the KEA program for the student in 2006 as it did to

recommend a residential program in 2003, the record indicates that the March 2006 CSE considered information, beyond the student's 2003 standardized evaluations. The student had been in respondent's school for the 2004-05 school year and part of the 2005-06 school year and respondent's staff was familiar with him (Tr. pp. 1061, 1391, 1454, 1831, 2087, 2179). Petitioners had been in regular contact with respondent and provided respondent with some information regarding the student's condition (Dist. Ex. F). Respondent had contact with professionals who provided mental health services to the student outside of the school (Tr. pp. 806-07, 812, 814, 837, 1868, 1931, 1986, 2000-01; Dist. Ex. F).

The record also indicates that the March 2006 CSE asked numerous questions regarding the student's substance abuse (Tr. p. 1129). Petitioners were asked whether they had considered options other than AA to address the student's substance abuse (Tr. p. 718). Respondent's staff questioned the consistency and continuity of the student's care as it related to substance abuse (Tr. p. 1606) and expressed concern regarding the disjointedness of support provided to the student and the incomplete exploration of community services (Tr. pp. 1428, 1430, 1432, 1608). Respondent's staff expressed further concerns regarding the reactionary placement of the student when he was in crisis (Tr. p. 1135; Parent Ex. 1 at p. 6). Petitioners confirmed that they had not explored the possibility of an intensive drug treatment program with follow-up treatment and wrap-around services (Tr. p. 1608; Parent Ex. 1 at p. 6).

The March 2006 CSE also reviewed the letters submitted by petitioners and concluded that some of the professionals who had drafted the letters had limited knowledge of the student (Tr. pp. 1603-09) or of respondent's KEA program (Tr. pp. 1931-32, 1742). Respondent's staff members concluded that petitioners' letters were not consistent with their own observations of the student and that a residential placement was beyond what the student needed (Tr. pp. 2119-20). The CSE Chairperson noted that for a brief period in November 2005, when the student was substance free, he was open to intervention and assistance (Tr. pp. 1609, 2029).

Additionally, although petitioners claim that the March 2006 IEP was developed without sufficient evaluative data, the record indicates that petitioners failed to provide the March 2006 CSE with pertinent information about the student upon which to base its determination. For example, petitioners did not advise the CSE of the student's threats of self-harm, aggression when hospitalized or reports of abuse (Tr. pp. 717-18, 1137, 1423, 1629, 1932-33, 2124-25, 2361-62). Based on the student's performance in the KEA program during the

2004-05 school year, respondent's staff remained convinced that if the student's substance abuse issues were dealt with, he could be successful in the KEA program (Tr. pp. 721, 1132). Respondent's staff acknowledged that at the time of the March 2006 CSE meeting, respondent was aware of the student's substance abuse and legal problems; psychiatric hospitalization; fidgetiness and anxiety; depression; lethargy and sleeping in school; a problematic, but not abusive, relationship with his brother; and non-compliance and verbal aggression within school (Tr. pp. 1421-22, 1735, 1754, 1755, 1816, 1926, 1820-22). Based on the record before me, I find that at the time that the March 2006 IEP was developed, respondent had evaluated the student (although with limited success due to the student's inability to focus), reviewed prior educational records and his current report card, and gathered as much information as possible about him by soliciting parental input and taking information provided by petitioners about the student under consideration in forming its recommendations (see Application of a Child with a Disability, Appeal No. 06-036). In light of the foregoing, I find that the March 2006 IEP was based on sufficient evaluative data.

SRO Decision, at pages 13-15.

## C.    THE SRO PROPERLY HELD THAT THE MARCH 2006 AND JUNE 2006 IEPS WERE APPROPRIATE FOR P.K.

In the Plaintiffs' Memorandum of Law, the Plaintiffs' attorney claims that the CSE failed to otherwise comply with the procedural requirements of the IDEA. Plaintiffs' Memorandum of Law, at pages 42-43.

