UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

P.K. and P.K., on behalf of P.K.,          :          07 Civ. 8494 (WCC)

                       Plaintiffs,          :          **ECF CASE**

        - against -          :          **OPINION**
                                   **AND ORDER**

BEDFORD CENTRAL SCHOOL DISTRICT,          :

                       Defendant.          :

- - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

KUNTZ, SPAGNUOLO, & MURPHY, P.C
**Attorneys for Plaintiffs**
444 Old Post Road
Bedford Village, NY 10506

LEAH L. MURPHY ESQ.

      Of Counsel

INGERMAN SMITH, LLP
**Attorneys for Defendant**
550 Mamaroneck Avenue, Suite 209
Harrison, NY 10528

RALPH C. DeMARCO, ESQ.

      Of Counsel

Copies E-Mailed to Counsel of Record

**Conner, Senior D.J.:**

Plaintiffs P.K. and P.K., on behalf of their minor child, P.K., bring this action against defendant Bedford Central School District (the "District") pursuant to the Individuals With Disabilities Education Act ("IDEA" or the "Act"), 20 U.S.C. §§ 1401, *et seq*. Plaintiffs appeal from the decision of a New York State Review Officer ("SRO") that affirmed the decision of an Independent Hearing Officer ("IHO") denying their request for tuition reimbursement for their unilateral placement of P.K. in a private, residential school during part of the 2005-06 school year, summer 2006 and the 2006-07 school year. Plaintiffs seek reimbursement for tuition and related expenses as well as a declaration that these placements were appropriate and that the District failed to offer P.K. a free appropriate public education ("FAPE") as required by the IDEA. The parties now cross-move for summary judgment. For the following reasons, the Court grants summary judgment in favor of defendant.

## BACKGROUND

The administrative record reveals the following facts.[1] P.K. was enrolled in the District's school system in kindergarten. (Ex. 22 at 1.) In December 2002, during his eighth-grade year, P.K. was admitted to the Partial Hospitalization Program at Four Winds Hospital ("Four Winds") due to "increased depressive symptoms, academic decline, increased irritability, decreased concentration, appetite loss, and sleep difficulties." (Ex. 120 at 27.) After P.K. was released from Four Winds, plaintiffs referred him to the District's Committee on Special Education ("CSE" or the "Committee")

---

[1] The record before the Court consists of the transcript of the IHO hearing, plaintiffs' exhibits 1-136, defendant's exhibits A-N and one IHO exhibit.

1

for evaluation.  (Ex. 41.)  On March 26, 2003, the CSE classified P.K. as emotionally disturbed and declared him eligible for special education.  (Ex. 16 at 1.)  P.K.'s Individualized Education Program ("IEP") provided for five hours of resource room services and one session of individual counseling per week.  (*Id.* at 4.)

P.K.'s behavioral and emotional difficulties then began to increase.  In May 2003, he was admitted to Four Winds as an in-patient due to suicidal ideation and mood instability.  (Hr'g Tr. 147-48; Ex. 120.)  The discharge/referral summary from this admission describes P.K. as prone to "explosive episodes" and "physical and verbal altercations with peers."  (Ex. 120.)  The summary notes that P.K. had been hospitalized three times in the past year due to his "severe difficulty with peer relationships and his inability to exhibit self control."  (*Id.*)  According to the hospital records, P.K. acknowledged having "an active drug problem."  (*Id.*)

After P.K. was admitted to Four Winds, plaintiffs requested an emergency CSE meeting, which took place on May 8, 2003.  (Ex. 15 at 3.)  The CSE decided to begin looking into residential placements for P.K., but postponed a final decision until such time as the Committee had more information about P.K.'s most recent hospitalization.  (*Id.* at 4.)  P.K. was discharged from the Four Winds in-patient program and referred to the Four Winds Partial Hospitalization Program on May 21, 2003.  (Ex. 120.)  He was again admitted to Four Winds on an in-patient basis on June 10, 2003 due to "significant depression."  (Ex. 13 at 4; Ex. 120.)  After being discharged, P.K. spent six weeks in the Summit Achievement Program, a wilderness program located in Maine.  (Tr. 171-72.)

The CSE reconvened on July 21, 2003 for P.K.'s annual review.  (Ex. 13.)   At the meeting, the CSE heard input from plaintiffs and a District school psychologist regarding P.K.'s recent behavior at home and at school.  (*Id.* at 3-4.)  The Committee also reviewed the psychiatric

2

evaluation and discharge summary from P.K.'s hospitalization at Four Winds.[2] (*Id.* at 4.) Based on this information, the CSE determined that P.K. needed a residential placement and recommended he enroll in the Devereux/Glenholme Residential Program ("Devereux") for the 2003-04 school year (P.K.'s ninth-grade year). (*Id.*) Plaintiffs agreed with this recommendation. (*Id.*)

P.K.'s year at Devereux went well; according to Mrs. K., he was "very successful scholastically and socially." (Hr'g Tr. 180.) The Devereux staff concluded that P.K. was generally making progress towards his behavioral goals. (Ex. 80.) The staff also determined that P.K. remained reliant on the structured nature of the program and would benefit from additional time there. (*Id.*) When the CSE convened on June 3, 2004 for P.K.'s annual review, representatives from Devereux recommended that P.K. remain in their program. (Hr'g Tr. 188.) District staff, however, recommended that P.K. enroll in the District's Keys to Emotional Awareness ("KEA") program, a therapeutic support program located at the District's Fox Lane High School ("Fox Lane"). (Ex. 7 at 5.)