In rejecting the Plaintiffs' similar claims, the SRO found, in pertinent part:

Petitioners also argue that the March 2006 IEP was insufficient because respondent did not conduct an FBA. State regulations require that an FBA be performed as part of an initial evaluation of a child suspected of having a disability if the child's behavior impedes his or her learning or that of others (8 NYCRR 200.4[b][1][v]). In addition, the IDEA as well as state and federal regulations mandate that the CSE "shall...in the case of a child whose behavior impedes his or her learning or that of others, consider, when appropriate, strategies, including positive behavioral interventions, and supports to address that behavior" (20 U.S.C. 1414[d][3][B][i]; 34 C.F.R. § 300.324[a][2][i]; see 8 NYCRR 200.4[d][3][i]). Where behavior impedes a child's learning, the CSE must properly assess that behavior as an initial

step in developing an appropriate IEP (Application of the Bd. of Educ., Appeal No. 05-123; Application of the Bd. of Educ., Appeal No. 05-031; Application of a Child with a Disability, Appeal No. 03-057; Application of a Child with a Disability, Appeal No. 02-032; Application of a Child with a Disability, Appeal No. 01-094; Application of the Bd. of Educ., Appeal No. 01-060). Respondent did not attempt to conduct an FBA; however, the record indicates that the KEA program had built-in behavioral interventions, which respondent's staff found effective (Tr. p. 1690). I note that respondent attempted to evaluate the student, but could not complete its evaluations, because the student was distracted (Tr. p. 1873). In developing its recommendations, the March 2006 CSE took into consideration petitioners' input as well as information provided from the student's private mental health providers (Tr. pp. 2027-28; Parent Ex. 1 at p. 5). Moreover, the record shows that the KEA team planned to work with the student to help him manage his behaviors (Tr. p. 1949). Under the circumstances of this case, I disagree with petitioners' contention that the lack of an FBA resulted in a denial of a FAPE to the student.

Moreover, despite their contention, petitioners have not presented sufficient evidence to show that the March 2006 IEP did not meet the student's special education needs at the time that it was developed. Respondent's staff testified that the services and supports recommended by the March 2006 CSE would have addressed the student's academic and emotional needs (Tr. pp.1127, 2118). They indicated that the present levels of performance represented the discussion that took place at the March 2006 CSE meeting and accurately reflected the student's needs (Tr.pp. 1652-53, 1950-51, 2117-18). Specifically with respect to the student's substance abuse problem, the March 2006 CSE recommended services including family support and a substance abuse program that would provide the student with consistency in dealing with his substance abuse problem (Tr. pp. 1133-34). Respondent also invited a representative from the Mental Health Association to the CSE meeting to provide petitioners with information on these services (Parent Ex. 1 at p. 5). The KEA psychologist testified that given the student's strong cognitive skills despite his emotional difficulties, counseling and support within the student's classes would be appropriate both academically and therapeutically (Tr. pp. 1945, 2115). Respondent's staff opined that the recommended program modifications, assistive technology, and support for school personnel on behalf of the student were all appropriate (Tr. pp. 1127, 1648-49). Specifically, respondent's staff testified that preferential seating was important for the student as it would allow him to be near an appropriate role model or close to the teacher

who could refocus the student or provide him with necessary support (Tr. pp. 1947, 2115). The CSE Chairperson also indicated that the student benefited from the use of a word processor to help him brainstorm and facilitate the writing process (Tr. pp. 1649, 1652, 1949, 2116). The support for school personnel meant that both the KEA psychologist and special education teachers would provide consultation to the student's general education teachers so that they could help him in the classroom and understand his needs and disability (Tr. pp. 1650, 1949). The CSE Chairperson also opined that the student's testing accommodations were appropriate (Tr. pp. 1650, 1950). She noted that the student exhibited some distractibility and that flexible scheduling allowed the student to take a break and "bring himself back together" (Tr. pp. 1651, 2117). It also allowed staff to assess the student's needs on a day-by-day basis and determine whether or not he could take the test in his classroom or required a smaller environment (Tr. p. 1651). Directions explained helped to focus the student and make sure he understood the task at hand (Tr. pp.1652, 1950, 2117). This helped the student's self-confidence (Tr. p. 1652). Use of a word processor with a spell check and grammar check would facilitate the writing process for the student (id.). According to the CSE Chairperson, the student's IEP goals and objectives were not changed because they remained appropriate for the remainder of the 2005-06 school year (Tr. pp.1653-54, 1951-52).