KEA is designed to provide academic and emotional support in a closely supervised, therapeutic setting. (Hr'g Tr. 1386, 1514-17.) The program features two resource-room periods, which give students a "home base" in which they can find a safe environment, relax and seek academic support when necessary. (*Id.* 1460, 1515-16.) KEA serves students who suffer from anxiety, a lack of self-confidence regarding academics, depression and suicidal ideation, as well as students who have undergone psychiatric hospitalizations and are returning from out-of-District placements. (*Id.* 1459.) During the 2004-05 school year, the program featured two special classes,

---

[2] The Four Winds documents were from P.K.'s May 2003 hospitalization. (*Id.*) Plaintiffs told the CSE that they had not yet received a discharge summary following P.K.'s June hospitalization. (*Id.*)

two special educators, several teaching assistants and a full-time psychologist. (*Id.* 1515.)

Plaintiffs agreed with the District's recommendation, and P.K. enrolled in KEA during the 2004-05 school year. (*Id.* 1514.) Plaintiffs were eager to have P.K. return home, and they were encouraged by the fact that Dr. Christine Nichols, the KEA psychologist, had previously worked with P.K. at Four Winds. (Hr'g Tr. 183-84.)

P.K. began the 2004-05 year well. According to Mrs. K., he was "a model student," and plaintiffs were "thrilled" with his performance. (Hr'g Tr. 201.) Suzanne Hanna, a private therapist working with P.K., testified at the IHO hearing that from September 2004 through January 2005 P.K. did "very, very well." (*Id.* 844.) There is some indication, however, that P.K. began to engage in inappropriate behavior in November 2004. Sometime in that month Mrs. K. was called into school because P.K. had threatened to throw a potted plant at another person. (*Id.* 205.) Mrs. K. felt that P.K. had started to exhibit "old behaviors" again and was "agitated and acting out." (*Id.*) Plaintiffs informed the KEA team that P.K. would be resuming private psychiatric treatment and mood-stabilizing medication. (*Id.* 205-06.) The KEA team supported these decisions. (*Id.* 206.) On March 10, 2005 P.K. was suspended for one day for threatening another student. (Ex. 85.)

The CSE met for P.K.'s annual review on March 22, 2005. (Ex. 5.) Despite the incidents mentioned above, the Committee's outlook was positive. The general education and special education teachers present both reported that P.K. was doing well academically and making progress in KEA. (*Id.* at 4.) The psychologist reported that P.K. "has had a great year." (*Id.*) P.K. felt he was having "a good year," and plaintiffs said that they were "pleased with [P.K.'s] performance." (*Id.* at 5.) P.K. said that the KEA support services were working for him. (*Id.*) Based on these observations, the CSE recommended, with plaintiffs' agreement, that P.K. continue in KEA during

the 2005-06 school year. (*Id.* at 1.) The IEP called for P.K. to attend KEA Special Classes three times per day, individual counseling once per week and counseling in an integrated setting once per week. (*Id.*) The IEP also provided for certain testing accommodations, including flexible scheduling, flexible seating and use of a word processor for extended writing tasks. (*Id.* at 2.)

In March or April 2005, P.K.'s problems with drugs and alcohol resurfaced. (Hr'g Tr. 227, 850-51.) On April 29, P.K. received a one-day suspension from school for "[t]hreatening and antagonizing another student to fight." (Ex. 86.) According to Mrs. K., it was in May that P.K. "started to have trouble and it really escalated." (Hr'g Tr. 214.) Around this time, Mrs. K. spoke with Hanna and Dr. Nichols about P.K.'s substance abuse and behavioral problems. (*Id.* 210, 224.) Hanna and Dr. Nichols also spoke with each other about how to get P.K. through the end of the school year and the summer; they both agreed that a strong, structured intervention would be necessary. (*Id.* 852-53.) According to Mrs. K., both Hanna and Dr. Nichols expressed concern that "maybe KEA . . . was not working for P.K. any more." (*Id.* 210.)

Hanna believes that around the end of the school year and during the summer, P.K.'s substance abuse and problematic behavior "really escalated." (*Id.* 853.) Mrs. K. testified that during the summer "P.K. pretty much just started to fall apart." (*Id.* 487.) Plaintiffs found they could not control P.K., and his depression and mood instability increased. (*Id.* 227.) P.K. did not receive extended year services during the summer. (Ex. 5 at 1.)

P.K. began to struggle shortly after returning to school in September 2005. (Hr'g Tr. 231-32.) According to Hanna, P.K. began the year with "a very poor attitude" and did not do well behaviorally or academically. (*Id.* 806.) Denise Taylor, the new KEA psychologist, believed that P.K.'s substance abuse was causing his difficulties at school during this time. (*Id.* 1849.) In

September, P.K. was hospitalized again, this time at his request. (*Id.* 232.) According to Mrs. K., P.K. was "self-medicating again." (*Id.* 233.) Plaintiffs sent P.K. to Silver Hill Hospital ("Silver Hill"), which they selected for its drug-treatment program. (*Id.*) After P.K. had been at Silver Hill for a week, the staff there referred him to the Partial Hospitalization Program at Four Winds for treatment of his emotional and psychiatric problems. (*Id.* at 233-34.) Mrs. K. was in "constant contact" with Taylor throughout this time period. (*Id.* at 234.) Taylor provided Mrs. K. with the contact information for a substance-abuse counselor who worked at Fox Lane. (*Id.* 1852-53.)

P.K. was discharged from Four Winds on October 21. (Ex. 120.) He did not return to school immediately, however, although he was attending Alcoholics Anonymous ("AA") meetings. (Hr'g Tr. 1707.) Around this time, P.K. began to display increasingly aggressive behavior at home. He would yell and curse at his parents, push Mr. K., break things and throw objects around the house. (*Id.* 855-56.)