\* \* \*

Next, I will consider petitioners' claim for reimbursement for summer 2006. Petitioners requested ESY services for summer 2006 (Parent Ex. 132). Students shall be considered for ESY services in accordance with their need to prevent substantial regression (8 NYCRR 200.6[j]; Application of the Bd. of Educ., Appeal No. 04-102). Substantial regression is the inability of a student to maintain developmental levels due to a loss of skill or knowledge during the months of July and August of such severity as to require an inordinate period of review at the beginning of the school year to reestablish and maintain IEP goals and objectives mastered at the end of the previous school year (8 NYCRR 200.1[aaa]). In a June 16, 2006 letter to respondent, petitioners indicated that they would be keeping their son at Wisdom Ranch for summer 2006 (Parent Ex. 132). Petitioners asserted in their letter that the March 2006 CSE acknowledged that during the previous summer the student exhibited difficulty with less structure (Parent Exs. 1 at p. 5; 132) and therefore, petitioners requested that respondent recommend ESY services for the student at Wisdom Ranch (Parent Ex. 132). Petitioners advised respondent that if

Wisdom Ranch, or a satisfactory alternative, was not recommended, they would seek tuition reimbursement for the student's summer 2006 placement at Wisdom Ranch (id.). The June 2006 CSE discussed petitioners' request (Parent Ex. 126 at p. 5). The CSE, with the exception of petitioners, determined that the student was not eligible for an ESY (Tr. p. 1632; Parent Ex. 126 at p. 6). Petitioners cited an incident that took place during the previous summer in which the student allegedly pulled a knife on another person and the student's then current felony charge as proof of the student's need for an ESY (Parent Ex. 126 at p. 6). Respondent asserted a lack of regression, noting that the student began the 2005-06 school year with a good work ethic and good grades (id.). Under the circumstances of this case, I find that the evidence in the record does not establish that the student would have experienced substantial regression during the summer, and, therefore, I concur with respondent that ESY services were not required.

I now turn to petitioners' claim that the June 2006 IEP was not appropriate to meet their son's special education needs. As set forth in great detail below, I disagree. The record reveals that on June 19, 2006, the CSE reconvened for the student's re-evaluation/annual review (Parent Ex. 126). Attorneys for both parties were present (id. at p. 5). The June 2006 CSE reviewed the private psychological evaluation from Ascent (Tr. pp. 1366, 1612, 1937-38; Parent Ex. 126 at pp. 8-9) and a letter from the student's private psychiatrist (Tr. pp. 1368, 1376, 1612, 1615; Parent Exs. 38; 126 at pp. 8-9). Respondent's KEA staff spoke about the student's progress while he was in the KEA program (Tr. pp. 1376, 1612). The student's psychiatrist participated in the meeting by telephone (Tr. pp. 1368, 1612, 1615, 1937). Although petitioners indicated that they informed respondent of the student's threats of self-harm (Tr. p. 2362), respondent's CSE members denied having been advised of the threats or of the student's aggressive behavior while hospitalized in January 2006 (Tr. pp. 1630, 1819, 1953, 2241). The June 2006 CSE did not have discharge summaries or treatment notes from the student's hospitalizations available for review (Tr. p. 1388). At the time of the June 2006 CSE meeting, the record reveals that Wisdom Ranch had not generated any progress reports for the student, and the student's mother testified that at time of the commencement of the impartial hearing, she had yet to receive them (Tr. p. 310).