On November 1, plaintiffs met with the KEA team[3] to develop a plan for P.K.'s transition back to school. (*Id.* 1532-33.) P.K. would have a delayed start time so that he did not have to ride the school bus with all the other students (some of whom were considered bad influences), as well as an early dismissal time so that he could continue attending AA meetings. (*Id.* 1535.) The plan also called for increased adult supervision and support to help P.K. manage his drug and alcohol cravings. (*Id.* 1536.) The parties discussed ways in which P.K. could make up the schoolwork he missed while he was out of school. (*Id.* 1535-36.) On November 17, the CSE met and formalized the plan in P.K.'s IEP. (Ex. 3.)

---

[3] The KEA team at this time was made up of Taylor; Laurie Bauer, CSE Chairperson and Assistant Director of Special Education; and special education teachers Tony Monchinski and Kieran O'Gorman. (*Id.* 1533-34.)

P.K. returned to school on November 3. (Hr'g Tr. 1888.) At first, he showed a "very serious and directed focus" towards succeeding academically and behaviorally. (*Id.* 1864-65.) P.K. was doing some of his schoolwork, but also struggling with drug and alcohol cravings. (*Id.* 1864.) He had trouble concentrating and was often so tired in school that he put his head down to rest. (*Id.*; *id.* 2101.) According to O'Gorman, by December P.K. was "not producing" academically. (*Id.* 2103.) P.K. "had started to sleep a lot. He was not alert and much of his day was spent really just not engaging in school." (*Id.* 2101-02.) P.K.'s grades for the first quarter of the 2005-06 year consisted of two incomplete's, two F's and a 50. (Ex. 32.)

The extent to which P.K. was using drugs and alcohol in November and December of 2005 is unclear. According to Mrs. K., P.K. was attending AA meetings during this time and remained sober continuously for fifty days following the month of September. (Hr'g Tr. 240-41.) Plaintiffs were in regular contact with P.K.'s AA sponsor and drug-tested P.K. at home. (*Id.* 241.) Taylor testified that P.K. was not, to her knowledge, using drugs or alcohol during November and December. (*Id.* 1871.) But Hanna, P.K.'s private therapist, testified that P.K. was probably never sober for more than two or three days at a time, except when he was in the hospital. (*Id.* 842.) According to Hanna, P.K. was still drinking and using drugs, albeit less frequently, during the period of time that he was attending AA meetings. (*Id.* 841.)

It is undisputed that P.K. had relapsed into substance abuse by January 1, 2006. (Ex. 126 at 5.) A series of behavioral incidents followed, and after winter break ended P.K. attended school for only a few days before plaintiffs sent him back to Four Winds. (*Id.*) Sometime in early January, P.K. was arrested (outside of school) for his involvement in a knife fight, resulting in a felony charge. (Hr'g Tr. 252, 551-53.) On January 9, Monchinski called plaintiffs and asked them to pick

P.K. up at school because he was "totally out of control." (*Id.* 250-51.) P.K. had been "antagonizing and threatening another student." (*Id.* 250.) While being driven home by Mr. K., P.K. tried to jump out of the moving car. (*Id.* 251.) This incident occurred two days after P.K. told Mrs. K. that he had thought about strangling himself with a vacuum-cleaner cord. (*Id.* 252.) P.K. was admitted to Four Winds once again on January 9. The hospital records from this admission note that P.K. had been "[h]eavily indulging in substance abuse [and] stating he wanted to end life." (Ex. 120.)

By letter to Bauer dated January 12, 2006, plaintiffs requested a CSE meeting. (Ex. 95.) The letter states that P.K. was in "crisis" and that KEA was no longer meeting his educational needs. (*Id.*) Bauer requested that plaintiffs meet with her and the KEA team before a CSE meeting was held. (Ex. 101.) Plaintiffs met with Bauer and the KEA team on January 17. (Hr'g Tr. 1585.) At the meeting, plaintiffs informed the KEA team that they planned to enroll P.K. in the Ascent Wilderness Program ("Ascent") the following day. (*Id.*) Plaintiffs asked the KEA team to consider residential placement for P.K. (*Id.* 1587.) Bauer told plaintiffs that state regulations required plaintiffs to explore local network services before the District could consider recommending residential placement. (*Id.* 266-67.) Plaintiffs agreed to do so. (*Id.* 267.)

P.K. was transported to Ascent by private escort service on January 18. On February 15, plaintiffs attended a KEA meeting on the topic of network services. (Ex. 97.) Convinced that these services were not adequate to meet P.K.'s needs, plaintiffs requested another CSE meeting. (*Id.*) By letter dated February 23, 2006, plaintiffs notified defendant of their intent to place P.K. at Wisdom Ranch, a residential therapeutic school located in Idaho, and seek reimbursement from the District. (Ex. 101.) On March 1, P.K. was discharged from Ascent and transported to Wisdom Ranch. (Ex. 121D at 1-2.)

The CSE met on March 9.  (Ex. 1.)  In support of their request for residential placement, plaintiffs presented the Committee with four letters from professionals who had worked with P.K.: Hanna; Dr. Jeff Schroeder, a psychologist at Ascent; Scott Gillet, a social worker who was working with the K. family and Dr. George Uy, a psychiatrist.  (Exs. 34-37.)  Each of these letters expressed the opinion that P.K. could not succeed while living at home and attending a mainstream public school, and that a residential placement was necessary.  (*Id.*)  The CSE reviewed the events of the current academic year.  (Ex. 1 at 5.)  KEA staff members working with P.K. provided input.  (Hr'g Tr. 722.)  The Committee observed that during the 2004-05 school year, P.K. "had done very well in KEA" and "was considered a 'poster child' for the program."  (Ex. 1 at 5.)  During the 2005-06 year, as P.K. struggled with symptoms of drug withdrawal and suffered an eventual drug relapse, his "availability for learning decreased."  (*Id.*)  Plaintiffs did not inform the Committee of P.K.'s recent threats of self harm.  (Hr'g Tr. 717, 1932-33.)