The private psychological evaluation indicated that the student was of above average to superior intelligence and performing at or slightly above his age and grade level in academic content areas

(Parent Ex. 123C at pp. 6-8). The psychologist noted a gap between the student's IQ and academic performance and suggested that it might be indicative of a learning disability but might also be indicative of the cognitive and motivational impediments of severe substance abuse (id. at pp. 7-8). He further noted that testing indicated the possibility of an ADHD - primarily inattentive type and suggested that further evaluation for the possibility of ADHD could be helpful (id. at pp. 7-9). According to the psychologist, socially, the student projected an extreme version of a "tough guy" image-arrogant, indifferent to others' troubles, hostile, quick to anger and "blow up," and defiant toward authority and accepted social standards (id. at p. 9). The psychologist opined that emotionally, the student's intimidating exterior hid a deep fear of his own weakness, instability and dependence (id.). The psychologist recommended a long-term structured residential treatment program for the student (id.).

The private psychiatrist noted that the student had a history of mood lability and depression and that he remained in a fragile state (Parent Exs. 38; 126 at p. 6). The psychiatrist reportedly indicated that part of the student's depression and mood disorder was a result of substance abuse (Tr. p. 1616). He reported that the student had progressed at Wisdom Ranch and opined that the student would decompensate if moved to a less structured program (Parent Ex. 38). The psychiatrist stated that Wisdom Ranch was indicative of the type of therapeutic and closely supervised environment that the student required to help him with his emotional and academic needs (id.). He urged the CSE to support the student in continuing his treatment and schooling at Wisdom Ranch (id.). Respondent's staff indicated that the student had been successful in school for two years prior to his substance abuse and opined that were his substance abuse treated, he could be successful in the KEA program (Tr. pp. 1385-86, 1936; Parent Ex. 126 at p. 6).

For the 2006-07 school year, the June 2006 CSE recommended that the student return to respondent's KEA special class where he would receive individual counseling one time per week and group counseling one time per week (Parent Ex. 126 at p. 1). For his core academic classes the student would attend general education classes with the support of a special education teacher or aide from the KEA program (Tr. pp. 1464-65; Parent Ex. 126 at p. 1). In addition, the student would attend KEA 10:1+2 special class resource room twice daily for 40 minutes (Parent Ex. 126 at p. 1). The program was the same program recommended by the March 2006 CSE with the exception that the student's English and social studies classes would be co-taught by a general education and

special education teacher rather than being taught as self-contained classes (Tr. pp. 1464-65). Also, the student's IEP indicated that he would have counseling available to him on an as needed basis, in addition to his scheduled weekly sessions (Parent Ex. 126 at p. 1). The KEA program included regular consultation by a psychiatrist, similar to the previous year (Tr. pp. 1468-69).

The student's present levels of performance were updated on his IEP and tests scores from petitioners' private psychological evaluation were added to the student's IEP (Parent Ex. 126 at p. 4). Respondent's staff indicated that the present levels of performance reflected the student's abilities (Tr. pp. 1657, 2236). The June 2006 IEP included an additional program modification, which allowed the student's homework assignments to be reduced and modified, and an additional supplementary aide, which afforded the student a copy of scaffolded class notes (Parent Ex 126 at pp. 1-2). The student's testing accommodations remained the same as in his previous IEP; however, a notation was added to indicate that the flexible setting was to include monitoring of the student's distractibility and anxiety (id. at p. 2). The student's IEP included a recommendation for an FBA (id. at pp. 2, 6). Recommended goals and objectives targeted the student's study skills, writing, and social-emotional-behavioral needs (id. at pp. 9-10).