A representative from Children's Mental Health Services provided information on network support services.  (Ex. 1 at 5.)  The CSE psychologist asked plaintiffs if they had ever considered "an intensive drug program . . . with follow up treatment and wrap around services" for P.K.  (*Id.* at 6.)  Plaintiffs replied that they had not.  (*Id.*)

The District's members of the CSE recommended that P.K. remain in KEA; plaintiffs disagreed.  (*Id.*)  The District staff found the letters from plaintiffs' outside professionals unpersuasive.  The staff was not convinced that the letter writers knew P.K. well enough to support their recommendations, or that they knew enough about KEA to judge its appropriateness for him. (Hr'g Tr. 1603-09; 1931-32.)  The staff also felt that the letter writers' recommendations were inconsistent with the staff's own observations and knowledge of P.K.  (*Id.* 2119-20.)  The staff noted

that P.K. had succeeded in KEA in the past during times that he was not abusing drugs or alcohol. (*Id.* 1609, 1930.) They believed that if P.K.'s substance-abuse problem could be brought under control, he would be successful in KEA once again. (*Id.* 2029.) After receiving a copy of P.K.'s March 9 IEP, plaintiffs wrote a letter to Bauer complaining of the CSE's "misguided focus on [P.K.'s] substance abuse and not his true disability . . . of emotional disturbance." (Ex. 105.)

On March 11, 2006, plaintiffs requested a due process hearing seeking tuition reimbursement for part of the 2005-06 school year. By letter dated June 16, 2006, plaintiffs informed the District superintendent that they would be keeping P.K. at Wisdom Ranch during the summer of 2006 and seeking reimbursement for the cost of the program. (Ex. 132.) The requests for reimbursement for 2005-06, summer 2006 and 2006-07 were later consolidated in one IHO proceeding. (IHO Op. at 5.)

The CSE reconvened on June 19, 2006 for P.K.'s annual review. (Ex. 126.) Plaintiffs presented the Committee with Dr. Schroeder's psychological evaluation of P.K. (*Id.* at 6; Ex. 123C.) Dr. Schroeder's report indicated that P.K.'s level of cognitive functioning fell within the average to superior range. (Ex. 126 at 6.) This was consistent with the District's testing results from 2003.[4] (*Id.*) Dr. Schroeder's report noted a gap between P.K.'s IQ and academic level that may have indicated a learning disability, but may also have indicated "the cognitive and motivation impediments of severe substance abuse." (Ex. 123C.) Dr. Schroeder recommended that P.K. be placed in a "long term structured residential treatment program." (*Id.*)

Plaintiffs also presented a letter from Dr. Uy, dated June 15, 2006. (Ex. 38.) In the letter,

---

[4] The minutes of the CSE meeting note that P.K. was unavailable for re-evaluation by the District and that plaintiffs did not plan to have P.K. return home in the near future. (*Id.*)

Dr. Uy explained that he had been treating P.K. for the past year and expressed the opinion that Wisdom Ranch was the type of therapeutic, closely supervised setting P.K. needed. (*Id.*) Dr. Uy "strongly" recommended that P.K. remain at Wisdom Ranch throughout the summer of 2006 and the 2006-07 school year. (*Id.*) During the meeting the Committee spoke with Dr. Uy by telephone regarding his recommendation. (Ex. 126 at 6.)

Once again, the CSE, with the exception of plaintiffs, recommended that P.K. remain in KEA based on the view that the program would be effective if P.K.'s substance-abuse problem were addressed. (*Id.*) The District staff also offered to explore local alternative day-treatment programs. (*Id.*) The staff did not agree with plaintiffs that P.K. needed extended-year services during the summer of 2006. (*Id.*) The staff reasoned that, since P.K. had not regressed at the beginning of the 2005-06 school year, there was no cause to believe that he would substantially regress over the summer of 2006. (*Id.*)

P.K.'s June 19, 2006 IEP reflects the District's recommendation that P.K. return to KEA for the 2006-07 school year and not receive extended year services during the summer of 2006. (*Id.* at 1.) The IEP calls for P.K. to be supported in his general education classes by a special education teacher or aide from the KEA team. (*Id.*) P.K. would receive individual counseling once a week and group counseling once a week. (*Id.*) He would also have counseling available to him on an as-needed basis. (*Id.*) P.K. would attend the KEA Special Class twice per day for forty minutes. (*Id.*) The IEP also called for a functional behavioral assessment.

In mid July 2006, P.K. was asked to leave Wisdom Ranch after being caught smoking and attempting to instigate conflict between dorms. (Hr'g Tr. 744-45; Ex. L.) P.K. was sent from Wisdom Ranch to the SUWS program, located in Idaho. (Ex. L.) P.K.'s SUWS program goals

included learning to "identify his maladaptive control patterns as they relate to interactions with the environment, self, others, and tasks" and learning to effectively manage his feelings and behavior. (*Id.*) P.K. spent the majority of his time at SUWS developing a strategy for a successful return to Wisdom Ranch. (*Id.*) The SUWS discharge summary notes that P.K. made "positive strides toward taking responsibility for his actions and past behaviors." (*Id.*) P.K. was discharged from SUWS on July 31 and returned to Wisdom Ranch. (*Id.*)

The IHO issued her decision on March 9, 2007. The IHO denied plaintiffs' request for tuition reimbursement, finding that the KEA program was appropriate to P.K.'s needs during the time periods in question and that Wisdom Ranch and Ascent were inappropriate. (IHO Op. at 32.) The SRO affirmed this decision in an opinion dated May 30, 2007. Plaintiffs filed their Complaint with this Court on October 1, 2007.