Respondent's staff suggested that the KEA program would provide the student with a closely supervised program (Tr. p. 1386) in a therapeutic setting (Tr. pp. 1386, 1941-42) and that the CSE's recommended program would address the student's emotional and educational needs (Tr. pp. 1386, 1945, 1952). According to respondent's psychologist, the KEA program provided a therapeutic environment by offering students support in their classes and helping them to manage their emotions while trying to learn (Tr. pp. 1941-42). The student's IEP indicated that he would be supported in general education classes by the special education teacher/aides from the KEA program (Tr. p. 1946; Parent Ex. 126 at p. 1). The student's special education teacher reported that in addition to classroom support, the resource room would assist the student with skills and work completion and that the counseling would provide him with therapy (Tr. p. 2121). The program psychologist reported that she was able to work with students to understand "triggers" that might "set them off" (Tr. p. 1942). In addition, program staff worked with classroom teachers and other school personnel to develop proactive strategies for managing students (Tr. pp. 1943-44). The KEA psychologist reported that when the student was not abusing substances, he fit the class

profile for students involved in the KEA program (Tr. pp. 1944-45).

The KEA psychologist stated that the recommendations made by the Ascent psychologist could be addressed in the KEA program (Tr. pp. 1939-40). Specifically, an ADHD screening and FBA could be conducted within the KEA program and the program could offer the student an academic component, as well as counseling on an individual, small group and as needed basis (Tr. pp. 1940-41). In the KEA program, the student could continue to work with the substance abuse counselor in respondent's school (id.). The CSE recommended program included two daily resource room periods where the student could receive support with his daily work (Tr. pp. 1945-46).

The CSE Chairperson stated that achievement testing revealed a relative weakness in the student's spelling ability, which was addressed as part of the student's academic program (Tr. pp. 1621-22). The student's June 2006 IEP provided for access to a word processor for writing assignments and for the use of a word processor and spell check device during testing (Parent Ex. 126 at p. 2). Scaffolded class notes were added to the June 2006 IEP based on observations from the student's special education teachers that the notes gave the student a chance to focus on instruction and provided the student an outline from which to study (Tr. pp. 1655, 1947, 2234). Modified homework assignments were added to the student's IEP to help reduce his frustration with homework (Tr. pp. 1655-56, 1947-48, 2234). The CSE Chairperson testified that the CSE's previous recommendation for a behavioral consultation with the student's general education teachers remained appropriate (Tr. pp. 1656-57, 2236). According to the CSE Chairperson, the student's testing accommodations were appropriate for helping him deal with distractions and reinforce exactly what was expected of him on a test (Tr. p. 1950).

The June 2006 CSE recommended that an FBA be conducted during the 2006-07 school year (Parent Ex. 126 at pp. 2, 6). The KEA psychologist indicated that the purpose of the assessment would be to identify the student's "triggers" so as to help him avoid responding to the triggers in an inappropriate manner (Tr. p. 1948). The June 2006 CSE added a study skills goal to the student's IEP related to turning in homework on time (Tr. p. 1952). The student's special education teacher opined that the recommended study skills and writing goals were appropriate (Tr. p. 2237). Based on the foregoing, the record shows that the June 2006 IEP addressed the student's emotional, academic and behavioral needs in a highly

- 20 -

supervised therapeutic setting. In developing its recommendations for the 2006-07 school year, the record establishes that respondent considered observations and recommendations from the student's private providers (see Parent Ex. 126 at pp. 8-9). Based upon the information before me, I find that the program proposed in the June 2006 IEP, at the time it was formulated, was reasonably calculated to enable the student to receive educational benefit (Viola, 414 F. Supp. 2d at 382 [citing to J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386, 395 n.13 [S.D.N.Y. 2004]; see Cerra, 427 F.3d at 195; see also Mrs. B., 103 F.3d at 1120; Application of a Child with a Disability, Appeal No. 06-112; Application of a Child with a Disability, Appeal No. 06-071; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021). In light of the foregoing, I concur with the impartial hearing officer's conclusion, for the reasons set forth above, that respondent offered the student an appropriate program in the least restrictive environment for the 2006-07 school year...

SRO Decision, at pages 15-21.

Based upon the foregoing, the DISTRICT submits that the 2005-2006 and 2006-2007 IEPs were reasonably calculated to allow P.K. to receive educational benefits and that MR. and MRS. K. have failed to meet their burden to show otherwise.