**DISCUSSION**

**I.    The IDEA**

**A.    Statutory Framework**

The IDEA represents "an ambitious federal effort to promote the education of handicapped children." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (internal quotation marks and citation omitted). In exchange for federal funding, the Act requires states to provide a "free appropriate public education . . . to all children with disabilities residing in the State between the ages of 3 and 21." 20 U.S.C. § 1412(a)(1)(A). A state satisfies the FAPE requirement by providing a disabled student with "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Bd. of Educ. v. Rowley*, 458 U.S.

176, 203-04 (1982) (interpreting the Education for All Handicapped Children Act, the precursor to the IDEA).

The IDEA calls for a "cooperative process . . . between parents and schools," and the IEP is central to that process.  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005); *see* 20 U.S.C. 1414(d).  The Act requires states to "identify and evaluate disabled children, develop an IEP for each one, and review every IEP at least once a year."  *Schaffer*, 546 U.S. at 53 (internal citations omitted).  The IEP must contain, *inter alia*:

> a statement of the child's present levels of academic achievement and functional performance . . . ; a statement of measurable annual goals, including academic and functional goals . . . ; a description of how the child's progress toward meeting the annual goals . . . will be measured . . . ; a statement of the special education and related services and supplementary aids and services . . . to be provided to the child . . . and a statement of the program modifications or supports for school personnel that will be provided for the child.

20 U.S.C. § 1414(d)(1)(A)(i).

Persons having input in the development of the IEP include the child's parents; at least one special education teacher of the child's; at least one regular education teacher of the child's; "a representative of the local educational agency who . . . is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities"; a person qualified to interpret evaluation results; other persons having knowledge of the child and, where appropriate, the child himself.  *Id.* § 1414(d)(1)(B).

The IDEA requires that disabled children be educated in the "least restrictive environment capable of meeting their needs."  *Walczak*, 142 F.3d at 132; *see also* 20 U.S.C. § 1412(a)(5).  This means that,

> [t]o the maximum extent appropriate, children with disabilities [should be] educated

13

> with children who are not disabled, and . . . removal of children with disabilities from the regular educational environment [should occur] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5).  Nevertheless, the Act recognizes the need to educate some children in more restrictive settings, such as "in the home, in hospitals and institutions, and in other settings."  *Id.* § 1401(29)(A); *see Walczak*, 142 F.3d at 122.  And when "placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child."  34 C.F.R. § 300.104.  But in light of the IDEA's "strong preference for 'mainstreaming'" children with disabilities, *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 108 (2d Cir. 2007), courts must "proceed cautiously" when considering residential placement, which is, "by its nature, considerably more restrictive" than local services.  *Walczak*, 142 F.3d at 132 (internal quotation marks and citation omitted).

To comply with the requirements of the IDEA, New York State has assigned responsibility for the development of IEP's to local CSE's.  *Id.* at 123 (citing N.Y. EDUC. LAW § 4402(1)(B)(1) (McKinney Supp. 1997-98)).  Under New York law, parents who are unsatisfied with a proposed IEP may challenge it in a due process hearing before an IHO.  N.Y. EDUC. LAW § 4404(1)(a); *see* 20 U.S.C. § 1415(f).  The parents may appeal an unfavorable IHO decision to an SRO, N.Y. EDUC. LAW § 4404(2); *see* 20 U.S.C. § 1415(g), and the SRO decision may be challenged in a state court of competent jurisdiction or U.S. District Court.  20 U.S.C. § 1415 (i)(2)(A).

### B.    Private Placement

Parents who believe that the state has failed to provide their disabled child with FAPE "may, at their own financial risk, enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." *Gagliardo*, 489 F.3d at 111; *see* 20 U.S.C. § 1412(a)(10)(C)(ii).   The parents will be entitled to reimbursement if they demonstrate that the district's proposed IEP was inappropriate to the child's needs and the private placement was appropriate. *Gagliardo*, 489 F.3d at 111-12; *Walczak*, 142 F.3d at 129.  Whether a proposed IEP is appropriate depends on two factors: whether the state complied with the IDEA's procedural requirements, and whether the IEP is "'reasonably calculated to enable the child to receive educational benefits.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206-07).

## II.    Standard of Review

This matter is now before us on the parties' cross-motions for summary judgment.  IDEA actions in federal court are often resolved through summary judgment based on the administrative record, but the standard of review is different from that applicable to summary judgment motions generally.  *See J.R. v. Bd. of Educ.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004) (Conner, J.).  In the IDEA context, the existence of a factual dispute does not defeat the motion.  *Id.*  Instead, the court "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence.'"  *Gagliardo*, 489 F.3d at 112 (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir. 1997)).

This "independent" review of the state administrative decision is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school

15

authorities which they review." *Rowley*, 458 U.S. at 206. "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129 (internal quotation marks and citations omitted). Courts must show "substantial deference to state administrative bodies on matters of educational policy," *Cerra v. Pawling Cent. School Dist.*, 427 F.3d 186, 191 (2d Cir. 2005), particularly where the administrative decision is careful and thorough. *Walczak*, 142 F.3d at 129.