## POINT 5

**IN THE UNLIKELY EVENT THAT THIS COURT RULES
AGAINST THE DISTRICT ON THE APPROPRIATENESS
OF THE IEPs, THIS COURT MUST REMAND THE ISSUE BACK
TO THE SRO FOR DETERMINATION AS TO THE APPROPRIATENESS
OF THE PRIVATE SERVICES AND AS TO WHETHER EQUITABLE
CONSIDERATIONS SUPPORT THE PARENTS' CLAIMS.**

In 1985, in School Committee of Town of Burlington, Massachusetts, v. Department of Education of Massachusetts, 471 U.S. 359, 105 S.Ct. 1996 (1985), the United States Supreme Court established a three prong test for awarding reimbursement in situations where a disabled student is unilaterally placed by his or her parents in a private school. This three prong test, known as the Burlington test, permits reimbursement if: (1) the services offered by the school district were inadequate or inappropriate; (2) the private school services selected by the parents

were appropriate; and (3) equitable considerations support the parents' claim. <u>Applications of</u> <u>Board of Education of Albion CSD and Child with a Disability</u>, Appeal Nos. 97-42 & 43, at 8 (S.R.O. 1997)(citing <u>School Committee of Town of Burlington, Massachusetts, supra</u>). In 1993, the Supreme Court extended application of the <u>Burlington</u> test to non-approved private schools in <u>Florence County School District Four v. Carter by Carter</u>, 510 U.S. 7, 114 S.Ct. 361 (1993).

Since the SRO determined that the 2005-2006 and 2006-2007 IEPs were appropriate, the SRO did not find it necessary to go on to make a determination as to the appropriateness of the services obtained for P.K. at Wisdom Ranch and SUWS and as to whether equitable considerations support MR. and MRS. K.'s claims. The DISTRICT submits that this Court should uphold the IHO's determination that the services privately obtained for P.K. by MR. and MRS. K. are not appropriate and that equitable considerations do not support MR. and MRS. K.'s claims.    In the unlikely event that this Court rules against the DISTRICT on the appropriateness of the IEPs and is unsure about upholding the IHO's determination,[3] the DISTRICT submits that this Court must remand the issue back to the SRO for determination as to the appropriateness of the private services and as to whether equitable considerations support the parents' claims.

## CONCLUSION

Based on the administrative record, and for the reasons set forth in the DISTRICT's Memorandum of Law and this Reply Memorandum of Law, the Defendant, BEDFORD CENTRAL SCHOOL DISTRICT, respectfully requests that this Court issue a judgment

---

[3]  The Plaintiffs' attorney has not taken a position on this point in the Plaintiffs' Memorandum of Law.  This language has been slightly modified from the DISTRICT's Memorandum of Law for the sake of clarity.  The DISTRICT submits that this Court cannot rule against the DISTRICT on issues that have not yet been determined by the SRO and believes that, in the unlikely event that this Court rules against the DISTRICT on the appropriateness of the IEPs and is unsure about upholding the IHO's determination, this Court must remand the case back to the SRO in order to obtain a complete administrative decision.

dismissing the Complaint, in its entirety, together with attorneys' fees, costs and disbursements, and for such other and further relief as this Court may deem appropriate.

Dated: Harrison, New York
      April 7, 2008

                    Respectfully submitted,

                    INGERMAN SMITH, LLP

                By:
                    RALPH C. DeMARCO (RD 1339)

                    Attorneys for Defendant
                      BEDFORD CSD
                    550 Mamaroneck Avenue, Suite 209
                    Harrison, New York 10528
                    (914) 777-1134

TO:    LEAH L. MURPHY, ESQ.
        KUNTZ, SPAGNUOLO & MURPHY P.C.
        Attorneys for Plaintiffs
         P.K. and P.K. o/b/o P.K.
        444 Old Post Road
        Bedford Village, New York 10506
        (914) 234-6363