III.    **Did the District Offer P.K. FAPE?**

Plaintiffs allege that the District denied P.K. FAPE during the 2005-06 school year, summer 2006[5] and the 2006-07 school year, and they seek tuition reimbursement for their unilateral private placement of P.K. during those times. (Complt. Prayer for Relief (b), (c)). In seeking this relief, plaintiffs challenge the March 2006 and June 2006 IEP's on both procedural and substantive grounds. (*See* Pls. Mem. Supp. Summ. J. at 42-47.)

_____

[5] Plaintiffs seek a declaration that the District denied P.K. FAPE during the summer of 2006 and reimbursement for P.K.'s summer 2006 residential placement. (Complt. Prayer for Relief (b)-(d)). The parties have not briefed the issue of P.K.'s entitlement to extended year services during that time. *See* 34 C.F.R. § 300.106(a)(1) ("Each public agency must ensure that extended school year services are available as necessary to provide FAPE . . . ."). As noted above, District staff recommended against extended year services because they were not convinced at the time that substantial regression was likely. (Ex. 126 at 6.) The SRO upheld this decision. (SRO Op. at 18-19.) The record shows this was a reasonable determination, and we affirm it.

A.    **Procedural Challenge**

Plaintiffs argue that the District violated the IDEA's procedural requirements in two ways. First, they claim that the District denied them the right to participate in the development of the March and June 2006 IEP's by ignoring their input at the CSE meetings; plaintiffs believe that the outcomes of those meetings were "pre-determined."[6]  (*Id.* at 42-43.)  Second, plaintiffs argue that the District relied on out-of-date information in developing P.K.'s March 2006 IEP.  (*Id.* at 43.)

The Second Circuit has stressed that the IDEA procedural inquiry is "no mere formality." *Walczak*, 142 F.3d at 129.  Rather, compliance with the Act's procedural requirements "is itself a safeguard against arbitrary or erroneous decisionmaking."  *Evans v. Bd. of Educ.*, 930 F. Supp. 83, 93 (S.D.N.Y. 1996) (internal quotation marks and citation omitted).  And the Supreme Court has observed that "the importance Congress attached to these procedural safeguards cannot be gainsaid. . . . [A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP."  *Rowley*, 458 U.S. at 205-06.  In assessing a school district's compliance with the IDEA's procedural requirements, the focus is on whether the parents were given an adequate opportunity to participate in the development of the IEP.  *See Cerra*, 427 F.3d at 192; *A.E. v. Westport Bd. of Educ.*, 463 F. Supp. 2d 208, 216-17 (D. Conn. 2006); *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 378-79 (S.D.N.Y. 2006); *Bruno v. Greenwich Bd. of Educ.*, 2006 U.S. Dist. LEXIS 1885, at *11 (D. Conn. Jan. 6, 2006).

Here, the SRO found that the District "considered input from [plaintiffs] and discussed program options for [P.K.]." (SRO Op. at 13.)  The record supports this finding.  During the March

_____

[6] The SRO noted that the record was unclear as to whether plaintiffs made this argument to the IHO, and that the IHO decision does not discuss it.  (*Id.*)  The SRO therefore concluded that the issue was not properly before him, but he decided to address it nonetheless.  (*Id.*)

9, 2006 CSE meeting, the Committee considered four letters from plaintiffs' outside professionals.[7] (Ex. 1 at 5-6; Exs. 34-37.)  The Committee also heard input from Mrs. K., who was present at the meeting.  (Ex. 1 at 5; Hr'g Tr. 1382, 1599.)  At the June 2006 meeting, the Committee spoke to Dr. Uy by telephone and reviewed his recent letter.  (Ex. 126 at 6.)  The Committee also reviewed Dr. Schroeder's evaluation.  (*Id.*)  At both meetings plaintiffs participated directly and provided information that the CSE considered.  The fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the IEP's, or that the outcomes of the CSE meetings were "pre-determined."  A professional disagreement is not an IDEA violation.

Plaintiffs next argue that the District violated the IDEA's procedural requirements by basing the March 2006 IEP on "out of date" documents.  (Pls. Mem. Supp. Summ. J. at 43.)  Plaintiffs claim that "[t]here was no current information before the CSE" during the March 2006 meeting, (*id.* at 7), and that the most recent information in P.K.'s file was close to three years old.  (*Id.* at 31.)

The District's social history, educational evaluation and psychological evaluation of P.K. all date to March 2003.[8]  (Exs. 20, 21, 22.)  But the suggestion that the District had no current

---

[7] As noted above, the District staff found these letters unpersuasive because each one either did not explain the basis for the writer's recommendation, did not show familiarity with KEA or conflicted with the District staff's observations of P.K.  A review of the letters shows that this was a reasonable finding.

[8] The IDEA requires disabled students to be reevaluated at least once every three years unless the parents and the local educational agency agree otherwise.  20 U.S.C. § 1414(a)(2)(B). P.K. was due for re-evaluation by March 12, 2006 (Ex. 16 at 1.)  Plaintiffs consented to the reevaluation in August 2005.  (Exs. 91, 92.)  The District was unable to complete the necessary testing, however, due to P.K.'s absence and eventual removal from Fox Lane during the 2005-06 year, as well as his frequent inability to focus when the District psychologist attempted to test him.  (Hr'g Tr. 2027-28.)

information about P.K. at the time of the March 2006 CSE meeting is simply incorrect.  P.K. attended Fox Lane during the 2004-05 school year and part of the 2005-06 year.  The District's staff had been working with P.K. and were familiar with him by the time of the March 2006 meeting.  The staff knew P.K.'s academic track record to that point.  Bauer had known him since 2003.  (Hr'g Tr. 1455.)  Plaintiffs note that the entire KEA team was replaced in May 2005 and that the new KEA team did not receive any records about P.K. from the old team.  But during the 2005-06 school year, the new KEA team worked directly with P.K. and had first-hand knowledge of his current academic and behavioral situation.  Taylor, the KEA psychologist, testified that she had enough information about P.K. at the start of the school year.  (Hr'g Tr. 1982.)  There was frequent contact between District staff and Hanna, P.K.'s private therapist.  And at the March 2006 CSE meeting, the Committee received input from P.K.'s special- and regular-education teachers, as well as plaintiffs and the outside professionals working with P.K.  (Ex. 1 at 5.)  Plaintiffs are unable to point to any provision of the IDEA or its implementing regulations that the District's reliance on this information violated, and no violation is apparent to the Court.

In his detailed and thorough opinion, the SRO found:

> [A]t the time that the March 2006 IEP was developed, [the District] had evaluated [P.K.] (although with limited success due to the student's inability to focus), reviewed prior educational records and his current report card, and gathered as much information as possible about him by soliciting parental input and taking information provided by petitioners about [P.K.] under consideration in forming its recommendations.  In light of the foregoing, I find that the March 2006 IEP was based on sufficient evaluative data.

(SRO Op. at 15 (internal citation omitted).)  The record supports this finding, and we affirm it.

B.    **Substantive Challenge**

A school district has complied with the IDEA's substantive requirements if the student's IEP is "'reasonably calculated to enable the child to receive educational benefit[s].'"  *Cerra*, 427 F.3d at 194 (quoting *Rowley*, 458 U.S. at 207) (brackets in original).  Those benefits must be "meaningful"; the IEP must offer the prospect of more than "trivial advancement."  *Walczak*, 142 F.3d at 130 (internal quotation marks and citations omitted).  A district meets this standard by providing an IEP that is "likely to produce progress, not regression."  *Id.* (internal quotation marks and citation omitted).  But a district is not "required to furnish every special service necessary to maximize each handicapped child's potential," *Cerra*, 427 F.3d at 195 (internal quotation marks and citation omitted), or to provide "everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (internal quotation marks and citation omitted).

"Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra*, 427 F.3d at 195.  Deference is likewise appropriate where, as here, the district court's review is limited to the administrative record on which the SRO based his decision.  *M.S. ex rel. S.S. v. Yonkers Bd. of Educ.*, 231 F.3d 96, 105 (2d Cir. 2000).  A court may not choose between the views of conflicting experts on matters of education policy, *see A.E.*, 463 F. Supp. 2d at 220, or "substitut[e] its judgment for that of the agency experts and the hearing officer" that it reviews. *Briggs v. Bd. of Educ.*, 882 F.2d 688, 693 (2d Cir. 1989); *see also Cerra*, 427 F.3d at 195; *M.S.*, 231 F.3d at 105. Instead, in determining whether a school district has met its obligations under the IDEA, a court must look for objective evidence in the record indicating whether the student would likely have progressed or regressed under the challenged IEP.  *See Cerra*, 427 F.3d at 196; *Walczak*, 142

20

F.3d at 120. When a child is being educated in mainstream classes, "the attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress." *Walczak*, 142 F.3d at 130.

Plaintiffs argue that the March and June 2006 IEPs were substantively inadequate because they did not provide for residential placement. (Pls. Mem. Supp. Summ. J. at 45.) The parties are in agreement that P.K. suffers from both an emotional disturbance (his IDEA classification) and a substance-abuse problem. It is the relationship between the two conditions that is the basis of their dispute. Plaintiffs argue that the District improperly sought to separate P.K.'s emotional disturbance from his substance-abuse problem. According to plaintiffs, the District failed to realize (or refused to acknowledge) that P.K.'s substance abuse was "an integral component of his disability" – that the two were "inextricably intertwined." (*Id.* at 5, 45.) Plaintiffs argue that, as a result of these interrelated conditions, P.K. could be effectively educated only in the structured environment of a residential program. (*Id.* at 45.) But the District recommended that P.K. remain in KEA based on the belief that the program would be effective if P.K. remained sober. (Hr'g Tr. 1654, 1929-30.) In plaintiffs' view the SRO erred by accepting this reasoning, which led him to view P.K.'s substance-abuse problem as "a 'medical' issue for which the District was not responsible." (Pls. Mem. Supp. Summ. J. at 45.)

The District recommended that P.K. remain in KEA during the 2005-06 and 2006-07 school years based on his success in KEA during the 2004-05 year, during which he was mostly sober. (Hr'g Tr. 1654, 1929-30, 2029.) When the CSE met on March 22, 2005, everyone agreed that P.K. was doing well. (Ex. 5 at 4.) The school psychologist reported that P.K. was having "a great year." (*Id.*) Plaintiffs were "thrilled" with his performance during the beginning of the year. (Hr'g Tr.

201.) But in March or April 2005, P.K. began using drugs, (Hr'g Tr. 227, 850-51) and by the end of the school year his drug use had "really escalated." (*Id.* 854.) Yet despite P.K.'s lapse into substance abuse towards the end, the year was a success academically. P.K. passed all his classes, earning two C's, seven grades in the B range and two A-minuses. (Ex. 123B.)

During the summer of 2005, P.K. used drugs and drank heavily. (Hr'g Tr. 854.) Shortly after returning to school in the fall, he was hospitalized as a result of his drug use. (*Id.* 232-33.) When P.K. was back in school during November and December, he was not productive academically. P.K. may or may not have been using drugs and drinking at this point,[9] but at the very least he was struggling with drug-withdrawal symptoms and cravings. (*Id.* 2123-24.) He had a drug relapse in January 2006, and plaintiffs removed him from Fox Lane, hospitalized him and sent him to Ascent and then to Wisdom Ranch. (Exs. 120, 121D.)

At the IHO hearing, Bauer explained why the District recommended residential placement for P.K. for the 2003-04 school year, but not 2005-06 or 2006-07. In 2003, P.K. had "a high level of fear" and a distorted sense of reality. (Hr'g Tr. 1811.) He had gone through recent family trauma in the form of his mother's diagnosis with cancer and the deaths of several close family members. (*Id.* 1811-12.) P.K. was exhibiting self-mutilating behaviors, and the CSE had received reports of suicidal ideation. (*Id.* 1812.) He also had trouble developing both peer and adult relationships. (*Id.*) P.K.'s substance abuse was not yet the major issue it would later become. (*Id.*)

In March and June 2006, by contrast, P.K. "was chemically and physically dependent and using multiple . . . illegal substances." (*Id.*) But despite the behavioral problems described above,

---

[9] As noted above, Mrs. K. believes that P.K. was continuously sober for fifty days at the end of 2005, but in Hanna's estimation P.K. was never sober for more than two or three days at a time. (Hr'g Tr. 240-41, 842.)

Bauer felt that P.K. had made "excellent connections" to adults and peers. (*Id.* 1812-13.)  P.K.'s thoughts were not "distorted" in 2006 the way the were in 2003. (*Id.* 1811.)  Although there had been signs of suicidal ideation in early 2006, plaintiffs did not inform the CSE about them. (*Id.* 717, 1812, 1932-33.)  Both Bauer and Dr. Jennifer Fields, Fox Lane school psychologist, recommended against residential placement in 2006 partly because local, less-restrictive substance-abuse treatment options had not yet been explored. (*Id.* 714, 1814.)  Bauer felt that KEA could not be deemed inappropriate until those local treatment options had been given a chance to work. (*Id.* at 1814.)  This approach was consistent with the IDEA's requirement that disabled children be educated in the least restrictive environment consistent with their needs. *See* 20 U.S.C. § 1414(a)(5); *Walczak*, 142 F.3d at 132.  Plaintiffs' contention that the District used the "same information" as the basis for recommending residential placement in 2003-04 and KEA thereafter is unfounded. (*See* Pls. Mem. Supp. Summ. J. at 27.)

In light of his track record, it was reasonable for the District to conclude that P.K. had been successful in KEA when he was sober, and that he would succeed in KEA in the future if he remained sober.  It was also reasonable for the District to attribute P.K.'s difficulties during the 2005-06 year to his substance abuse, and not to his disability or any shortcoming of the KEA program.[10]  To the question of how P.K. went from being the "poster child" for KEA one year to failing his classes and being removed from school the next, the unavoidable answer is drug and alcohol abuse.

As noted above, plaintiffs argue that P.K.'s disability and substance abuse were

---

[10] Dr. Schroeder, the Ascent psychologist who recommended to the CSE that P.K. remain in a residential program, testified that substance abuse was P.K.'s "primary problem" when he arrived at Ascent in January 2006. (Hr'g Tr. 1015.)

"intertwined." This argument could plausibly be advanced in most, if not all cases in which a student has both a disability and a substance-abuse problem. To accept it would be to hold that school districts must provide (or pay for) substance-abuse treatment for students who happen to be disabled. Nothing in the text of the IDEA suggests that Congress intended this result, which would add a significant financial burden to already heavily burdened public-school systems. Plaintiffs have not cited any case holding that the IDEA requires a school district to pay for private substance-abuse treatment, and we are not aware of any. Courts that have addressed the issue have reached the opposite conclusion, as do we. *See Blickle v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 1993 WL 286485, *9 n.10 (N.D. Ill. July 29, 1993); *Field v. Haddonfield Bd. of Educ.*, 769 F. Supp. 1313, 1327 (D.N.J. 1991).

But it is also worth noting that the District did, in fact, support plaintiffs' efforts to find local treatment options for P.K.'s substance-abuse problem. P.K. was given an early dismissal time so that he could attend AA meetings. (Hr'g Tr. 1538; Ex. 3 at 1.) The District brought in its own substance-abuse counselor to work with P.K. (Hr'g Tr. 1672.) The KEA team planned to provide P.K. with increased adult monitoring at school to help him control his cravings. (*Id.* 1536.) At the March 2006 CSE meeting, a representative from Children's Mental Health Services was on hand to provide plaintiffs with information about local network support services available to P.K. (Ex. 1 at 5.)

P.K. succeeded in the KEA program during the times that his substance-abuse problem was under control. While a residential placement may have been the most effective way to treat P.K.'s substance-abuse problem, that treatment was not the District's responsibility. We therefore find that the March and June 2006 IEPs, which called for P.K. to remain in KEA, were reasonably calculated

to allow him to achieve educational benefit. *See Cerra*, 427 F.3d at 194. We find that the District offered P.K. FAPE as required by the IDEA, and therefore we do not reach the issue of whether the private placements were appropriate. *See Walczak*, 142 F.3d at 129.

## CONCLUSION

For all of the foregoing reasons, the decision of the New York State Review Officer is affirmed. Defendant's motion for summary judgment is granted, and plaintiffs' cross motion for summary judgment is denied at moot. The Clerk's Office is directed to enter judgment in favor of defendant.

SO ORDERED.

Dated: White Plains, New York
        August 1, 2008

_____
Sr. United States District Judge

25